EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. NO.:  18-cv-11187

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

TIM BALLINGER,

        Plaintiff,

V.

TOWN OF KINGSTON, MAURICE J. SPLAINE,

and ROBERT H. FENNESSY, JR.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF MAURICE J. SPLAINE

Law Office of Joseph L. Sulman

391 Totten Pond Road, Suite 402

Waltham, Massachusetts 02451

December 13, 2018

10:08 a.m. - 3:50 p.m.

JENNIFER M. VAILLANCOURT,

Professional Shorthand Reporter

2

```
 1              APPEARANCES
 2  ON BEHALF OF THE PLAINTIFF:
    JOSEPH L. SULMAN, ESQ.
 3  Law Office of Joseph L. Sulman
    391 Totten Pond Road
 4  Suite 402
    Waltham, Massachusetts  02451
 5  617.521.8600
    jsulman@sulmanlaw.com
 6
 7
    ON BEHALF OF THE DEFENDANT:
 8  BRADFORD N. LOUISON, ESQ.
    Louison, Costello, Condon & Pfaff, LLP
 9  101 Summer Street
    Boston, Massachusetts 02110
10  617.439.0305
    blouison@lccplaw.com
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

```
 1                    INDEX PAGE
 2   DEPOSITION OF MAURICE J. SPLAINE
     EXAMINATION                              PAGE
 3   BY MR. SULMAN                             4
 4                  EXHIBIT INDEX
     EXHIBIT         DESCRIPTION              PAGE
 5   Exhibit 1   Employee list                29
     Exhibit 2   Collective bargaining agreement  39
 6   Exhibit 3   OSHA letter                  46
     Exhibit 4   Fax                          48
 7   Exhibit 5   E-mail                       52
     Exhibit 6   Post-shooting Incident Procedures  60
 8   Exhibit 7   Duties and responsibilities  62
     Exhibit 8   Task survey analysis         63
 9   Exhibit 9   Hearing transcript           68
     Exhibit 10  Internal investigation       72
10   Exhibit 11  Notice of disciplinary action  75
     Exhibit 12  Arbitration decision         77
11   Exhibit 13  Hearing transcript           78
     Exhibit 14  Answers to interrogatories   86
12   Exhibit 15  Statement transcript         90
     Exhibit 16  Notice of paid leave         93
13   Exhibit 17  March 21, 2017 medical note  102
     Exhibit 18  March 27, 2017 letter        103
14   Exhibit 19  April 3, 2017 letter         107
     Exhibit 20  Answers to interrogatories   107
15   Exhibit 21  Notice of sick leave         112
     Exhibit 22  Neurology evaluation         116
16   Exhibit 23  Order to provide medical     122
     Exhibit 24  Order to attend independent medical  130
17               exam
     Exhibit 25  Independent medical examination  132
18               report
     Exhibit 26  Grievance                    139
19   Exhibit 27  August 8, 2017 addendum      140
     Exhibit 28  September 11, 2017 addendum  143
20   Exhibit 29  Notice of injured-on-duty status  149
     Exhibit 30  Injured on duty policy       152
21   Exhibit 31  Position statement           153
     Exhibit 32  January 3, 2016 - July 2, 2016 shift  154
22               bid
     Exhibit 33  July 3, 2016 - December 31, 2016  156
23   Exhibit 34  E-mail                       158
     Exhibit 35  Retirement application       161
24   Exhibit 36  Supplemental information     163
```

4

1  DEPOSITION OF MAURICE J. SPLAINE

2  DECEMBER 13, 2018

3  PROCEEDINGS:

4        MR. SULMAN:  Counsel, before we

5  begin, can we agree to what's known as the usual

6  stipulations?

7        MR. LOUISON:  Yes.

8        MR. SULMAN:  That is we'll reserve

9  objections to form and motions to strike till trial.

10        MR. LOUISON:  Yes.

11        MR. SULMAN:  Does the witness want

12  30 days to read and sign?

13        MR. LOUISON:  Yes.

14        MR. SULMAN:  Waive notary?

15        MR. LOUISON:  Yes.

16        MAURICE J. SPLAINE, the deponent, having

17  been satisfactorily identified and duly sworn by the

18  Notary Public, was examined and testified as follows:

19        EXAMINATION

20        BY MR. SULMAN:

21    Q.   Sir, can you please state your name for the

22  record?

23    A.   It's Maurice, M-A-U-R-I-C-E, middle initial

24  is J as in Joseph, last name is Splaine,

5

1    S-P-L-A-I-N-E.

2        Q.    And, Chief, where do you reside?

3        A.    Town of Kingston.

4        Q.    Can you give your address?

5                    MR. LOUISON:  No.  I'm going to

6    object.  It's probably the only thing I'll object to,

7    but the statute provides that addresses of police

8    officers are not to be public record, so I don't want

9    to put it on there.

10                   MR. SULMAN:  That's fine.

11                   MR. LOUISON:  Kingston's good, and

12   I'll make sure that he appears for anything.

13                   MR. SULMAN:  Okay.  That's fine.

14                   MR. LOUISON:  Thank you.

15       Q.    Are you married, sir?

16       A.    Yes.

17       Q.    What's the name of your wife?

18       A.    Beth.

19       Q.    Any children?

20       A.    Yes.

21       Q.    And I don't need their names, but what are

22   their ages?

23       A.    24 and 22.

24       Q.    Do any of them live with you?

1    A.   Well, the oldest does.  The youngest will

2 next week.

3    Q.   For vacation?

4    A.   He will be graduating from college in

5 December -- well, December.

6    Q.   Good for him.  Good for you.  Good for him?

7 Him?

8    A.   Yes.

9    Q.   Is this your first wife?

10    A.   Yes.

11    Q.   How long have you been married?

12    A.   Since -- well, I got to do the math, since

13 1991.

14    Q.   What's your date of birth?

15    A.   2-10-63.

16    Q.   Have you ever had your deposition taken

17 before?

18    A.   I've been at depositions, yes.

19    Q.   Have you ever given a deposition before?

20    A.   Yes.

21    Q.   So you probably know the process, but let me

22 just go over it a little bit.  As you know, I

23 represent Tim Ballinger in a lawsuit against you and a

24 former town manager Mr. Fennessy and the Town of

7

1   Kingston about certain allegations.

2            So the process here is I'm going to ask you

3   some questions, and you've taken an oath to answer the

4   questions truthfully to the best of your ability, is

5   there anything today that may prevent you from doing

6   that?

7       A.   No.

8       Q.   It's important that you answer all those

9   questions verbally rather than with a head nod or head

10  shake or anything nonverbal because the court reporter

11  here is taking everything down.  Is that okay?

12      A.   Yes.

13      Q.   It's also very important that you understand

14  the questions I ask, so if I ask a question and it's

15  unclear, either because I mumble or it's just a

16  confusing question, please ask me to rephrase it.

17  Otherwise, it will appear in the transcript that you

18  understood the question.  Okay.

19      A.   Okay.

20      Q.   Also, it's very important that we don't

21  speak over each other, so please let me ask my

22  question to the punctuation, and in turn I will do my

23  best to let you finish your answer fully to the

24  period.  Okay.

8

1    A.    Okay.

2    Q.    Good.

3          If you need to take a break for any reason,

4    stretch your legs, use the restroom, speak to your

5    attorney, that's fine.  I just ask that if there's a

6    question pending, you need to answer the question

7    first before taking a break.  Okay.

8    A.    Understood.

9    Q.    Have you ever been a party to a lawsuit

10   other than in your capacity as a member of the police

11   department?

12   A.    No.

13   Q.    Other than in matters involving Susan

14   Munford or Tim Ballinger, have you ever been a party

15   to a lawsuit?

16   A.    No.

17   Q.    Have you ever given testimony in court other

18   than in matters -- in matters concerning police

19   department matters?

20   A.    I don't understand what you're.

21   Q.    So I assume as a police officer, you've

22   given testimony in court; right?

23   A.    That's correct.

24   Q.    Have you ever given testimony in court as a

9

1    private citizen?

2         A.    No.

3         Q.    And when did you start working for the

4    Kingston Police Department?

5         A.    1988 I was appointed as a civil service

6    permanent intermittent police officer.

7         Q.    Was that from a civil service list?

8         A.    Yes.

9         Q.    Was that your first police job?

10        A.    Yes.

11        Q.    What did you do before that?

12        A.    I went to college and I worked part-time

13   jobs.

14        Q.    Where did you go to college?

15        A.    Boston College.

16        Q.    When did you graduate?

17        A.    1985.

18        Q.    What was your degree in?

19        A.    Political science.

20        Q.    And where did you graduate high school?

21        A.    Silver Lake Regional High School.  That's in

22   Kingston.

23        Q.    Is that a technical high school?

24        A.    No.

1    Q.    Is that the Kingston Public High School?

2    A.    Well, it's -- at the time, it was a

3  four-town regional school that consisted of the towns

4  of Kingston, Pembroke, Halifax, and Plympton.

5    Q.    Is it still around?

6    A.    It still is, but Pembroke left the region,

7  and they have their own school system now.

8    Q.    So it's a regional high school.

9    A.    Yes, it is.

10    Q.    Is it where high school students in Kingston

11  go?

12    A.    Yes.

13    Q.    How long were you a permanent intermittent

14  at Kingston before you became full-time?

15    A.    I was appointed as a full-time permanent

16  intermittent officer in 1990, and then in 1991 I

17  became a full-time civil service patrol officer.

18    Q.    What's the difference between full-time

19  intermittent and simply a permanent intermittent?

20    A.    Permanent intermittent you're basically an

21  employee at will.  You work when they call you, then

22  an opening developed in 1990, and they decided to fill

23  it at that time with a full-time permanent

24  intermittent officer.  I think it was a budgetary

11

1    decision.

2        Q.    And as a full-time permanent intermittent,

3    are you working a regular shift?

4        A.    Regular 40-hour shift, yes.

5        Q.    Are you a member of the union?

6        A.    No.

7        Q.    Did you attend the academy at that point?

8        A.    I attended the -- well, the reserve academy

9    would have been prior to that, but, you know, the

10   full-time academy back then -- back then they used to

11   get waivers where they were postponed by your

12   attendance.

13          I went to the -- I ended up getting laid off

14   in 1992 due to lack of funds, rehired in 1993, and

15   that's when I went to the academy.

16       Q.    So you went to the reserve academy in 1988.

17       A.    Yes.

18       Q.    And you were hired as a full-time in '91 but

19   laid off in '92.

20       A.    That's correct, and rehired in '93.

21       Q.    And then the academy then was --

22       A.    Was in '93.

23       Q.    Okay.  Was there any break in your

24   employment since 1993?

12

1    A.    No.

2    Q.    Who was the police chief in Kingston in

3  1993?

4    A.    Michael DeCapua.

5    Q.    Can you spell that for me?

6    A.    Michael I can, M-I-C-H-A-E-L, and DeCapua,

7  D-E, capital C, A-P-U-A, something like that.

8    Q.    What was the next change in your position

9  after you left the academy?

10   A.    In 1996, I was appointed as the DARE

11 officer.  I held that position for 10 or 11 years.

12 1996 I was also promoted to a provisional sergeant.

13 In 1998 --

14   Q.    Can I stop you there for a second?

15   A.    Yeah.

16   Q.    You said you held the position of DARE

17 officer for how long?

18   A.    It was either 10 or 11 years.

19   Q.    And was that continuous?

20   A.    Yes.

21   Q.    You didn't switch positions.

22   A.    I would have switched positions, but I

23 maintained being the DARE instructor.

24   Q.    And was that full-time?

1        What I mean is every day you went to work,

2   were you the DARE officer?

3       A.   No.  It was basically a -- one or two days a

4   week I would go to the school.

5       Q.   Was it -- is the DARE officer the same thing

6   as a school resource officer or is it different

7   positions?

8       A.   Kind of back in the day it was.  It was

9   basically community relations, teach the kids about,

10  you know, dangers of alcohol, tobacco products, that

11  type of thing.

12        There was a lot of social type of work,

13  teaching the kids how to get along, conflict

14  resolution, that type of thing.

15      Q.   Is that the job that has now morphed into

16  the school resource officer?

17      A.   Not really.  The DARE officer was aimed at

18  the elementary school kids.  The school resource

19  officers now are aimed towards the middle school and

20  the high school.

21      Q.   Are those two jobs separate now?

22      A.   The DARE officer position's gone.

23      Q.   Is there a school resource officer position

24  in Kingston?

14

1    A.   Yes.

2    Q.   Is that a full-time position?

3    A.   Yes.

4    Q.   Like, it's every day you do that?

5    A.   Well, there is another person that does it,

6  yes.

7    Q.   That's what I'm saying, and every day he

8  does it.

9    A.   Yes.  That just went into effect this last

10 August.  Prior to that, it was done on a part-time

11 basis.

12   Q.   Is that a five and two schedule for him?

13   A.   Yes.

14   Q.   So it needs to be because it's at the

15 school; right?

16   A.   Yes.

17   Q.   When I say five and two --

18   A.   I know what you mean.

19   Q.   -- that -- you know what I mean, but the

20 reader won't.

21        Five and two meaning it's five days on

22 during Monday through Friday and then the weekends

23 off?

24   A.   That's correct.

1    Q.    And you say that became a full-time position

2 last August.  You mean August 2017?

3    A.    No.

4    Q.    You mean this most recent August?

5    A.    Yeah, four months ago.

6    Q.    Who holds that position now?

7    A.    Richard Allen.  Allen is spelled A-L-L-E-N.

8    Q.    So that position can be patrol or sergeant.

9    A.    Yes.

10    Q.    And Mr. Allen is a patrol officer.

11    A.    That's correct.

12    Q.    So going back to your job, you said in 1996

13 you became the DARE officer.

14    A.    That's correct.

15    Q.    And at some point, you were promoted to

16 provisional sergeant.

17    A.    That's correct.

18    Q.    When was that?

19    A.    Again, in 1996.

20    Q.    And provisional means, it wasn't from a

21 test; right?

22    A.    Well, it was from a test, but -- and it was

23 from the civil service list, but the department at

24 that time decided they wanted to have lieutenants'

16

1    positions, so they made provisional lieutenants, and I

2    ended up filling a provisional sergeant's position.

3           And when the next test came out in 1998,

4    that's when I was made a full-time sergeant because

5    they're -- you know, the provisional lieutenants ended

6    up becoming the, you know, full-time lieutenants.

7        Q.    Who was the chief at the time you became

8    full-time sergeant?

9        A.    Gordon, last name is Fogg, F-O-G-G.

10       Q.    What was the next change in your position?

11       A.    2001, I became the detective sergeant, and

12   in 2004 --

13       Q.    Can I stop you there?

14       A.    Okay.

15       Q.    When you're a detective sergeant, are you

16   assigned to the detective division?

17       A.    Yes.

18       Q.    Who was in charge of the detective division?

19       A.    I would have been.

20       Q.    So there's no lieutenant in charge of it.

21       A.    That's correct.

22       Q.    Was Fogg still the chief at the time?

23       A.    Yes.

24       Q.    What was the next change in your assignment?

1      A.     In 2004, I was promoted to lieutenant.

2      Q.     Full-time?

3      A.     Yes.

4      Q.     From -- and is lieutenant civil service in

5   Kingston?

6      A.     Yes.

7      Q.     Is it a bargaining unit?

8      A.     No.   They -- they kind of treat it as a

9   bargaining unit, but it's basically two independent

10   contracts that are kind of negotiated as a bargaining

11   unit, but they're not 150E employees.

12      Q.     So there's two lieutenants in Kingston.

13      A.     That's correct.

14      Q.     And they have individual contracts.

15      A.     They have the same contract, but they're --

16   they're identical to each other.

17      Q.     So they each have a contract, but it's the

18   same contract.

19      A.     Yes.

20      Q.     And there's no deputy chief or captain.

21      A.     No.

22      Q.     Has there ever been?

23      A.     No.

24      Q.     Who was the other lieutenant at the time you

1  became lieutenant?

2      A.    Thomas Kelley.

3      Q.    And was Fogg the chief at the time?

4      A.    Yes.

5      Q.    And then what was the next change in your

6  position or assignment?

7      A.    2013 I became the chief of police.

8      Q.    And is that when -- or is that because chief

9  Fogg retired?

10     A.    No.  In 2004, Chief Fogg retired around

11  September or so.  Lieutenant Kelley was named the

12  interim chief, but he didn't want the full-time

13  position.

14     Q.    He passed it up.

15     A.    It wasn't -- he didn't even apply for it.

16  He didn't want it, and they hired a member from

17  outside the department.

18     Q.    Who did they hire?

19     A.    Joseph J. Rebello, R-E-B-E-L-L-O.

20     Q.    Where did he come from?

21     A.    Like, everywhere.  The position prior was

22  from the Massachusetts Town of Stow, but he held the

23  chief of police positions in multiple communities

24  before that.

1  Q.  In Massachusetts?

2  A.  Yes.

3  Q.  And how long was Rebello chief?

4  A.  He was the chief from 2005 to 2013.

5  Q.  And other than you and Lieutenant Kelley,

6 did anyone else serve as lieutenants under Chief

7 Rebello?

8  A.  No.

9  Q.  And why did Rebello leave the position as

10 chief, as far as you know?

11  A.  Age, age and years.

12  Q.  Just retired?

13  A.  Yes.

14  Q.  Was it completely voluntary?

15  A.  Yes.

16  Q.  How did you get along with him?

17  A.  Very well.

18  Q.  Now, is the chief position in Kingston civil

19 service?

20  A.  No.

21  Q.  And what was the process of you becoming

22 chief?

23    Was it an assessment center, simply an

24 interview?

1          What was it?

2     A.    They interviewed four candidates in open

3 session of the board of selectmen's meeting.

4     Q.    Any other internal candidates?

5     A.    Yes.

6     Q.    Who else?

7     A.    They were all internal candidates.

8     Q.    All internal.  Okay.

9          Was Lieutenant Kelley one of them?

10    A.    Yes.

11    Q.    So at that time, he decided to apply.

12    A.    Yes.

13    Q.    What was -- Strike that.

14         Who else was a candidate?

15    A.    James Sauer, S-A-U-E-R, he was a sergeant,

16 Robert C. Wells, W-E-L-L-S, he was a sergeant,

17 Lieutenant Kelley, and myself.

18    Q.    And were there any tests, written tests for

19 anything?

20    A.    No.

21    Q.    Other than the interview with the selectmen,

22 what other steps did the selection process entail?

23    A.    I wouldn't know.  I just know we had an open

24 interview in open forum public meeting.  I don't know

what other criteria the board of selectmen set.

Q.   Did you have to fill out any application or write anything?

A.   A cover letter and resume.

Q.   You didn't have to write up any type of vision or anything like that.

A.   No.

Q.   And as far as you know, were you the number one choice by the selectmen?

A.   Well, I got the job.  It was originally a two to two vote out of a five-member board.  One person had to abstain.

Q.   Who was that?

A.   Sergeant Susan Munford who sat on the board of selectmen.

Q.   She abstained.  Okay.

Because she was a member of the department?

A.   Yes.

Q.   At that time, was there any ongoing dispute between she and you?

A.   No.

Q.   Were the two votes that were against you in favor of one other candidate?

A.   Yes.

22

1      Q.    Who was it in favor of?

2      A.    Robert Wells.

3      Q.    Do you know how the tie was broken?

4      A.    They -- one of the members switched the

5    vote.

6      Q.    Do you know who that was?

7      A.    The chairman of the board switched his vote

8    from Robert Wells to me.  His name was Joseph Casna,

9    C-A-S-N-A.

10      Q.    C-A-S-N-A?

11      A.    That's correct.

12      Q.    Do you know why he switched his vote?

13      A.    I don't.

14      Q.    Did you ever ask him?

15      A.    No.

16      Q.    At the time of this vote, did you and Susan

17    Munford have a cordial -- well, strike that.

18            At the time of this vote, was there any

19    animosity or any ill will between you and Susan

20    Munford?

21      A.    No.

22      Q.    Going back to you becoming lieutenant, can

23    you describe all your duties and responsibilities as

24    lieutenant?

1     A.    Whatever the chief advised me to do.  I was

2  in charge of the maintenance of the building,

3  maintenance of the cruisers, the budget, you know,

4  personnel issues, in charge of radios, liaison with

5  the schools, I mean.

6     Q.    Well, so let me maybe ask you a different

7  question.  There were two different lieutenants, you

8  and Lieutenant Kelley.

9     A.    That's correct.

10    Q.    Was there a division of responsibility

11  between you and Lieutenant Kelley?

12    A.    Basically, he was in charge of the

13  personnel, and I was in charge more of administrative

14  duties.

15    Q.    So in terms of oversight of patrol

16  sergeants, would that be Lieutenant Kelley?

17    A.    Day-to-day operation, yes.  Yeah.

18    Q.    In terms of oversight of payroll, that would

19  be more you.

20    A.    I don't understand that type of a question.

21    Q.    Well, you said in charge of administrative

22  duties.  What fell under -- what fell under the

23  responsibility of administrative duties?

24    A.    Budgeting and scheduling.

24

1    Q.    What about sick leave issues, things like

2 that?

3    A.    Usually that would be something reserved for

4 the chief, but I would have input in it.

5    Q.    What about maintenance of records, when, you

6 know, sworn members were going out on sick leave and

7 things like that?

8    A.    It -- it -- it changed at different time

9 periods.

10    Q.    And how did it change?

11    A.    Originally, if we're talking about injured

12 on duty, that originally was managed through the

13 selectmen's office through the town administrator.

14         And that changed, I believe, in 2008 when

15 there was a lack of real oversight from the board of

16 selectmen's office.  Chief Rebello wanted it handled

17 in-house at the police station.

18    Q.    Well, so how would members of the department

19 know that it was handled by the selectmen's office?

20    A.    I don't know what they knew.

21    Q.    Well, so if a member sent -- I guess what

22 I'm saying is, if a member was out on -- did you call

23 it IOD or 111F or what would you call it?

24    A.    Well, it's all inclusive, yes.

25

1    Q.    Well, I'm trying to understand the

2   terminology you would use with members.  Would you say

3   --

4    A.    You could be injured on duty.

5    Q.    Okay.  Injured on duty.

6    A.    And if they met the criteria, that there was

7   an injury on duty that was no fault of their own, they

8   could be placed on, you know, 111F, and they would get

9   their pay without having -- with -- with tax relief.

10    Q.    Yeah.

11        So I'm just trying to figure out, if a

12   member has an injury and wants to send in a form

13   before 2008, would -- where would -- as far as you

14   know, where would they send the form in?

15        Would they send it to the department or to

16   the town hall?

17    A.    They wouldn't send us any forms.  Basically,

18   what would happen is that when the injury occurred,

19   the injured officer would have to, you know, notify

20   their supervisor.

21        They would have to file a report.  They

22   would have to go down to the hospital and be checked

23   out by a physician.

24        Any paperwork they got from the initial, you

1  know, exam by the emergency room doctor, they would

2  bring back to me at the police station.

3        I would then forward that to the person at

4  town hall who was an administrative assistant in the

5  board of selectmen's office, and that's basically the

6  last I saw of anything.

7        If during the course of the period they were

8  out, the officer sometimes will bring me an out of

9  work note, and I would forward that to town hall as

10 well.

11       The police department never maintained any

12 medical records.  I don't even believe town hall

13 maintained them.  The Town of Kingston hired a vendor

14 to administer IOD claims.

15    Q.   What was the vendor's name?

16    A.   At that time, it was Cabot Risk I believe or

17 Cabot -- Cabot Risk I believe it was, and they would

18 be the IOD claims administrator.

19       They would be, you know, the company that

20 would make sure that if the officer needed some type

21 of medical treatment, that it was medically necessary,

22 they would negotiate, you know, a -- a pay schedule

23 with the medical provider, and then they would be the

24 ones that administered bills and cares.

27

1          The next usually correspondence that the
2    department would get would just be that the person
3    could return back to work without restrictions.
4          Q.   So a return to work from the doctor, that
5    would be sent to you.
6          A.   But that's all it would say.  It would be a
7    one sentence usually on a -- on a form, and it usually
8    would be combined on the same type of form that would
9    say, you know, the person is out of work until such
10   and such a date, the person could come back and do
11   modified work or, you know, the person can come back
12   to work without restrictions.  That's usually as much
13   detail as we would get.
14         Q.   Well, I mean, what happened if you got more
15   detail?
16         A.   We wouldn't.
17         Q.   Well, you said you wouldn't.  What happened
18   if you would get more detail?
19         A.   That's speculative.  It didn't happen, I
20   mean.
21         Q.   How big is the department today, sworn
22   members?
23         A.   There's 25 sworn members.
24         Q.   Is that who are employed today or is that

28

1   the positions that are allocated?

2       A.    There's actually 24 positions right now that

3   are filled, and there's one position that's open.

4       Q.    And what rank is that?

5       A.    It would be a sergeant's opening.  It's the

6   Susan Munford position.  It's still in litigation.

7       Q.    And so can you tell me the names of all the

8   positions that are allocated, sworn positions?

9       A.    There would be one chief, two lieutenants.

10      Q.    Yeah.

11      A.    Six sergeants.

12      Q.    Yeah.

13      A.    15 patrolmen.

14      Q.    And right now, there are actually serving 15

15  patrolmen, five sergeants, two lieutenants, and one

16  chief.

17      A.    Actually, there's four sergeants right now.

18      Q.    So there's only 23 positions filled.

19      A.    No.  There's an extra patrol position right

20  now.  I have two individuals in the police academy

21  right now, and, hopefully, when they graduate in the

22  spring, I'll be able to reinstate some sergeants'

23  positions.

24      Q.    Do you mean you are going to make a

29

1    promotion from patrol to sergeant?

2        A.    Yes.

3        Q.    Is there a sergeants' list right now?

4        A.    Yes.

5        Q.    So how many officers are serving as patrol

6    right now?

7        A.    I'm not good at math.  It's either 16 or 17.

8        Q.    Either 16 or 17 are serving as patrol right

9    now?

10       A.    Excuse me.

11       Q.    Either 16 or 17 are serving as patrol right

12   now.  This might make it easier.

13                    (Exhibit-1, Employee list, marked

14   for identification.)

15       Q.    Sir, I've handed you what's been marked as

16   Exhibit 1 to your deposition.  I'll represent to you

17   this is a page from the Kingston Police Department

18   website I downloaded, I believe, yesterday.  Do you

19   recognize this?

20       A.    (Deponent viewing document.) No, but it's

21   not accurate.

22       Q.    Well, I'm sure it's not.  It's dated

23   September 6, 2017 at the bottom.

24                    Have you been on the Kingston Police

1   Department website recently?

2       A.   No.

3       Q.   Well, again, I'm representing to you this is

4   what I downloaded from the website yesterday.   Is this

5   a roster from the website of --

6       A.   (Deponent viewing document.) Yes.

7       Q.   -- of members of the police department as of

8   September 6, 2017?

9       A.   (Deponent viewing document.) Yes.

10      Q.   So can you update this roster as of today?

11      A.   (Deponent viewing document.) Yes.

12      Q.   So looking at the top, administration -- and

13  we can ignore the nonsworn officers, the nonsworn

14  employees -- you're still the police chief, and Thomas

15  Kelley is still the lieutenant; right?

16      A.   (Deponent viewing document.) That's correct.

17      Q.   The criminal investigation bureau is Robert

18  Wells, lieutenant, and Ryan Calter and Michael Skowyra

19  still in the bureau?

20      A.   (Deponent viewing document.) Yes.

21      Q.   And is Officer Calter and Officer Skowyra,

22  are those patrol officers?

23      A.   Yes.

24      Q.   Now, under sergeant, Sergeant Ballinger has

1   been voluntarily retired by the -- by Kingston; right?

2        A.   I believe they refer to it as an involuntary

3   accidental disability retirement.

4        Q.   Now, are the remaining four sergeants the

5   four sergeants you just mentioned?

6        A.   (Deponent viewing document.) Yes.

7        Q.   That's Sergeant Potrykus, P-O-T-R-Y-K-U-S,

8   Sergeant Morgan, Sergeant Bateman, and Sergeant Sauer;

9   correct?

10        A.   (Deponent viewing document.) That's correct.

11        Q.   And they're still serving.

12        A.   That's correct.

13        Q.   Now, the patrol officers below that, I don't

14   need to name them all, are they all serving as patrol

15   offices?

16        A.   (Deponent viewing document.) The top one is

17   no longer there.  He too is retired on an involuntary

18   disability retirement.

19        Q.   And when did he retire?

20        A.   I believe I got the notification it was

21   either in January or February of '18.

22        Q.   And it was -- you said it was in -- was it

23   involuntary?

24        A.   Yeah.  That's what -- that's what the

32

1    process is called, yes.

2        Q.   You said --

3        A.   If the employee --

4        Q.   I'm sorry.

5             You said you got the notification, meaning

6    notification that it was final.

7        A.   That it was final, yes.

8        Q.   When did you initiate it?

9        A.   I believe March of 2017.  It takes almost a

10   year to process a claim.

11       Q.   Other than that officer, are the remaining

12   sworn officers current?

13       A.   They are all there.  Then there would be two

14   additions, would be the two people that are in the

15   recruit academy.

16       Q.   And what are their names?

17       A.   Martin McDonald, M-C-D-O-N-A-L-D, and then

18   Zachary, last name is Francis, F-R-A-N-C-I-S.

19       Q.   Thank you.

20            And how do you pronounce the patrol officer

21   who's listed first on this page?

22            How do you pronounce his last name?

23       A.   (Deponent viewing document.) Silva.

24       Q.   Silva.  Okay.

1      A.    S-I-L-V-A.

2      Q.    Okay.  I think it's -- I couldn't tell.

3            Now, was his involuntary retirement

4   application sent to the board of selectmen; do you

5   know?

6      A.    Yes.  Yes.

7      Q.    The whole thing?

8      A.    Yes.

9      Q.    With the medical -- all the medical

10  information?

11     A.    I don't know what medical information would

12  be disseminated to the board of selectmen.  I -- I

13  don't believe they get the whole packet.

14           I mean, the packet is prepared by our labor

15  counsel.  I don't know if he e-mailed the board of

16  selectmen the entire packet or just that the

17  disability retirement had been, you know, processed.

18  I just don't know.

19     Q.    Okay.  What are the various special

20  positions that are available to patrol officers?

21     A.    They just signed a new collective bargaining

22  agreement, and I -- off the top of my head, I don't

23  know them all.  There's, like, 10 new positions that

24  they just negotiated.

1    Q.    Are they different than the old positions?

2    A.    Yes.  They added some.

3    Q.    Are they the same as in the sergeants'

4  contract?

5    A.    Both contracts are basically identical, and

6  they both have clauses in them that say there's

7  management rights, that I can make, you know, a

8  patrolman or a sergeant, assign them a specialty

9  assignment.

10         And it says, basically, a specialty

11  assignment could be from the patrol contract, from the

12  sergeants' contract, or neither.

13    Q.    And the specialty positions are the same for

14  patrol or sergeant.

15    A.    There's more in the patrolman contract now.

16    Q.    Is canine officer one?

17    A.    Yes.

18    Q.    And what is --

19    A.    I believe that's only in the patrol

20  contract.

21    Q.    And what is a canine officer position?

22    A.    It's basically a patrolman position who

23  works a four and two work schedule but has a dog.

24    Q.    And it's a specially trained dog; right?

35

1       A.    Yes.

2       Q.    Does that -- does that canine officer have

3   any specialized duties because he has the specially

4   trained dog?

5       A.    He could be called out for -- you know, on

6   an as-need basis if they needed, you know, a dog for

7   tracking or, you know, lost child or something like

8   that.

9             But, you know, you know, they all basically

10  have the same, you know, duties and assignments.  They

11  have to, you know, do the essential functions of

12  patrol.  They have to be able to do that before they

13  can do a specialty position.

14      Q.    We talked about school resource officer

15  before; correct?

16      A.    Yes.

17      Q.    Is that a patrol or a sergeant or just a

18  patrol officer?

19      A.    I believe that's just in the patrol

20  contract.

21      Q.    And that's a five and two schedule; right?

22      A.    It is now, yes.

23      Q.    And what are the duties and responsibilities

24  of a school resource officer?

1    A.   It's kind of a -- a detailed duty

2  description where he acts as, like, the liaison

3  officer between the school and the police.  He offers

4  guidance.  He'll assist with teaching of classes.

5        They try to steer clear of using the school

6  resource officer as any type of, like, disciplinarian.

7  That should be a school function, not a police

8  function.

9        He does community outreach with the students

10  and parents.  He'll, you know, attend different school

11  events.  It's a rather lengthy, you know, job duty

12  description.

13    Q.   Is there a document that describes the job?

14    A.   Probably there is, yes.  He -- he went to

15  the training for a school resource officer, and I know

16  that he has a plethora of documents that he obtained

17  from that training.  It was a one-week 40-hour

18  training school.

19    Q.   And when did he attend this?

20    A.   He attended it in August.

21    Q.   And this is Officer Allen.

22    A.   That's correct.

23    Q.   Do you recall any of those specialty

24  positions in the patrol officer contract?

37

1      A.   I believe the specialty positions are

2  detective, prosecutor, school resource officer,

3  canine.

4           Then there are -- the ones that were just

5  added were part-time specialty positions, which were

6  very generous with -- you know, that were just given.

7  It was, like, if they had an assignment with SEMLAC

8  which is the Southeastern Mass.

9      Q.   It's a SWAT team.

10     A.   Well, it does more than SWAT.  It's a

11 regional law enforcement group that we're part of.

12 They do search and rescue, SWAT, motorcycle.

13          The school resource officer is part of the

14 division.  The detectives are part of a division, so

15 it's very comprehensive.

16     Q.   It stands for Southeastern Massachusetts Law

17 Enforcement.

18     A.   Council.

19     Q.   Council.  Okay.

20          So it's not just a SWAT team.

21     A.   That's correct.  SWAT is just one component

22 or one area of service that is available or members

23 could be part of.

24     Q.   So you can be a member of SEMLAC but not --

38

1    have nothing to do with the SWAT team.

2         A.    That's correct.  They could be on the search

3    and rescue team.  They -- like I said, they could be

4    in the detective unit.  School resource officers have

5    their own unit.  It's, you know, rather comprehensive.

6         Q.    And how do officers and sergeants get

7    assigned to the specialty -- to these specialties?

8         A.    Within the department?

9         Q.    Yes.

10        A.    They apply, submit a resume, and then we'll

11   interview the candidates, and then we'll choose, you

12   know, who we best think fits that role.

13        Q.    Is there a bidding process?

14        A.    Specialty positions are not a bid position.

15   It's -- they can apply for it, but it's not something

16   that is automatically granted by seniority.  It's

17   again by who we think will be the best candidate.

18        Q.    Now, you said the patrol officer position

19   refers to the prosecutor or is it the sergeants'

20   contract refers to the prosecutor?

21        A.    They both do.

22        Q.    They both do.  Okay.

23              Has a patrol officer ever served as the

24   police prosecutor?

39

1    A.    Yes.

2    Q.    And when was that?

3    A.    The last full-time patrol officer that

4    served that was Alan Cabral, C-A-B-R-A-L, and he

5    retired in either 2009 or 2010.

6                    (Exhibit-2, Collective bargaining

7    agreement, marked for identification.)

8    Q.    Chief, I've handed you what's been marked as

9    Exhibit 2. Do you recognize this as the CBA between

10   the Town of Kingston and the Superior Police Officers

11   Union?

12   A.    (Deponent viewing document.) Yes.

13   Q.    And that union is comprised of the

14   sergeants.

15   A.    Yes.

16   Q.    Lieutenants, as we said, have individual

17   contracts.

18   A.    That's correct.

19   Q.    And this contract was effective between the

20   period of July 1st, 2014 and June 30th, 2017.

21   A.    That's correct.

22   Q.    Was there another contract that --

23   A.    It's still in negotiations.

24   Q.    So this contract remains in effect.

1      A.    That's correct.

2      Q.    Because there's an evergreen clause in it or

3  what's known as a --

4      A.    Yes.

5      Q.    -- clause that keeps it in effect?

6      A.    Yes.

7      Q.    Did you help negotiate this contract?

8      A.    No.

9      Q.    You weren't part of it at all.

10     A.    Nope.

11     Q.    Can you turn to page 4 of the agreement, and

12  I'm referring to Article 7. Are you there?

13     A.    (Deponent viewing document.) Yeah.

14     Q.    This article concerns hours of work and

15  conditions.  Do you see that?

16     A.    (Deponent viewing document.) Yes.

17     Q.    And Article 7.0 describes how most shifts

18  are four and two, meaning four days on and two days

19  off, except the position of police prosecutor and DARE

20  community policing and school resource officer which

21  are the five and two; is that correct?

22     A.    (Deponent viewing document.) That's correct.

23     Q.    And that's consistent with what you just

24  testified.

41

1    A.   Well, yeah.  It's -- that's also verbatim in
2  the patrol contract as well.
3    Q.   And it also says the police prosecutor will
4  have all court holidays off; right?
5    A.   (Deponent viewing document.) Yes.
6    Q.   Now, in Section 7.2, it refers to
7  departmental positions such as court prosecutor,
8  safety officer, narcotics officer.  Is there a
9  position safety officer?
10   A.   (Deponent viewing document.) No.
11   Q.   Is there a position narcotics officer?
12   A.   No.  It uses the words "such as."
13   Q.   I understand.  I'm just asking.
14   A.   Okay.
15   Q.   When did you first start working with Tim
16  Ballinger?
17   A.   I believe he was hired in 1998.
18   Q.   And when did you start supervising him in
19  any way?
20   A.   I believe for a short period of time when I
21  was a midnight sergeant, he worked for me for a brief
22  period of time.
23   Q.   When were you a midnight sergeant?
24   A.   It would have been between -- probably in

1    1998.

2        Q.    When you say, "a brief period of time," do

3    you mean a matter of months?

4        A.    Probably, yes.

5        Q.    And when you became lieutenant, did you

6    supervise him?

7        A.    He would have been supervised by Lieutenant

8    Kelley.  I mean, I would have -- if he had an issue

9    and I was working during the day, he could have, you

10   know, come up to me and asked me something, but,

11   again, Lieutenant Kelley was basically in charge of

12   the patrol division.

13       Q.    So you didn't consider him a direct report.

14       A.    No.  In fact, his direct report would have

15   been Sergeant Wells.

16       Q.    Well, not when he was a sergeant.

17       A.    Yeah.  So Sergeant Wells was the senior

18   sergeant, so he would have basically worked with

19   Sergeant Wells.

20       Q.    Even when sergeant -- even when Sergeant

21   Ballinger was a sergeant?

22       A.    Yes.

23       Q.    Well, did Sergeant Wells have the authority

24   to give orders to Sergeant Ballinger?

43

1    A.    Yes.

2    Q.    So --

3    A.    Sergeant Wells was in charge of the

4  detective division or court division, and Ballinger

5  worked on a part-time basis under Wells in those

6  capacities.

7    Q.    Did you have any concerns with Sergeant

8  Ballinger's performance?

9    A.    At what period of time?

10    Q.    Let's say prior to his injury.

11    A.    What injury?

12    Q.    What injury?

13    A.    That's what I'm asking you.

14    Q.    Prior to his -- you know, his major injury.

15    A.    In 2006?

16    Q.    Yes.

17    A.    No.

18    Q.    How did you learn about his injury?

19    A.    Are we talking about the 2006?

20    Q.    Yes.  I think -- I mean, let's not play

21  games here.  You know there's a major --

22                    MR. LOUISON:  Excuse me.  There's

23  other injuries, so please don't start arguing with my

24  client --

44

1              MR. SULMAN:  I'm not arguing.

2              MR. LOUISON:  -- because you don't

3    like the answer.

4              MR. SULMAN:  Well, I mean, Sergeant

5    Ballinger has one major injury in his life.  He was

6    electrocuted.

7              MR. LOUISON:  You didn't ask him

8    that.

9        Q.   Okay.  How did you hear about his major

10   injury?

11       A.   It happened -- I believe it was on August

12   21st, 2006, and he reported that he was -- I don't

13   know exactly what he reported -- electrocuted, and

14   that he requested medical assistance and police

15   respond to the scene.

16       Q.   And he reported that directly to you.

17       A.   No, on the radio.

18       Q.   And you heard it on the radio.

19       A.   Yes.

20       Q.   And what actions did you take in your role

21   as lieutenant concerning this injury?

22       A.   That he got medical treatment at the

23   hospital.  We had the scene photographed.  Witnesses

24   were spoken to.

45

1           The sergeant on duty conducted an

2    investigation, wrote a report.  When all the reports

3    were gathered both by the on-duty sergeant and medical

4    reports, I would have forwarded that to the town

5    administrator's office for processing.

6           Q.   Did you take -- did you have any

7    responsibility in regards to an investigation for

8    unsafe work environment?

9           A.   OSHA was notified.  OSHA came down and

10   investigated.

11          Q.   And did you have any responsibility running

12   that?

13          A.   No.

14          Q.   Well, how did you know that OSHA came down?

15          A.   'Cause if you have an injury that's --

16   happens, you know, on a work site, you have to notify

17   OSHA.

18          Q.   Who notified OSHA?

19          A.   The police department notified OSHA.

20          Q.   Did you notify them on behalf of the police

21   department?

22          A.   No, I did not.  It would have gone through

23   the emergency dispatch.

24          Q.   Were -- when OSHA contacted the police

46

1  department, did they contact you?

2      A.    No.

3      Q.    At the time, what did you learn about

4  Sergeant Ballinger's injuries?

5      A.    I know that -- I know that he was

6  electrocuted.  I don't know the extent of his injuries

7  or his medical record or history.

8      Q.    I'm not asking you what you know now.

9            At the time, what did you learn about

10 Officer Ballinger's injuries?

11     A.    That he was out of work for a significant

12 period of time.

13     Q.    And you didn't learn anything more than that

14 about his specific injuries.

15     A.    No.

16                      (Exhibit-3, OSHA letter, marked for

17 identification.)

18     Q.    So I've handed you what's been marked as

19 Exhibit 3 in your deposition.  This is a letter to you

20 from Brenda Gordon, area director at U.S. Department

21 of Labor and Occupational Safety and Health

22 Administration, dated November 21st, 2006.

23           She writes, "Dear Lieutenant Splaine, in

24 response to your phone call about an electric shock

47

1   incident at an excavation site at 5 Spring Street,

2   Kingston, Massachusetts, our Braintree area office

3   conducted an on-site investigation to determine

4   whether OSHA safety and/or health standards were

5   violated."  Did I read that correctly?

6        A.   (Deponent viewing document.) Yes.

7        Q.   Do you recall having a -- calling OSHA about

8   an excavation site at 5 Spring Street in Kingston,

9   Mass?

10       A.   I don't recall this, no.

11       Q.   But you do recall there being an

12  investigation by OSHA; right?

13       A.   Yes.

14       Q.   Do you recall the result of the OSHA

15  investigation?

16       A.   No, I don't.

17            Can I just make a clarification?  I know

18  that there was litigation that took place after this,

19  and I believe they found some type of violations with

20  the contractor.  What they were, I don't know.

21       Q.   Now, did you know at the time -- I'm not

22  asking what you know now, but I'm asking at the time

23  did you know that Sergeant Ballinger was out on 111F

24  leave?

48

1      A.    Yes.

2                      (Exhibit-4, Fax, marked for

3      identification.)

4      Q.    Chief Splaine, I'm handing you what's been

5      marked Exhibit 4. This appears to be a fax transmittal

6      page with the name Lieutenant Splaine at the top, and

7      it's indicating there's two pages, and then the

8      following two pages -- and the next two pages we -- we

9      produced to the defendants to your attorney.

10              And these documents are dated April 7th,

11     2007, and the name at the top of the medical

12     documents, do you see, is Tim Ballinger?  Do you see

13     that?

14     A.    (Deponent viewing document.) Okay.  Right.

15     Okay.  Yes.

16     Q.    Now, do you recall receiving fax or -- with

17     medical documents about Tim Ballinger around this

18     time?

19     A.    Yes.

20     Q.    Indicating that Mr. Ballinger could return

21     to work?

22     A.    (Deponent viewing document.) Which is on the

23     -- the last page here.

24     Q.    Do you recall receiving this?

49

1    A.    (Deponent viewing document.) Well, I don't,
2  I -- not till recently.  I mean, I don't recall this,
3  you know, from 11 years ago.
4    Q.    Well, so is it your testimony that you did
5  not receive this in 2007?
6    A.    No.  That's not what I said.
7    Q.    Okay.  So what is your testimony about
8  whether or not you received this in 2007?
9    A.    Well, I did receive it.
10   Q.    You did receive it in 2007.
11   A.    Yes.
12   Q.    And if you see on the first page, do you see
13 where it says, "mild PTSD symptoms"?
14   A.    (Deponent viewing document.) Yes.
15   Q.    Did you read that at the time?
16   A.    I don't recall.
17   Q.    But it's your testimony -- and I'm basing
18 this on your interrogatory answers -- that you weren't
19 aware that Mr. Ballinger or Sergeant Ballinger had
20 PTSD until his testimony in February 2017; right?
21   A.    This only says he has symptoms.  I don't
22 know anything about a diagnosis.
23   Q.    So I'm just asking you.
24   A.    Okay.

50

1      Q.    You answered interrogatories in this case;

2  right?

3      A.    Yes.

4      Q.    And those interrogatory answers -- and I can

5  show them to you, if you want -- but in those

6  interrogatory answers, you testified that you weren't

7  aware that Sergeant Ballinger had PTSD until his

8  testimony in February 2017; is that correct?

9      A.    I didn't recall he had PTSD.

10     Q.    Now, were you aware around this time that

11  Sergeant Ballinger was cleared to return to work?

12     A.    Yes.

13     Q.    And he was cleared to return to work without

14  restrictions.

15     A.    That's correct.

16     Q.    And what did you understand his assignment

17  to be at this time?

18     A.    They had made a -- 'cause he was out, and we

19  were having financial issues within the department,

20  they made a temporary or acting police sergeant, and

21  they only usually change those positions in either

22  January or July.

23          Mr. Ballinger came back, I believe, sometime

24  in April.  The chief at the time just said you can

51

1   work as a detective now until shift bid in July, and

2   he worked as a detective until July, then he went on a

3   uniform patrol assignment.

4       Q.   And is that what you've been told or is that

5   what you recall?

6       A.   That's what I recall.

7       Q.   When you say he was -- was he acting or

8   full-time at the time as sergeant?

9       A.   Who's that now?

10      Q.   Ballinger.

11      A.   Ballinger was a full-time sergeant.

12      Q.   Full-time sergeant.  Okay.

13      A.   Yes.

14      Q.   Because you just said -- you just referred

15  to something as acting.  I don't know why you

16  mentioned that.

17      A.   There was another individual.  His name was

18  John Lind.  John Lind was put in an acting sergeant

19  position or a provisional sergeant's position to fill

20  the vacancy created by Ballinger's absence.

21      Q.   I see.

22      A.   And the chief didn't want to take him out of

23  that position when Timothy returned in April, so he --

24  he basically created an extra sergeant's position

1   until July, you know.

2          And in July of that year, he made then

3   Sergeant Wells a full-time detective sergeant, and he

4   had Lind and Ballinger both work uniform patrol

5   positions.

6                    (Exhibit-5, E-mail, marked for

7   identification.)

8      Q.   Chief, I've handed you what's been marked as

9   Exhibit 5 in your deposition.  This is an e-mail from

10  Chief Rebello to an e-mail address that says KPDMA.

11  Do you recognize that e-mail address?

12     A.   (Deponent viewing document.) It would have

13  gone to everybody at the department.

14     Q.   That's what I thought.

15          The subject line is Sergeant Ballinger.  The

16  e-mail says, "Timmy has been cleared to return to

17  work.  His return will be effective April 15th, 2007.

18  Sergeant Ballinger will be assisting with

19  investigations until further notice."

20          From this e-mail, it appears that Chief

21  Rebello was indicating that Sergeant Ballinger would

22  be, quote, assisting with investigations until further

23  notice.  Is it your testimony that that turned out not

24  to be true?

1    A.    It would have been until the July shift bid

2  of that year.  Like I said, he didn't want to take the

3  other person out of that position.

4    Q.    So as far as you know, Sergeant Ballinger

5  did assist with investigations until July.

6    A.    That's correct.

7    Q.    And then he was transferred to patrol.

8    A.    Yes.

9    Q.    Meaning a patrol sergeant?

10    A.    Yes.

11    Q.    Did you have any observations of Sergeant

12  Ballinger when he worked as a patrol sergeant?

13    A.    I'm sure I did.

14    Q.    Do you recall them?

15    A.    No.

16    Q.    Did anyone tell you about their observations

17  of Sergeant Ballinger as patrol sergeant?

18    A.    Not that I recall.

19    Q.    Did Chief Rebello consult with you about his

20  decision to make these assignments?

21    A.    Not that I recall.

22    Q.    I may have asked this -- or I don't think I

23  asked this, but you may have testified about this in

24  another way, but I just want to make sure.  Did you

54

1   review any medical records from the time that Sergeant

2   Ballinger was injured on the job until his return to

3   work about Sergeant Ballinger?

4       A.   In this time period?

5       Q.   Yes.

6       A.   No.  I mean, other than the faxes that you

7   provided, we have no other records.

8       Q.   So I understand you're saying we have no

9   other records, but my question is more specific.

10          Do you recall reviewing any medical records

11  about Sergeant Ballinger from the time of his injury

12  until his return to work?

13      A.   I don't believe so.  I don't recall that I

14  did.

15      Q.   When you became chief, what was Sergeant

16  Ballinger's position?

17      A.   He worked as a patrol sergeant or patrol

18  supervisor two days a week, and then he filled in as a

19  detective sergeant two days a week.

20      Q.   And that was in 2013.

21      A.   He -- he -- yes.

22      Q.   When you became chief?

23      A.   I know that that's what he was when I became

24  chief.  He probably held that position prior to that

1    as well.

2        Q.    So he was patrol sergeant two days a week

3    and detective sergeant two days a week.

4        A.    That's correct.

5        Q.    And do you know what his duties were when he

6    was a detective sergeant?

7        A.    At that point, the full-time prosecutor Alan

8    Cabral had retired, so the detective sergeant's duties

9    included investigations and going to court.

10       Q.    And who performed those duties?

11       A.    Sergeant Wells went to court four days a

12   week or was detective four days a week, and Ballinger

13   would have gone two days a week.

14       Q.    So on the days that Ballinger was a

15   detective, he went to court.

16       A.    Yes.

17       Q.    So the two days he was detective, he was

18   effectively prosecutor.

19       A.    Well, if court was open.  I mean, it could

20   have been weekends, and court wasn't open.

21       Q.    I see.  Okay.  Okay.

22            So the two days are just whichever two days

23   he worked.

24       A.    Yes, 'cause they worked, you know, again the

1  four and two rotation.

2     Q.   Right.  Okay.

3          Now, so when you became chief, did you make

4  any changes to Sergeant Ballinger's assignment?

5     A.   Not right away, no.

6     Q.   Were you aware of any limitations to

7  Sergeant Ballinger's ability to perform his job when

8  you became --

9     A.   No.

10    Q.   -- chief?

11    A.   No.

12    Q.   When did you first make any changes to

13 Sergeant Ballinger's assignment or position?

14    A.   I think it -- I got to do some backtracking

15 --

16    Q.   Sure.

17    A.   -- or explaining.  When Joseph Rebello was

18 chief, there was several retirements within the

19 department.

20         And because the town had financial issues,

21 they didn't fill them, so we went from a department of

22 24 patrol positions to 22.

23         And that's why the prosecutor position

24 wasn't filled, and it was combined with the

57

1    detective's position.

2         When I became chief, I fought to get the

3    positions restored, and I was successful in getting a

4    position back, one position back each year for two

5    years.

6         And that, I believe, would have been in

7    2015.  July of 2015 I was able at that point to

8    restore a prosecutor position.

9         And because Ballinger had worked down the

10   courts with Robert Wells, I, you know, put him in that

11   position, and Robert Wells was then promoted to

12   lieutenant.

13       Q.   So in 2015, Wells promoted to lieutenant.

14       A.   He may have been promoted 2014.  I'm not

15   quite sure, but it wasn't until I got the funding

16   in -- for the July of '15 that I was able to make a

17   prosecutor position.

18       Q.   And that was a full-time position.

19       A.   Yes.

20       Q.   And who did you put in that position?

21       A.   Ballinger.

22       Q.   And that is simply because he was the best

23   person for the job.

24       A.   Yes.  He had been it doing it, yes.  I don't

1  think anybody else applied for it either.

2      Q.    And when he applied for that job, his

3  schedule changed five days on, two days off.

4      A.    That's correct.

5      Q.    And it's five days on, Monday through

6  Friday.

7      A.    Yes, when court's open, yes.

8      Q.    'Cause he has to be there for court?

9      A.    Yes.

10     Q.    And what's your understanding of what he

11  does as the court prosecutor?

12     A.    He represents the town in, you know, any

13  criminal matter that, you know, originates in

14  Kingston.

15     Q.    And what court does --

16     A.    Unless it's a felony, then the DA's office

17  would handle that.

18     Q.    What court does he appear in?

19     A.    Plymouth District Court in Plymouth, Mass.

20     Q.    And is he in sort of -- so every day does he

21  go to the station first or does he go to court first?

22     A.    He would go to the station, pick up whatever

23  paperwork he would need, and then he would spend the

24  day at court.

59

1    Q.   And what type of paper does he pick up at

2    the station?  You have to talk to me like I don't know

3    what I'm -- like I don't know.

4    A.   Whatever would be on for the day.  If there

5    was an arrest overnight, there could be arrest

6    reports.

7         There could be cases that were ongoing where

8    he may have to bring down, you know, something for a

9    pretrial conference.  There could be a trial that day.

10        There could be motor vehicle hearings, you

11   know.  There could be a number of things that he might

12   have to pick up for paperwork.

13   Q.   So is he -- in his role as a police

14   prosecutor, is he writing up his own police reports

15   now or no?

16   A.   No.  He would be taking the reports that the

17   officers wrote and, you know, making sure that the

18   court received them.  At that time, they were faxing

19   stuff.  Now everything's electronically submitted.

20   Q.   And is he testifying himself now?

21   A.   There may be times that he would have to,

22   you know, read the report and give a synopsis before

23   the court as to what the officer's observations were.

24   Q.   But not his own observations?

60

1    A.    No.   Unless he -- unless it was a case that

2  he investigated as a detective.

3    Q.    And how often was he actually investigating

4  crimes as a detective at this point?

5    A.    I guess whatever the work -- workload was.

6  He'd be assigned different cases by Robert Wells or --

7  I don't know how many cases he was assigned at the

8  time.

9    Q.    Is there a PTSD policy in the police

10 department?

11   A.    Yes.

12   Q.    And is it a separate policy or is it part of

13 a larger policy?

14   A.    It's a separate policy.

15              (Exhibit-6, Post-shooting Incident

16 Procedures, marked for identification.)

17   Q.    I'm handing you what's been marked as

18 Exhibit 6. This policy is called "Post-shooting

19 Incident Procedures."  Are you familiar with this

20 policy?

21   A.    (Deponent viewing document.) I mean, this

22 was a policy that was in effect, yes, you know.

23 There's a newer policy now.

24   Q.    Is there a newer policy that's actually

61

1    titled post-traumatic stress disorder policy?

2        A.    I believe it is.

3                    MR. SULMAN:  So, Counsel, we

4    haven't received that.  I think that's --

5                    MR. LOUISON:  Okay.

6                    MR. SULMAN:  I think Chief Splaine

7    believes that -- well, let me ask the question.

8        A.    It may have gone into effect after Ballinger

9    had retired.  I don't know.  We get updated policies a

10   lot from the Massachusetts Police Chiefs Association,

11   and I don't know when that may have gone into effect.

12       Q.    Well, let me ask a more kind of pointed

13   question.  Was there a post-traumatic stress disorder

14   policy in effect during Tim Ballinger's employment

15   that you believe applied to his employment situation?

16       A.    This is -- this would have been the policy

17   that would have been in effect.

18       Q.    This is the policy that would have been in

19   effect.

20       A.    Yeah, when he was an employee.

21       Q.    Now, this policy we're looking at, if you

22   look under Roman numeral 1, the second paragraph, it

23   says, "The purpose of this policy is to provide

24   guidelines that should be uniformly applied following

62

1  any officer involved shooting incident."  Do you see

2  that?

3      A.   (Deponent viewing document.) Yes.

4      Q.   Now, Tim Ballinger was not involved in any

5  officer involved shooting incident; was he?

6      A.   No.

7      Q.   Is there any other policy that you believe

8  was in effect at the time of Sergeant Ballinger's

9  policy that you believe applies to his PTSD?

10     A.   No.  This would be the policy that would

11  contain PTSD.

12                    (Exhibit-7, Duties and

13  responsibilities, marked for identification.)

14     Q.   Chief, I've handed you what's been marked as

15  Exhibit 7 in your deposition.  Is this a policy issued

16  by the Kingston Police Department for the duties and

17  responsibilities of the various positions?

18     A.   (Deponent viewing document.) Yes.

19     Q.   And under Roman numeral -- sorry -- not

20  Roman numeral, but under number 1 it lists the duties

21  and responsibilities of sergeants.

22     A.   (Deponent viewing document.) Yes.

23     Q.   Did you send this document to any of the

24  medical professionals that evaluated Sergeant

63

1    Ballinger?

2        A.    No.

3                      (Exhibit-8, Task survey analysis,

4    marked for identification.)

5        Q.    Now, I've handed you what's been marked as

6    Exhibit 8. Do you recognize this document?

7        A.    (Deponent viewing document.) Yes.

8        Q.    And what is this?

9        A.    (Deponent viewing document.) This is a

10   document that's used to find out whether or not

11   officers can perform the essential functions of

12   certain positions.  This is something that's on the

13   civil service website.

14       Q.    And this is issued by the human resources

15   division.

16       A.    Of civil service, yes.

17       Q.    Not issued by Kingston; right?

18       A.    Not issued by -- no, by the Town of

19   Kingston's human resources, no.

20       Q.    And is this the document that you provided

21   to the medical professionals that evaluated Sergeant

22   Ballinger?

23       A.    (Deponent viewing document.) Yes.

24       Q.    And it says, "sergeant essential tasks."

64

1    A.    (Deponent viewing document.) Yes.

2                    MR. SULMAN:  Off the record.

3                    MR. LOUISON:  Sure.

4                    (Brief break from 11:37 a.m. to

5    11:45 a.m.)

6    Q.    (BY MR. SULMAN) Did you ever communicate

7    with the district attorney's office about Tim

8    Ballinger?

9    A.    I think you'd have to rephrase the question.

10   I don't...

11   Q.    What do you mean?

12         What don't you understand about the

13   question?

14   A.    I -- I don't believe I've ever had any

15   conversation specifically about Tim Ballinger, no.

16   Q.    Did you ever receive any feedback about Tim

17   Ballinger's work from the district attorney's office,

18   either positive or negative?

19   A.    No.

20   Q.    Did you ever receive any feedback from

21   magistrates or judges about Tim Ballinger, either

22   positive or negative?

23   A.    No.

24   Q.    Did you ever receive any feedback from the

1   public, such as victims of crime, about Tim Ballinger,

2   either positive or negative?

3       A.    No.

4       Q.    Did anyone in the department give you any

5   feedback about Tim Ballinger's work as a prosecutor,

6   either positive or negative?

7       A.    No.

8       Q.    How long has Susan Munford been an employee

9   of the department?

10      A.    How long was Susan Munford an employee?

11      Q.    Yeah.  Yeah.

12      A.    After Ballinger, 2003 or '04, somewhere in

13  there.  2003 I believe she was hired.

14      Q.    She was hired.

15      A.    Yeah, as a full-time officer.  She worked

16  prior to that as a permanent intermittent officer and

17  a police matron.

18      Q.    What's a police matron?

19      A.    If you have a female arrest, they'll bring

20  a -- you know, a female in to watch them.  Under the

21  law, you can't have a male officer watch a female

22  that's in custody, but you could have a female officer

23  watch a male that's in custody.  I don't write the

24  laws.

66

1    Q.    Interesting.

2          When did Susan Munford become a sergeant?

3    A.    2005 I believe.

4    Q.    At some point, did you become aware that

5    they were long-term friends?

6    A.    Yes.

7    Q.    How did you become aware of that?

8    A.    They just -- you know, it's a small

9    department.  I mean, I mean, a lot of the people that

10   you work with you're also friendly with.

11         They both grew up in town, and, you know,

12   their families go back a long ways together.  I

13   believe they've known each other since they were

14   little kids.

15   Q.    So is that well known in the department --

16   A.    Yes.

17   Q.    -- that they're long-term friends?

18   A.    Yes.

19   Q.    At some point, Susan Munford was suspended;

20   correct?

21   A.    Yes.

22   Q.    I'm not going to go in to detail about this,

23   but what was the basis for her initial suspension?

24   A.    I think it was on March 30th, 2016.  She

1   left the district courthouse.  She states that she

2   went home, opened her mail and found a notice that an

3   MCAD suit that she had filed against a previous town

4   administrator Mr. Jim Thomas was dismissed and that

5   she was responsible for court costs.

6          And when -- and I believe there was other

7   terminology that she thought meant that she had to

8   pay, you know, all the town's legal expenses as well.

9          So she left her house in an unmarked police

10  car that she had brought to court.  In her words, she

11  then flew to town hall.

12         She went into the town administrator's

13  office, and she demanded that he fix this, that she

14  wasn't paying, you know, court costs.

15         She basically went on a verbal tirade,

16  depending upon what witness you listen to, that ranged

17  somewhere between 20 and 40 minutes where it was, you

18  know, just using a lot of profanities, throwing paper

19  at the town administrator, ripping stuff up, making

20  overly overt aggressive mannerisms and stuff.

21         While this was going on, she also would

22  simultaneously just break into tears.  The witnesses

23  didn't know what to do because the witnesses, you

24  know, were the administrative assistant and a

1    secretary in the selectmen's office.   That's

2    technically their boss.

3            They didn't want to call the police on the

4    police, and it just went on, so that's the basis of

5    the investigation that we conducted in regards to her

6    conduct that day.

7        Q.    And this was to then town manager Robert

8    Fennessy; right?

9        A.    That's correct.

10       Q.    And at some point, was there a hearing

11   regarding this suspension?

12       A.    Yes.

13       Q.    And Tim Ballinger testified at it.

14       A.    Yes.   It was a four-day hearing.

15                    (Exhibit-9, Hearing transcript,

16   marked for identification.)

17       Q.    Did you attend the hearings?

18       A.    No.

19       Q.    Did you keep apprised of them, I mean, of

20   what went on at the hearing?

21       A.    To an extent, I was briefed.

22       Q.    And how were you briefed?

23       A.    Labor counsel would have briefed me.   On

24   occasion, Lieutenant Kelley would brief me as well.

1    Q.   And would Lieutenant Kelley brief you by

2  himself or in the presence of counsel?

3    A.   By himself.

4    Q.   So, now, I've handed you what's been marked

5  as Exhibit 9. This is a transcript from the matter of

6  Town of Kingston and Susan Munford dated January 28th,

7  2016.  It's testimony of Tim Ballinger.  Do you recall

8  that Tim Ballinger testified at the suspension

9  hearing?

10   A.   Yes.

11   Q.   And do you recall that he testified about

12 the time that he was present at Foxborough stadium

13 when -- or the stadium in Foxborough when Lieutenant

14 Kelley handed Susan Munford her notice of suspension?

15   A.   I don't know what he testified to.  I was

16 listed as a potential witness, so I didn't want to

17 know what other people said.

18   Q.   You were never apprised of his testimony.

19   A.   No.

20   Q.   Were you aware that he was testifying?

21   A.   I would know that, yes.

22   Q.   Were you aware of that at the time?

23   A.   Yes.  He was a witness that was called by

24 the union.

70

1    Q.   And you agree with me that Sergeant

2  Ballinger has a right to testify on behalf of the

3  union; right?

4    A.   Absolutely.

5    Q.   And he can't be punished for that; right?

6    A.   No.

7    Q.   And can you turn to page 69 of this, and

8  here I understand you say you didn't, you know, hear

9  anything about his testimony, but I just wanted to

10  read this into the record.

11       At line 12, he's asked a question of that

12  Lieutenant Kelley was on his way, and Sergeant

13  Ballinger answers.  "Yes.  So we waited probably

14  almost two hours.  When Lieutenant Kelley got there,

15  he came up to the car.  I've talked about this with

16  Lieutenant Kelley on many occasions.  I was

17  insubordinate.  I was angry.  I was yelling.  I was

18  swearing.  I'm diagnosed with PTSD.  I have issues,

19  but I always apologized after."

20       Did Lieutenant Kelley or anyone else around

21  this time inform you that Sergeant Ballinger mentioned

22  his PTSD diagnosis during this proceeding?

23    A.   No.

24    Q.   Did you end up testifying in this

1    proceeding?

2        A.    In this particular one, no.

3        Q.    Now, as -- this 30-day suspension turned in

4    to a termination; correct?

5        A.    Well, there was a separate internal affairs

6    investigation that was conducted after this.   That

7    resulted in the termination.

8        Q.    But it arose out of the Fennessy

9    interaction; correct?

10       A.    No.

11       Q.    Oh, it arose out of the evidence issue;

12   right?

13       A.    It arose out of her failing to properly

14   investigate four sexual assault cases and that she had

15   50-something pieces of evidence in her desk or in her

16   locker.

17       Q.    In any event, she never went back to work

18   after the suspension; right?

19       A.    That's correct.

20       Q.    Now, after this -- after Sergeant Ballinger

21   testified in June 28th, the next day you ordered an

22   investigation into his behavior; correct?

23       A.    Not because of the hearing, no.

24       Q.    I didn't ask why.

1     A.    Oh.

2     Q.    You ordered an investigation into his

3  behavior, right, the next day?

4     A.    It was -- it was in that time frame.  I

5  don't remember it was the exact next day.

6                   (Exhibit-10, Internal

7  investigation, marked for identification.)

8     Q.    I've handed you what's been marked as

9  Exhibit 10.  Is this the record -- well, strike that.

10          Do you recognize Exhibit 10 as records from

11  your investigation into an incident on June 28th, 2016

12  involving Sergeant Ballinger and Sergeant Potrykus?

13     A.    (Deponent viewing document.) Yes.

14     Q.    And the first page or two pages is the

15  letter you sent to Lieutenant Wells on June 29th

16  informing him that you received intelligence that

17  Sergeant Ballinger failed to report on time for his

18  scheduled midnight to eight a.m. shift on Tuesday,

19  June 28th; correct?

20     A.    (Deponent viewing document.) Yes.

21     Q.    And that was the same day as his testimony

22  in the suspension hearing for Sergeant Munford;

23  correct?

24     A.    Yes.

1     Q.   And then the investigation that you ordered

2  also concerned an interaction between Sergeant

3  Ballinger and Sergeant Potrykus later that

4  day; correct?

5     A.   Earlier that day.

6     Q.   Earlier that day.  Okay.

7          And an allegation that Sergeant Ballinger

8  failed to -- well, actually, charges that resulted

9  later also concerned allegations that Sergeant

10  Ballinger failed to turn in his report on time;

11  correct?

12     A.   Well, that was a subsequent violation, but

13  prior they were only looking at whether or not he was

14  on time for work and whether or not he had a verbal

15  dispute with Sergeant Potrykus.

16     Q.   Now, is it fair to say that Sergeant

17  Ballinger is not the first sergeant or patrol officer

18  that has failed to report to work on time?

19     A.   That's fair to say, yes.

20     Q.   And not everyone is investigated; correct?

21     A.   That's correct.

22     Q.   And Sergeant Ballinger and Sergeant Potrykus

23  are of equal rank; right?

24     A.   Sergeant Potrykus is a senior sergeant.

1    Q.   But they're equal rank; correct?

2    A.   Yes.

3    Q.   And while it may not be desirable, it's not

4  uncommon for officers or sergeants to get into

5  disagreements at work; is it?

6    A.   I'll agree on that, yes.

7    Q.   And every allegation of a disagreement at

8  work is not investigated; right?

9    A.   That's correct.

10   Q.   And Sergeant Potrykus didn't allege that

11 Sergeant Ballinger threatened him with violence; did

12 he?

13   A.   Yes, he did.

14   Q.   He alleged violence.

15   A.   I -- Sergeant Potrykus that day came into my

16 office, a 25-year plus veteran, I have never seen him

17 like he was.

18        He broke down crying.  He said that he was

19 legitimately concerned with his safety.  He was so

20 upset that he called Lieutenant Kelley close to one

21 o'clock in the morning after he left the station, you

22 know.

23        A normal disagreement between workers, I

24 wouldn't, but I've never seen Potrykus react like

1  this.

2                    (Exhibit-11, Notice of disciplinary

3  action, marked for identification.)

4      Q.   I'm handing you what's been marked as

5  Exhibit 11 in your deposition.  Now, this is your

6  notice of disciplinary action to Sergeant Ballinger;

7  right?

8      A.   (Deponent viewing document.) Yes.

9      Q.   Dated July 13th?

10     A.   (Deponent viewing document.) Yes.

11     Q.   Now, there's three alleged violations here;

12  correct?

13     A.   (Deponent viewing document.) That's correct.

14     Q.   The first is violation reporting for duty.

15  The second one is respectful treatment; correct?

16     A.   (Deponent viewing document.) That's correct.

17     Q.   And sticking with that one, you allege at

18  the bottom of the page that Sergeant Ballinger

19  gestured to Sergeant Potrykus in a physically

20  threatening manner; correct?

21     A.   (Deponent viewing document.) Yes.

22     Q.   Is that the extent of the threat of

23  violation that you allege Sergeant Ballinger made to

24  Sergeant Potrykus?

1     A.    Potrykus said that he was waiving his finger

2  and stuff at him too, that he was just out of control

3  yelling at him talking about stuff like you're number

4  one; I'm number two.  He was upset that a patrolman

5  was the one that called him for being late not the

6  sergeant.

7     Q.    Is that the extent of the physical threat

8  that you allege Sergeant Ballinger made?

9     A.    Yes.

10    Q.    Now, you also find a violation of Section

11 3.2, directives and orders; correct?

12    A.    (Deponent viewing document.) That's correct.

13    Q.    And do you recall that Lieutenant Wells did

14 not recommend this violation?

15    A.    He kind -- Wells and Ballinger are very

16 close.

17    Q.    My question is simply:  Do you -- what you

18 recall -- do you recall that Lieutenant Wells did not

19 recommend this violation?

20    A.    I don't think that's exactly what he said.

21 I think what he said is that he sustained it, but he

22 was trying to legitimize it.

23    Q.    Well, did he or did he not recommend finding

24 this violation?

77

1    A.    He said it was sustained, yes.

2    Q.    He did.  Okay.

3          Do you recall that Sergeant Ballinger asked

4    Lieutenant Wells if he could -- if he could review his

5    statement with his union counsel, and Lieutenant Wells

6    said okay?

7    A.    I don't believe that's exactly what was said

8    either.

9    Q.    Now, this matter was appealed to

10   arbitration; correct?

11   A.    That's correct.

12   Q.    And the arbitrator vacated the discipline.

13   A.    Yes.

14                   (Exhibit-12, Arbitration decision,

15   marked for identification.)

16   Q.    I'm handing you what's been marked as

17   Exhibit 12.  Is this the arbitration decision?

18   A.    (Deponent viewing document.) Yes.

19   Q.    Was there any further appeal by the town of

20   this decision?

21   A.    No.

22   Q.    There's one part of the arbitrator's

23   findings that I'll read to you.  I don't actually have

24   where it is, but the arbitrator writes, "The process

78

1    surrounding the Munford case caused tension and

2    division among department members."  Would you agree

3    with that?

4        A.    (Deponent viewing document.) Yes.

5        Q.    Now, at some point, there was a hearing

6    scheduled on Susan Munford's termination; correct?

7        A.    Yes.

8        Q.    Were you scheduled to testify in that?

9        A.    Yes.

10       Q.    Did you testify before or after Tim

11   Ballinger testified?

12       A.    I didn't end up testifying in the

13   termination hearing.  I ended up testifying later and

14   in the arbitration proceedings.

15                     (Exhibit-13, Hearing transcript,

16   marked for identification.)

17       Q.    I'm handing you what's been marked as

18   Exhibit 13.  You were not present for this testimony;

19   were you?

20       A.    (Deponent viewing document.) I was.

21       Q.    You were.

22       A.    Yeah.  This testimony was held public.

23   There was an audience, and Sergeant Munford decided

24   she wanted it broadcast live on Facebook Live.

1    Q.    So you were watching it.

2    A.    I was in the room.

3    Q.    You were in the room.

4    A.    Yes.

5    Q.    And why did you choose to be present?

6    A.    The labor counsel advised me I should be.

7    Q.    And so during this testimony, did you hear

8  Sergeant Ballinger testify about any diagnosis that he

9  had?

10   A.    He testified about a lot of things.  Yes.  I

11 did hear that.

12   Q.    What did he testify about?

13   A.    He was asked questions about dates; he

14 couldn't remember.  He testified that he didn't recall

15 policies of procedures.

16        He testified that he was in an incident

17 involving Sergeant Potrykus where he had angry

18 outbursts.  It was kind of scary testimony listening

19 to him.

20        The hearing officer was asking him to

21 identify different dates, if he could be more specific

22 on when different things happened, he couldn't.

23        The hearing officer got frustrated with him

24 when he couldn't even recall what decades things

80

1   happened in. He was just making really blanket

2   allegations, disparaging remarks against the whole

3   station.

4           And I was -- the concern is, is this, you

5   know, how he, you know, acts in court, is this how he

6   testifies down there.  I had some real major concerns

7   as to what I was witnessing.

8   Q.    What do you mean he was making disparaging

9   remarks about the whole station?

10  A.    He was alleging that nobody follows policies

11  and procedures; that nobody, you know, properly

12  cataloged evidence; that he saw evidence laying around

13  the station, things of that nature, things that just

14  weren't true.

15  Q.    Well, how do you know they weren't true?

16          Do you work in the evidence room?

17  A.    He said throughout the whole station.  I

18  walk through the station.  I don't go in the evidence

19  room.

20  Q.    And, I mean, one of the -- where is evidence

21  kept at the police station?

22  A.    It depends where in the process we have it,

23  you know.  At initial intake, the officers would write

24  a report, catalogue it, put it in an evidence locker,

1    a temporary storage unit.

2           And then the evidence officers would then

3    remove it and bring it down into the basement where

4    the evidence room is.

5       Q.   And why did that bother you so much that he

6    was saying things that you believe weren't true about

7    the evidence?

8       A.   He was trying to, you know, kind of, like,

9    scorch-and-burn testimony trying to protect Sergeant

10   Munford and saying that everybody didn't follow the

11   rules.

12          He was trying to paint the whole department

13   with a broad-brush which it's just not true.  I mean,

14   it was really disheartening as to what he was saying

15   about his colleagues.

16      Q.   Is it fair to say that, you know,

17   maintaining evidence is an important function of the

18   police department?

19      A.   Yes.

20      Q.   If an investigation's done properly, you

21   don't want misinformation to be spread about it;

22   correct?

23      A.   That's correct.

24      Q.   And you would want the public to receive the

82

1  correct information about it; right?

2      A.   That's correct.

3      Q.   The public has the right to know how the

4  police department is functioning; correct?

5      A.   Correct.

6      Q.   And this was -- this actually was a public

7  hearing; right?

8      A.   When you have a --

9      Q.   Well, I'm just wondering.  You said this was

10 on Facebook; right?

11     A.   Yes.

12     Q.   So everybody in the public could see it;

13 correct?

14     A.   That's correct.

15     Q.   You didn't want the public to know or

16 believe that the police department was sort of, you

17 know, mishandling evidence; right?

18     A.   That's correct.  It was a public hearing

19 that Sergeant Munford chose to make public.  It even

20 had representatives there from the district attorney's

21 office just to observe what was being said.

22          I mean, there was -- there was quite an

23 audience there.  She invited everybody to her

24 termination hearing at a board of selectmen's meeting

1  where she went to the podium and invited everybody to

2  go.

3       Q.   Who from the district attorney's office was

4  there?

5       A.   I don't know.  He sent a couple

6  representatives.  I know there was a state trooper and

7  I believe some ADA.

8       Q.   So this was potentially embarrassing for

9  you.

10      A.   Yes.  Well, not only for me, but for him,

11  Sergeant Ballinger.

12      Q.   You mean for the entire department?

13      A.   Yes.

14      Q.   I don't have the entire transcript here, but

15  I can print it out if you want, but you recall what he

16  testified about.  He testified about it wasn't just

17  Susan Munford.  It was the whole evidence room, that

18  it was a mess, right, pretty much?

19      A.   Well, that's what he was alleging.

20      Q.   And you're saying it's not true.

21      A.   Well, the two of them, Munford and

22  Ballinger, were the evidence officers, and they were

23  responsible for maintaining, cataloging the evidence,

24  and they were in the process of redoing the evidence

1  room for a long period of time.

2         When I became chief, I spent a lot of money

3  on the evidence room for a -- you know, equipment

4  upgrades, storage upgrades, things of that nature.  I

5  basically told them you have carte blanche to do

6  whatever you want to get that room in shape.

7         It was also in the time frame where the

8  state was dealing with Annie Dookhan and all the cases

9  that were know, tainted because of her, you know, lack

10 of, you know, properly handling evidence, and I didn't

11 want that with us.

12        So they, you know, expanded the room in

13 size, expanded the process, and they showed me the

14 progress they were making and how they were cataloging

15 everything in the computer and putting things in

16 different shelves and bins so that the evidence could

17 be easily retrieved.

18        And that's what they were doing during this

19 period, so, you know, it wasn't as he alleged it was,

20 you know.

21    Q.   So I just want to make sure I understand

22 your testimony.  You're saying Sergeant Munford and

23 Sergeant Ballinger before this testimony showed you

24 that they were cataloging --

1    A.    Yes.

2    Q.    -- cataloging all the evidence.

3    A.    That's correct.  I bought them new printers,

4  computers, all that stuff were placed in the evidence

5  room to facilitate the job they were doing.

6    Q.    So I'm -- I want to understand a little bit

7  more about who was present from the public there.  You

8  said a state trooper was present.

9    A.    There was a state trooper assigned to the

10  DA's office, yes.

11    Q.    Do you remember who that was?

12    A.    No, I don't.

13    Q.    Anyone else from the public that you recall

14  being present?

15    A.    There was probably 50 people in the room.

16    Q.    So I understand 50 people in the room.

17          How many of those were from Kingston?

18    A.    I would say probably about all of them.  The

19  way the room was set up was like a courtroom.  The

20  hearing officer would be where you were sitting.  I

21  was here (indicating) with Lieutenant Kelley and labor

22  counsel.

23          Munford and her counsel were to the right of

24  us, and then all the people sat behind us, so I didn't

86

1    want to keep looking, turning around to see who was in

2    the room.

3        Q.    Were most of them just audience members --

4        A.    Yes.

5        Q.    -- that were there to observe?

6        A.    Yes.

7        Q.    Was the whole department there?

8        A.    No.  There was nobody from the department

9    there.  It was citizens, media, you know.

10       Q.    Were they there as supporters of Susan, as

11   far as you know?

12       A.    I don't know what they're -- I couldn't

13   speculate as to why they were there.

14       Q.    Prior to this, had you had any conversations

15   with Lieutenant Kelley about Sergeant Ballinger's

16   PTSD?

17       A.    No.

18                      (Exhibit-14, Answers to

19   interrogatories, marked for identification.)

20       Q.    I'm handing you what's been marked as

21   Exhibit 14 in your deposition.  Are these your answers

22   to interrogatories?

23       A.    (Deponent viewing document.) Yes.

24       Q.    Can you turn to the second to last page?  Is

1    that your signature there?

2        A.    (Deponent viewing document.) Yes.

3        Q.    Did you sign this under the pains and

4    penalties of perjury?

5        A.    (Deponent viewing document.) Yes.

6        Q.    Can you turn to Answer Number 3 on page 3?

7    Well, I guess this starts on number 2, the

8    interrogatory asks you to describe when you first

9    learned that the plaintiff had any physical or

10   psychological limitations, conditions, or impairments

11   resulting from the injury sustained on or about August

12   21st, 2006.

13           And your answer is -- and I'll read the last

14   paragraph -- "On February 17th, 2017, as part of an

15   appointing authority termination hearing of another

16   employee, the plaintiff disclosed that he had PTSD and

17   other medical limitations as a result of his injury in

18   2006."  What other medical limitations as a result of

19   his injury in 2006 did the plaintiff disclose during

20   that testimony?

21       A.    He talked about -- and his union attorney

22   brought it up -- that he had memory issues that he

23   couldn't remember anything.

24       Q.    Well, I'm sorry.  Did the -- did Sergeant

88

1    Ballinger say he couldn't remember anything --

2        A.    Yes.

3        Q.    -- in his testimony?

4        A.    Yes.

5        Q.    He said he -- he literally said he couldn't

6    remember anything.

7        A.    Yes.   He said he wasn't familiar with

8    policies and procedures, rules and regulations, yes.

9        Q.    Did he say that during his testimony or

10   during his --

11       A.    Yes.

12       Q.    Let me finish my question.

13             Did he say that during his testimony or

14   during his follow-up interview with Lieutenant Kelley?

15       A.    During his testimony.

16       Q.    Are there any other medical limitations as a

17   result of Sergeant Ballinger's injury in 2006 that you

18   learned as a result of his testimony?

19       A.    Well, he stated he had PTSD and that he had

20   memory issues.   That was what he stated.

21       Q.    Now, if you could turn to Interrogatory

22   Number 6 on page 6, and I ask you here to describe in

23   complete detail as possible the basis for your

24   decision to place the plaintiff on administrative

89

1   leave on or about March 14th, 2017.

2          You say, "On February 17th, 2017, the

3   plaintiff provided testimony at a termination hearing

4   for another member of the Kingston Police Department

5   that he had memory issues, medical issues, and he was

6   diagnosed with PTSD."  Are those memory issues and

7   medical issues the same as you just testified about?

8       A.   Yes.

9       Q.   What action, if any, did you take after the

10  testimony on February 17th, 2017 as a result of

11  learning that the plaintiff had PTSD?

12      A.   I had Lieutenant Kelley conduct an interview

13  with Sergeant Ballinger to -- for clarification on

14  some of the things that he said.

15         It was an interview that was conducted in

16  the lieutenant's office, and Sergeant Ballinger had

17  union counsel with him.

18      Q.   Did you have that recorded?

19      A.   Yes.

20      Q.   After the interview, did you listen to the

21  recording or did you simply talk to Lieutenant Kelley

22  about it?

23      A.   I didn't listen to the recording.  I saw the

24  transcript that you have there.

1     Q.    Did you talk to Lieutenant Kelley about it

2  or did you simply look at the transcript?

3     A.    I looked at the transcript.  I mean, I would

4  have had a brief conversation with him, but it was --

5  I looked at the transcript.

6                (Exhibit-15, Statement transcript,

7  marked for identification.)

8     Q.    I'm handing you Exhibit 15.  Exhibit 15 is a

9  transcript dated March 9th, 2017 interviewee Timothy

10 Ballinger.  Do you recognize this?

11    A.    (Deponent viewing document.) Yes.

12    Q.    Is this the transcript of the interview by

13 Lieutenant Kelley of Sergeant Ballinger with Leigh

14 Panettiere attending?

15    A.    (Deponent viewing document.) Yes.

16    Q.    Is this what you reviewed?

17    A.    (Deponent viewing document.) Yes.

18    Q.    Who drafted these questions?

19    A.    Labor counsel and Lieutenant Kelley.

20    Q.    Why did you have labor counsel draft these?

21    A.    Everything that usually we do that involves

22 any type of personnel action we're going to have labor

23 counsel review.

24                We want to make sure that we're not opening

1    the town up to any liability.  We also want to make

2    sure that the person that's the subject of whatever

3    the incident is has all their rights maintained as

4    well.

5        Q.    Were you involved in the drafting of these

6    questions?

7        A.    No.

8        Q.    And so is it fair to say that you learned

9    from this that Sergeant Ballinger was not being

10   treated at the time for any psychological disorder?

11       A.    That's correct, yes.

12       Q.    Now, Lieutenant Kelley near the bottom third

13   of the first page of the transcript indicates that he

14   has something from a Doctor Cass.  Do you see that?

15       A.    (Deponent viewing document.) I believe that

16   the transcript has got the name wrong.

17       Q.    Right.  It's Doctor Katz.

18       A.    That's correct.

19       Q.    K-A-T-Z, is that it?

20       A.    Yes.

21       Q.    Do you know what he's referring to there?

22       A.    I believe it's some -- I believe there's a

23   document that said he has mild PTSD like symptoms or

24   something like that.

92

1     Q.   Do you believe that's the document we looked

2  at earlier today?

3     A.   I believe so.

4     Q.   So that's the document from March 7th, 2007

5  or the fax that we looked at earlier.

6     A.   Yes.  Yes.

7     Q.   Now, on the second to last -- or third to

8  last page, he's asked -- and this is Ballinger 1609 in

9  the bottom -- "Do you understand the Kingston Police

10 Department rules and regulations, policies and

11 procedures?"  Do you see that?

12    A.   (Deponent viewing document.) Yes.

13    Q.   He says, "Not all of them, no."  When are

14 members of the department, patrol officers, sergeants,

15 asked that question?

16    A.   When they get on the job, Lieutenant Kelley

17 goes over all the policies and procedures with every

18 new hire.  It's then up to them to maintain knowledge

19 of them, but he testified at the hearing that he

20 didn't remember any of them.

21    Q.   Understood.

22         But on an ongoing basis, are patrol officers

23 or sergeants tested on their understanding of the

24 Kingston Police Department rules and regulations?

1    A.   No.

2    Q.   Did you rely on this -- Strike that.

3        When did you receive this transcript?

4    A.   I don't -- I don't recall.  I don't know.

5           (Exhibit-16, Notice of paid leave,

6  marked for identification.)

7    Q.   I'm handing you what's been marked as

8  Exhibit 16.  This is a letter dated March 14th, 2017

9  to --

10    A.   (Deponent viewing document.) Uh-huh.

11    Q.   -- Sergeant Ballinger from yourself

12  notifying Sergeant Ballinger of being placed on paid

13  administrative leave in order to provide medical

14  documentation.  It is, as you can tell, five days

15  after the interview.

16    A.   (Deponent viewing document.) Uh-huh.

17    Q.   Do you believe you got the transcript within

18  those five days?

19    A.   Probably.  Usually what happens is the

20  interview is recorded on a device where you can

21  download it on a computer and then send it to this

22  company and have it transcribed and given back the

23  next day or -- you know, which would have been Friday

24  or the Monday.

94

1    Q.    The transcription happens that quickly.

2    A.    Yes.

3    Q.    So my question is:  Did you rely on the

4  interview or a transcription of the interview in

5  making the decision to place Sergeant Ballinger on

6  paid administrative leave?

7    A.    It would have been one of the factors, yes.

8    Q.    And what about the interview or the

9  transcription caused you to place Sergeant Ballinger

10  on paid administrative leave?

11    A.    It was not only the transcript, but it was

12  his testimony that I witnessed at, you know, Munford's

13  hearing.

14         It caused a lot of concern for me, and, you

15  know, I wanted to find out whether or not he could do

16  the job and how well he could do the job.  That's why

17  we, you know, had him get doctors' notes.

18         I didn't want to just make a decision

19  willy-nilly.  I wanted to have some type of medical

20  foundation on which to base it on.

21    Q.    And what about the testimony caused you

22  concern?

23    A.    That when he testified that he had memory

24  issues where he couldn't identify what decade things

95

1    took place in, where he said he wasn't familiar with

2    rules and regulations or policies and procedures,

3    those type of things.  That transcript doesn't even do

4    justice to what it was like in the room.

5        Q.   Now, who drafted this document?

6        A.   I did it for the most part, and I had it

7    reviewed by counsel.

8        Q.   And what counsel were you using?

9        A.   It would be labor counsel.  It would be the

10   law firm of Clifford & Kenny.

11       Q.   And who from Clifford & Kenny?

12       A.   John Clifford.

13       Q.   And when you referred to labor counsel in

14   this deposition, are you referring primarily to John

15   Clifford?

16       A.   John Clifford basically handled all matters

17   involving Tim Ballinger, and then Jamie Kenny was

18   doing the Susan Munford proceedings.

19       Q.   Did labor counsel make any edits to this, as

20   far as you recall?

21       A.   I don't recall if they did.

22       Q.   Who drafted the questions 1 through 5?

23       A.   (Deponent viewing document.) I've had

24   numerous occasions where I've sent people out for

1  IMEs, and I have kind of a plethora of questions that

2  I ask.

3      And they've all been vetted through the, you

4  know, counsel or through our IOD handler, so I just

5  pick out questions that I think are relative to this

6  particular, you know, situation.

7      Q.   So you asked Number 1, "Does Sergeant

8  Ballinger have post-traumatic stress disorder or a

9  related condition?"

10     A.   (Deponent viewing document.) that's correct.

11     Q.   And you asked 2, "Does this condition

12  prevent Sergeant Ballinger from performing the

13  essential function of his job?"  Correct?

14     A.   (Deponent viewing document.) Yes.

15     Q.   And then you attached a copy of the

16  essential duties of a police officer; right?

17     A.   That's correct.

18     Q.   When was the last time Sergeant Ballinger

19  wore a uniform in his job?

20     A.   Any time he worked an overtime shift.  I

21  mean, it could have been -- I'd have to go back and

22  review the schedule but probably within days of, you

23  know, him being out in March there.

24     Q.   When was the last time Sergeant Ballinger

1   did a patrol?

2       A.   Again, I'd have to go back and review the

3   schedule, but it was probably, you know, in, you know,

4   March, February that year.

5       Q.   When was the last time he arrested someone?

6       A.   I don't know.

7       Q.   When was the last time he was involved in a

8   high-speed chase?

9       A.   I don't believe we've had any of those.

10      Q.   When was the last time he responded to a

11  crime in progress?

12      A.   Again, I'd have to review the logs.  I don't

13  know.

14      Q.   When was the last time he did a vehicle

15  stop?

16      A.   I don't know.

17      Q.   Do you know the last time he had to

18  physically restrain a resisting individual?

19      A.   No, I don't.

20      Q.   Do you know the last time he had to search a

21  building for individuals or weapons or fruits of a

22  crime?

23      A.   No, I don't.

24      Q.   Why did you send the essential duties of a

1  police officer rather than a description of a

2  prosecutor?

3      A.   We don't have a description of a prosecutor.

4  They have to be able to do the essential functions of

5  their job before they can do an assignment within

6  their job.

7      Q.   For the past two years, his position has

8  been a prosecutor; right?

9      A.   Primarily, yes.

10     Q.   Did you think of writing up a job

11 description of prosecutor and sending it along with

12 this document?

13     A.   No.   'Cause I want to know if he can be a

14 police officer not a prosecutor.

15     Q.   Prior to February 17th, 2017, did you have

16 any intentions of reassigning Sergeant Ballinger from

17 prosecutor to -- back to patrol?

18     A.   Yes.

19     Q.   What were those intentions?

20     A.   It's a small department, and when Munford

21 was out, she was a shift supervisor two days a week

22 out of her -- you know, her rotation.

23          I'm bleeding money, you know, in overtime

24 costs.   I wanted to put him back in patrol so I didn't

99

1   have -- you know, be a patrol supervisor to eliminate

2   overtime.

3       Q.   And did you tell this to anyone?

4       A.   Yes.

5       Q.   Who?

6       A.   I told this to the other sergeants.  I told

7   it to the lieutenants.  I told it to labor counsel.

8       Q.   Did you tell it to anyone before February

9   2017?

10      A.   Well, he's in a position -- the prosecutor

11  position where I can't reassign until the next shift

12  bid that was put in in July.

13      Q.   I understand.

14           But did you tell this to anyone before

15  February 2017 before his testimony?

16      A.   No.  No, not prior to that, no.

17      Q.   When did you first tell that -- your

18  intention to reassign Sergeant Ballinger to patrol?

19      A.   The shift bids have to be put out by

20  contract 30 days prior, so I would have posted the

21  opportunity to bid on shifts in mid-May.

22           And by, like, May 31st, I have to post what

23  the shifts are going to be for July, so it would have

24  been in the -- you know, in May of 2017.

100

1    Q.   Prior to you posting the shift bids, did you

2   tell anyone your intention --

3    A.   No.

4    Q.   -- to reassign Sergeant Ballinger?

5    A.   It would have been on the shift bids as to

6   what the bids were, but, no.

7    Q.   I understand that.

8         But prior to that, did you tell Lieutenant

9   Wells, Lieutenant Kelley, hey, I'm going to reassign

10  Sergeant Ballinger?

11   A.   No.

12   Q.   Did you know who Sergeant Ballinger was

13  going to provide these questions to?

14   A.   No.

15   Q.   Did you have a meeting with him when you

16  gave him this document?

17   A.   I didn't give it to him.  Lieutenant Kelley

18  gave it to him.

19   Q.   And did Lieutenant Kelley -- did you have a

20  meeting with Lieutenant Kelley about this document?

21   A.   Just that, you know, I wanted him to give it

22  to Sergeant Ballinger.

23   Q.   And did you say to Lieutenant Kelley

24  anything about it?

1    A.    No.   I mean, I mean, I just gave him the

2  document to, you know, give to Sergeant Ballinger.

3  That was -- that's the end of it.

4    Q.    You didn't say anything else about it.

5    A.    No.

6    Q.    Did Lieutenant Kelley say anything to you?

7    A.    Not that I recall.

8    Q.    What do you recall Lieutenant Kelley telling

9  you about the interview on March 9th?

10    A.    I don't think we spoke very much about it

11  other than that he was sending the recording out to be

12  transcribed, and that was about it, you know, that he

13  confirmed that he had medical concerns, and he didn't

14  remember policies and procedures.

15         The only thing that I really remember in any

16  detail is that Attorney Panettiere wanted to make some

17  clarifications at the end, and Kelley said that, I

18  don't care what you have to say, this is over, and

19  that was it.

20    Q.    Do you know why Lieutenant Kelley said that?

21    A.    I don't.

22    Q.    But Lieutenant Kelley said that.  Do you

23  remember that from the audio or Lieutenant Kelley told

24  you that?

102

1    A.    I believe that after the interview, Attorney

2    Panettiere said something -- sent Lieutenant Kelley an

3    e-mail that wanted to make some type of clarification

4    to what Sergeant Ballinger meant by something.

5    Q.    And what was that clarification?

6    A.    I don't recall off the top of my head.  I

7    just know that he received an e-mail from her.

8    Q.    Did Lieutenant Kelley have any remarks about

9    that e-mail to you?

10    A.    No.

11    Q.    Is there anything else you recall that

12    either you said or Lieutenant Kelley said when you

13    discussed that interview?

14    A.    No.

15                  (Exhibit-17, March 21, 2017 medical

16    note, marked for identification.)

17    Q.    I'm handing you what's been marked as

18    Exhibit 17.  This is dated March 21st, 2017 Cove

19    Counseling PC.  It appears to be a note from Russell

20    Fry.  Do you recognize this as a note you received

21    concerning Sergeant Ballinger?

22    A.    (Deponent viewing document.) This was the

23    second medical report I received.  The first one I

24    received was from Doctor Katz.

1    Q.   You can -- that's fine, if that's your

2  testimony.  I believe this is the first one, but --

3    A.   But it wasn't.  The first one I got was from

4  the other doctor who was talking about he could do

5  some things on the job, that he could be a prosecutor

6  and be on a SWAT team, but he had concerns about him

7  basically doing certain patrol functions.

8        And at that point, I figured Sergeant

9  Ballinger would be coming back to work, and then I got

10  this one that contradicted the other report.

11                (Exhibit-18, March 27, 2017 letter,

12  marked for identification.)

13    Q.   Sir, I've handed you what's been marked as

14  Exhibit 18 in your deposition.  This is dated -- the

15  date of service is March 27th, 2017.  It's signed by

16  Doug Katz.  Is this what you're referring to as the

17  first report?

18    A.   (Deponent viewing document.) It must be, but

19  I know I received this one before I received that one.

20    Q.   That's fine.

21        And in this report from Doctor Katz that's

22  Exhibit 18 the third paragraph reads, "Overall, he has

23  been adapting, compensating to these symptoms since

24  his injury.  He's been able to perform his work at the

104

1   Kingston Police Department as a detective primarily

2   working on prosecution duties and the SWAT team mainly

3   at headquarters."  Did I read that correctly?

4        A.    (Deponent viewing document.) Yes.

5        Q.    And do you agree with me that Sergeant

6   Ballinger was working in the SWAT team at

7   headquarters?

8        A.    No.  The SWAT would be a -- if there was a

9   call out, they'd have to go to a high-risk situation,

10  and it would not be at the police station.  It would

11  be whatever community in southeastern mass was having

12  the incident at the time.

13       Q.    But do you agree with me that as a member of

14  the SWAT team, he could work at a headquarters and not

15  actually be at the --

16       A.    No.  He would be at the scene.

17       Q.    And in the next paragraph, Doctor Katz says,

18  "I find that his neurological condition is stable

19  based on history and examination."  Do you see that?

20       A.    (Deponent viewing document.) Yes.

21       Q.    And it says, "He has had some increase in

22  symptoms from time to time including more recently,

23  but I do not think there's a significant change in his

24  underlying condition."  Do you see that?

1      A.    (Deponent viewing document.) Yes.

2      Q.    He continues, quote, I believe he can

3 continue to carry out his duties as a police officer

4 and detective as he has performed these duties in the

5 last few years.  Do you see that?

6      A.    (Deponent viewing document.) Yes.  But what

7 I'm concerned about is the next paragraph.

8      Q.    He writes -- the next paragraph.  Okay.

9      A.    (Deponent viewing document.) Yeah.

10      Q.    But do you agree with me that overall Doctor

11 Katz agrees he can return to work?

12      A.    In a limited capacity is what he's saying.

13      Q.    Right.

14            And that capacity he has been performing for

15 the last two years was court prosecutor?

16      A.    But he was also working as shift supervisor

17 on occasion on overtime, you know, so you got to make

18 sure that he can do the essential functions of a

19 police sergeant before he can go to court.

20      Q.    Now, it's your testimony that you received

21 the Doctor Katz report before -- that's Exhibit 18

22 before you received Doctor Fry's that's Exhibit 17.

23      A.    That's correct.

24      Q.    Why didn't you simply return Sergeant

106

1   Ballinger to work after you received Doctor Katz's

2   report?

3        A.    'Cause I believe his union attorney told our

4   labor counsel that he was going to go see two doctors,

5   and I believe that she also was talking about

6   difficulty in him making appointments within the time

7   frame that was allotted.

8        Q.    Now, after you received what's been marked

9   as Exhibit 17, the report from Doctor Fry, did you

10  request more information?

11       A.    Yes.  And, again, labor counsel was in talks

12  with union counsel, and at that time she stated that

13  Ballinger was going to seek a disability retirement.

14       Q.    Ultimately Sergeant Ballinger did not seek

15  disability retirement; right?

16       A.    He has.

17       Q.    Well, he did not voluntarily seek disability

18  retirement; right?

19       A.    According to his counsel, he was going to

20  get further documentation from -- from his

21  psychologist here.

22            And the psychologist was asked to provide,

23  you know, documents talking about permanency, and

24  that's where they were going.

107

1        And then -- I don't know -- a month or two

2   later, the doctor said that it wasn't permanent that

3   he couldn't work now.  I -- that's, you know, the

4   medical documentation we received.

5        Q.   So my question is simply:  Sergeant

6   Ballinger did not voluntarily seek disability

7   retirement; did he?

8        A.   He supposedly was at this time, but he

9   eventually ultimately didn't.

10                      (Exhibit-19, April 3, 2017 letter,

11   marked for identification.)

12                      MR. LOUISON:  It's almost one

13   o'clock.

14                      (Brief break from 12:54 p.m. to

15   1:29 p.m.)

16                      (Exhibit-20, Answers to

17   interrogatories, marked for identification.)

18        Q.   (BY MR. SULMAN) Chief, I'm handing you

19   what's been marked as Exhibit 19.  Exhibit 19 is

20   before you and is an April 3rd, 2017 letter from

21   Doctor Fry to yourself.  It's sort of a more detailed

22   version of the previous letter from Doctor Fry;

23   correct?

24        A.   (Deponent viewing document.) Yes.

1    Q.   Do you recall how you received this?

2    A.   (Deponent viewing document.) I don't know if

3 it came in the mail or e-mail.  I don't know.

4    Q.   Well, do you recall what the circumstances

5 are that you got a more detailed version of Doctor

6 Fry's note?

7    A.   I don't -- I didn't send a second notice to

8 him or a second letter.  I don't know why he decided

9 to author an additional letter.  I don't recall.

10    Q.   At the top of his April 3rd, 2017 letter, he

11 writes, "I have responded to your notice of

12 administrative leave order to provide medical

13 documentation dated March 14th, 2017 answering five

14 questions pertaining to Sergeant Ballinger's fitness

15 for duty.  Further elaboration appears to be needed.

16 I apologize for not being more specific."  Did you

17 ever ask for more information to Doctor Fry?

18    A.   Me, no.  But I know that labor counsel and

19 Ballinger's attorney were going back and forth.  They

20 may have had a conversation asking for additional

21 information, but I didn't.

22    Q.   Well, did Sergeant Ballinger ever request to

23 return to work and was denied return to work because

24 of a lack of information?

1     A.    No.

2     Q.    Can I ask you to turn to Exhibit 20?   These

3   are the defendant's Town of Kingston's answers to

4   interrogatories.

5     A.    (Deponent viewing document.) Yes.

6     Q.    Now, you did not sign these, but if you can

7   turn to Interrogatory Number 1 on page 2?

8     A.    (Deponent viewing document.) I didn't

9   prepare these.   This is the first time I've seen this.

10     Q.    Is it fair to say you helped answer these?

11     A.    No, not at all.

12     Q.    Not at all.

13         Under Interrogatory Number 1, it says,

14   "Please identify each person who drafted these answers

15   or was consulted for the purposes of drafting these

16   answers.   For each such person, please list the

17   person's name, employer, and contact information."   Do

18   you see that?

19     A.    (Deponent viewing document.) Yes.

20     Q.    Under Answer Number 1, it lists Thomas

21   Calter the third, town administrator, Tina

22   Calisto-Betti, Town of Kingston Human Resource

23   manager, and then Chief Maurice Splaine.   Do you see

24   that?

110

1    A.    (Deponent viewing document.) Yes.

2    Q.    Now, can I ask you to turn to page 5 of

3  this, under Interrogatory Number 6?  Do you see that?

4    A.    (Deponent viewing document.) Uh-huh.

5    Q.    It lists -- it asks, "Please describe the

6  plaintiff's position as the Kingston Police

7  Department's court prosecutor, including but not

8  limiting to, A, a description of his duties, and, B,

9  any duties that plaintiff was required to perform that

10  were not formally a part of his job as a Kingston

11  Police Department's court prosecutor."  Do you see

12  that?

13    A.    (Deponent viewing document.) Yes.

14    Q.    Now, can I ask you to turn to the next page.

15  Do you see that this is answered by Thomas Calter the

16  third, town administrator?

17    A.    (Deponent viewing document.) Yes.

18    Q.    Was he the town administrator at the time of

19  Sergeant Ballinger's employment?

20    A.    Calter became town administrator in May

21  about -- probably for a two- or three-week period.

22  Calter was hired as a town administrator in -- just

23  prior to, I think, Ballinger's disability retirement

24  being approved.  There was probably a couple week

111

1    overlap.

2         Q.   Right.

3              So was he town administrator at any time

4    that Sergeant Ballinger actually worked on a

5    day-to-day basis?

6         A.   No.

7         Q.   Did he have any personal knowledge of

8    Sergeant Ballinger's work as a court prosecutor as or

9    as a sergeant?

10        A.   Yes.

11        Q.   What personal knowledge did he have?

12        A.   His son works for me.  His son is Detective

13   Ryan Calter, and Ryan Calter is one of the three

14   people that are handling the prosecution duties now.

15        Q.   But I said personal knowledge.  Did Thomas

16   Calter -- has Thomas Calter, the town administrator,

17   personally observed Sergeant Ballinger's work?

18        A.   Probably not.  I would speculate.

19        Q.   So were you consulted in -- for the answer

20   to Answer Number 6?

21        A.   (Deponent viewing document.) I know that

22   Attorney Ryan asked me a lot of -- of questions, and I

23   believe this interrogatory was specific for the -- for

24   town hall.

1        And I referred them to town hall because of

2   the HR aspect, but Attorney Ryan did ask me questions

3   that I guess could be as part of this interrogatory,

4   yes.

5        Q.   And then the answer to Number 6 is, "The

6   court prosecutor is not a position but an assignment

7   within the detective division of the Kingston Police

8   Department.  The general duties of a police prosecutor

9   is that he or she appears in the Plymouth District

10  Court and works in conjunction with the district

11  attorney's office and other court personnel to address

12  the needs of pending criminal matters.

13        "The town is not aware of any duties the

14  plaintiff was required to perform that were not

15  formally a part of his job as a Kingston Police

16  Department's court prosecutor."  Did I read that

17  correctly?

18        A.   (Deponent viewing document.) Yes.

19                 (Exhibit-21, Notice of sick leave,

20  marked for identification.)

21        Q.   I'm handing you what's been marked as

22  Exhibit 21 in your deposition.  This is a document

23  dated March 24th, 2017 to Sergeant Ballinger from

24  yourself called "Notice of placement on sick leave -

113

1  Order to Provide medical documentation - Delivered in

2  hand."

3          You note that you received a document

4  authored by Doctor Fry that he submitted responses on

5  March 14th, and then you notified Sergeant Ballinger

6  that he has placed on sick leave effective March 27th,

7  2017 and that he would remain on sick leave status

8  until further notice; correct?

9      A.   (Deponent viewing document.) Yes.

10     Q.   And then you ordered Sergeant Ballinger to

11 provide documentation in respect to the following;

12 correct?

13     A.   (Deponent viewing document.) Yes.

14     Q.   Is this when you ordered him to provide all

15 medical records going back to 2006?

16     A.   Yes.

17     Q.   And did you receive those records?

18     A.   I received some records from him, yes, over

19 a period of time.

20     Q.   And why did you want those records?

21     A.   So we could make a determination if the, for

22 lack of a better word, ailments that he had at this

23 time were relative to the 2006 injury.

24          He had been back to work 10 years with --

114

1  without restriction, and all of a sudden in February

2  of this year he was saying that it was related to a

3  2006 incident.

4          He never provided any documentation or any

5  notice that he had any medical issues in the recent

6  past.

7      Q.   Well, didn't Doctor Fry's notice say it was

8  related to the work injury?

9      A.   Yeah, but you got -- you got to provide

10  relevancy.  He hadn't documented anything that took

11  place recently.

12          And you don't know what took place in his

13  personal life outside of work that could have

14  triggered something.

15          So you're trying to bring it back to an

16  incident that's -- that's documented, so that's what

17  we were looking for was documentation to link it back

18  to a specific incident back in 2006.

19      Q.   So was this for 111F issues?

20      A.   Yes.

21      Q.   Did you ask for records from your injured on

22  duty vendor?

23      A.   Yes.

24      Q.   And did you obtain records from the injured

1   on duty vendor?

2        A.    The issue that we were having is that when

3   the 2006 incident took place, that was under Cabot

4   Risk.  We had changed vendors after, you know, his

5   injury here to a company called Cook and Company.

6             I called Cook and Company to find out what

7   they had for records, and they only had injured on

8   duty records for Ballinger from, I think, 2008 on.

9   They didn't have anything for, you know, the 2006

10  injury.

11            When I called Cabot Risk, I was told those

12  records were no longer readily available.  They had

13  been put on, I think, microfiche, and then the

14  microfiche was stored off site, and it would be a

15  while before they could, you know, obtain them.

16            And I believe that I did eventually get them

17  sometime in late June so that the IME doctor had them

18  for her records.

19       Q.    So you got -- did you get them from Cabot in

20  late June?

21       A.    I believe so.  I know I received records in

22  late June, and I -- to the best of my recollection, it

23  was either through them or that they contacted the

24  doctor and provided them that way.  I don't recall how

116

1    I got the records from 2006.

2         Q.   And are you saying the records you obtained

3    in late June were all records arising out of the

4    injury in 2006 or they were --

5         A.   Yes.

6         Q.   -- they were records dated in 2006?

7         A.   They were for the 2006 injury.

8         Q.   Regardless of what date they were?

9         A.   I believe that would be a correct statement.

10        Q.   So are you aware that there are records now

11   for this case for evaluations that Sergeant Ballinger

12   may have had in 2009, '10, '11 arising out of the 2006

13   injury?

14        A.   Yes.  I'd say that's true.

15        Q.   And are those the records you believe you

16   obtained in June?

17        A.   Probably, you know.

18                   (Exhibit-22, Neurology evaluation,

19   marked for identification.)

20        Q.   So I'm handing you what's been marked as

21   Exhibit 22.  Is this an example of medical records you

22   believe you obtained in June 2017?

23        A.   (Deponent viewing document.) I couldn't

24   swear to it.  I don't know, but it's possible.

1     Q.    Fair to say you didn't have this medical

2  record until you placed Tim Ballinger on sick leave;

3  correct?

4     A.    That would be correct, yes.

5     Q.    And did you -- is this one of the medical

6  records that you obtained at some point while he was

7  on sick leave?

8     A.    (Deponent viewing document.) Yes.

9     Q.    And do you believe you obtained this from

10  Tim Ballinger --

11     A.    No.

12     Q.    -- or through a request from the vendor?

13     A.    A request through the, you know, vendor

14  Cabot Risk.

15     Q.    What is your understanding of how Tim

16  Ballinger provided these evaluations or Tim

17  Ballinger's doctors provided these evaluations to the

18  vendor at the time they occurred?

19     A.    I don't know if they mailed them.  I don't

20  know if they were faxed.  I don't know.

21     Q.    But you understand they were provided to the

22  vendor at the time they occurred.

23     A.    I would assume so.

24     Q.    Do you know why they were provided to the

1   vendor in -- say, for instance, this one that occurred

2   in 2012, why they were provided to the vendor rather

3   than the police department directly?

4        A.   We never receive any medical records for

5   anybody.  It's like HIPAA violations, and what the

6   vendor does is it will take a look at whatever the

7   medical document is.

8             And if they recommend -- say somebody needs,

9   you know, an MRI or something of that nature, or

10  physical therapy, they review, you know, you know,

11  whatever the diagnosis is.

12            And then they make a medical opinion as to

13  whether or not it -- whatever the prescribed treatment

14  is is relative to, you know, the injury.

15            And then they then negotiate a price where

16  they end up using the Medicaid standards and stuff

17  like that, so they -- they manage everything, and then

18  they warehouse all the records so we don't have any

19  HIPAA violations.

20            Like I told you earlier, basically all the

21  police department houses for records is the initial

22  injury report.

23            And during the course that the person is out

24  injured, if they come back and they say they have a

119

1    still out of work note, they would provide that, you

2    know, to me, then I would forward that to the -- you

3    know, now Cook and Company, who's our current IOD

4    administration firm, and the -- a note that would say

5    that they could come back to work without restriction.

6         That's about the only records that we have

7    in regards to an IOD injury, and it's not just for

8    Ballinger.  It's for everybody.

9         Q.   Of course.

10        So because this medical treatment arose out

11   of an on-the-job injury, the treatment was being

12   covered by the IOD insurance.  Is that fair to say?

13        A.   Right.  And it would have been covered by

14   Cabot Risk because that was the date and time of the

15   company that, you know, had the claim then.

16        So even though it was, at this point, you

17   know, many years, six years after the fact, they were

18   still responsible for the billing and treatment and

19   housing of these records.

20        Q.   And it was still known that this treatment

21   arose out of that injury that happened on the job.

22        A.   I -- I believe that as a result of the 2006

23   injury, he had to go back periodically, I think it was

24   every two years, just to be reevaluated.

1    Q.   And is it part of that evaluation to

2  determine whether or not he could still perform the

3  job?

4    A.   See, they never would tell me whatever the

5  results were.  I suppose no news is good news, so if

6  they're telling me he can't -- you know, if they're

7  not telling me he can't, then I'm assuming he can.

8    Q.   Can I ask you to turn back to Exhibit 19

9  which is the April 3rd, 2017 note?  Actually, I'm

10  going to ask you to turn to Exhibit 17, 17, yeah, the

11  March 21st one.  This is the one that Doctor Fry

12  submitted March 21st.

13    A.   (Deponent viewing document.) Uh-huh.

14    Q.   In paragraph 5, Doctor Fry was responding to

15  your question as to whether he had seen any evidence

16  of unprovoked attacks of anger; correct?

17    A.   (Deponent viewing document.) Uh-huh.

18    Q.   And he answered, no.  Well, he didn't say

19  no, but he says, "I have not seen any evidence

20  historically or present of unprovoked attacks of

21  anger"; correct?

22    A.   (Deponent viewing document.) That's what he

23  writes, yes.

24    Q.   And then he writes, quote, in my experience

121

1  with Sergeant Ballinger, he has successfully followed

2  medical, psychological, neurological protocols toward

3  a successful reentry to the Kingston Police

4  Department, unquote.  Did you read that?

5      A.   (Deponent viewing document.) Yes.

6      Q.   Did you have any reason to disagree with

7  that?

8      A.   Well, I don't know the last time he treated

9  Sergeant Ballinger.  It was many years I believe, so I

10  don't know how fresh this statement is.

11      Q.   Did you have any reason to disagree with it

12  based on your personal experience?

13      A.   Well, yeah.  The incident with Sergeant

14  Potrykus had me, you know, kind of, you know,

15  concerned as to what's going on.

16          And then he just recently kind of bragged

17  about it at Munford's hearing that he just had a

18  conflict with a colleague, so, yeah.  I mean, again,

19  that's why --

20      Q.   What did he brag about at the -- having a

21  conflict at Sergeant Munford's testimony?

22      A.   When he was asked whether he had -- after he

23  said he had PTSD, they asked him if he ever had any

24  angry outbursts towards people or thing with little or

122

1  no provocation because I believe that was what was

2  written in Munford's, you know, diagnosis.

3         And he says, yes, and he kind of was

4  smirking about the whole thing, and he talks about how

5  he had an incident with, you know, a colleague a few

6  months back.

7     Q.   Did he describe that incident?

8     A.   Not -- not in detail in the hearing, but I

9  knew what he was referencing.

10    Q.   What was he referencing?

11    A.   The incident with Potrykus where he was

12  suspended.

13                   (Exhibit-23, Order to provide

14  medical documentation, marked for identification.)

15    Q.   Now, this is a May 4th, 2017 --

16    A.   (Deponent viewing document.) Uh-huh.

17    Q.   -- letter that you issued to Sergeant

18  Ballinger, subject line "Ordered to provide medical

19  documentation delivered via e-mail to counsel."

20    A.   (Deponent viewing document.) Right.

21    Q.   So this was sent to Leigh Panettiere.

22    A.   Yes.

23    Q.   You write, "I received a medical report

24  authored by psychologist Russell Fry that was

123

1    submitted in response to my order issued to you on

2    March 14th, 2017.  Upon review of said document, I

3    will need additional information pertaining to your

4    medical status."

5         Now, then you ask for more information, 1,

6    are you permanently incapacitated as a result of your

7    psychological condition; 2, if you are not permanently

8    incapacitated, what is your prognosis for recovery or

9    return to full duty?"  I didn't see any further report

10   by Doctor Fry.  Did he issue another further report?

11   A.    I believe he did, and I believe this was as

12   a result of conversation between Attorney Panettiere

13   and Attorney Clifford where she was saying that she

14   was trying to get Ballinger to go out on a disability

15   retirement, and I believe Clifford just said just get

16   the doctor to write that he's permanently

17   incapacitated.

18        And I believe there was a response that said

19   something about he's incapacitated at the current time

20   or something.  I think that's as far as it went.

21   Q.    What were -- were you issuing these orders

22   under a provision of the sergeants' contract?

23   A.    I don't know really if it would be under

24   28.1 in the collective bargaining agreement with the

124

1   sergeants or whether or not it would be under the IOD

2   policy, you know.

3           But these are questions that need to be

4   answered in order to place somebody on 111F or to file

5   for a disability retirement.  You need to show that

6   the incident was job related, and that it's permanent,

7   and that's what I was looking for.

8       Q.   Had Sergeant Ballinger applied for

9   disability retirement at this point?

10      A.   No.

11      Q.   And had he filed an application for 111F at

12  this point?

13      A.   I'm not sure whether he did on the May 4th

14  date.  It would -- at one point, his attorney e-mailed

15  John Clifford saying put him on 111F.  John responded

16  back to her saying there's a process; here's the

17  policy; here's the application.

18          And he then filed a grievance saying that we

19  didn't put him on 111F.  The trouble is he hadn't

20  applied yet, so I don't know how he grieved something

21  he hadn't applied for.

22      Q.   So my question was:  By May 4th, 2017, had

23  Sergeant Ballinger applied for 111F?

24      A.   I don't know.  I don't know the dates of his

1    actual application.

2        Q.    And if you can turn back to Exhibit 2 for

3    me?

4        A.    2?

5        Q.    Yes, the CBA.

6        A.    (Deponent viewing document.) Okay.

7        Q.    Is this the section that you said you may

8    have been invoking?

9        A.    (Deponent viewing document.) 28.1, yes.

10                   MR. LOUISON:   What page is it on?

11   14?

12                   THE DEPONENT:   Yes.

13       Q.    Where in 28.1 does it give the chief the

14   right to require more information or require an

15   evaluation?

16       A.    Well, it talks about -- about the chief, you

17   know, has the right -- I believe in previous sections

18   maybe under sick time -- that I can request people to

19   go and get doctors' notes telling me about, you know,

20   their ability to do the job.

21       Q.    So are you referring to 15.1 instead on page

22   9?

23       A.    (Deponent viewing document.) Yes.  Okay.

24       Q.    Is that what you were referring to, Section

126

1    15?

2         A.    (Deponent viewing document.) Well, you have

3    that, plus it's coupled with 28.1 that he's got to,

4    you know, provide me with documentation talking about

5    a new injury.

6              And he has to report it in the same fashion

7    even if it's a preexisting injury, you know, that

8    it's, you know, bothering him as well or reappearance

9    of a preexisting one.

10             And it talks about in here that they're

11   going to be on sick leave until we can investigate the

12   claim.

13             And then it further goes and says that once

14   he establishes that the claim is relevant to an

15   on-the-job injury, we'll reinstate the sick time.

16        Q.    So for the May 4th, 2017 order or the March

17   14th or March 24th, 2017 order, did you invoke or were

18   you intending to invoke Section 15.1?

19        A.    It was issued on a bunch of factors; one was

20   the conversations that were going on between two

21   counsels in regards to he was going to seek a

22   disability retirement, and those are the questions

23   that needed to be answered for that as well.

24        Q.    So my question was more specific.  In those

1    three orders, the March 14th, March 24th, and May 4th,

2    2017, were you intending or did you invoke Section

3    15.1 of the CBA?

4        A.    Yeah.  I can ask for a sick note, yes.

5        Q.    Well, under Section 15.1, it says, "The

6    chief may require medical examination if any employee

7    reports his inability to report for duty because of

8    illness."  Did Sergeant Ballinger report an inability

9    to report for duty because of illness?

10        A.    I would say his doctors' notes there from

11    Fry is showing that he's not capable to coming to work

12    at this time, so, yeah, I would say that that's a

13    documented illness.

14        Q.    You asked for the doctor's note.

15        A.    Okay.

16        Q.    But before you got the doctor's note from

17    Fry, did Sergeant Ballinger report an inability to

18    report to work --

19        A.    No.

20        Q.    -- due to illness?

21        A.    No.

22        Q.    Now, can you look at Section 28.3 of the

23    contract?  Section 28.3 talks about a temporary

24    modified work program.  Do you see that?

128

1      A.    (Deponent viewing document.) Uh-huh.

2      Q.    Did you ask any of the medical professionals

3  who evaluated Sergeant Ballinger whether he may have

4  been able to be assigned to a temporary modified work

5  program?

6      A.    In order to get there, you have to be on

7  111F.  This is not something you just put an officer

8  on.  They would have been on 111F, and you're trying

9  to then get them back to full duty.

10     Q.    Where does it say in here that you have to

11 be on 111F?

12     A.    (Deponent viewing document.) I believe it's

13 -- the way it's always been interpreted is that you do

14 28.1 first and get 111F.

15         And this mechanism has been used in the past

16 to get officers back to work, and, yeah.  I mean, this

17 whole thing, it's not just at one subsection.  It's

18 the following ones as well.

19         And this has only been utilized one time in

20 the, you know, nearly 30 years that I've been at the

21 station, and it was to get somebody back to work.

22         They -- you know, while he was out on his

23 injured-on-duty injury, he injured himself while at

24 home and suffered another injury.

1          The IOD injury had healed itself, so he

2    could come back to work in that -- from that injury,

3    but he couldn't perform all the other functions, you

4    know, so we put him on the temporary modified work

5    program, you know, while he recovered from the other

6    injury, and the issue --

7          Q.   And how long was he on that?

8          A.   (Deponent viewing document.) I don't know.

9    A couple months.  And the issue that you have with

10   that is it costs the town more money because if you go

11   down the 28. -- where is it -- yeah, 28.7, is that

12   once they're on 111F, that's tax free.

13          And when they come back to work, they're no

14   longer receiving the 111F benefits even when they're

15   on this temporary modified work program, so the town

16   ends up having to make up the difference.

17          So now you're paying somebody to do less

18   work, and it's costing you more money to do it because

19   you're paying them an additional, you know, like, 20

20   percent to make up the difference they would get if

21   they were on IOD.

22          Q.   Did you ever have any discussions with

23   anyone about placing Sergeant Ballinger on a temporary

24   modified work program?

130

1      A.    No.

2      Q.    Who was that officer that was placed on a

3 temporary modified work program?

4      A.    Roger Silva.

5      Q.    Is that the same Silva we looked at in the

6 --

7      A.    Yes.

8      Q.    And just let me finish my thought -- looked

9 at the roster?

10           When was he placed on the program?

11     A.    Chief Rebello was the chief at the time.

12 Silva was a 20-something year employee who probably

13 spent a third of his career, if not more, out on IOD,

14 so I don't remember the exact time of that one.  Maybe

15 2008 or so.  It's somewhere in that time.  I don't

16 recall the exact date.

17                 (Exhibit-24, Order to attend

18 independent medical exam, marked for identification.)

19     Q.    This is an exhibit marked 24 in your

20 deposition, a letter dated June 1st, 2017 from

21 yourself to Sergeant Ballinger ordering him to attend

22 an independent medical exemption with Doctor Judy Fine

23 Edelstein pursuant to Article 15.1 of the CBA which is

24 attached to the order.  Now, that's the section we

131

1    just looked at of the CBA; correct?

2        A.    (Deponent nodding.)

3        Q.    Correct?

4        A.    Yes.

5        Q.    Sorry.  You just nodded.

6              What prompted you to issue this order to

7    Sergeant Ballinger?

8        A.    Because we had conflicting reports from his

9    two doctors; one saying he couldn't work; one that

10   said he could, so I'm trying to get, you know,

11   information as to whether or not he could or couldn't.

12       Q.    And, again, you cited Article 15.1; correct?

13       A.    (Deponent viewing document.) Yes.

14       Q.    Had the department used Doctor Fine

15   Edelstein before?

16       A.    No.

17       Q.    How did you choose her?

18       A.    Labor counsel did research and found -- you

19   know, I forget who they consulted with, and we were

20   trying to figure out whether it was best to have him

21   evaluated by a neurologist or a psychiatrist,

22   psychologist, and we figured we wanted the medical

23   documentation, so we went with a neurologist.

24       Q.    At this point, did you still understand --

132

1    Strike that.

2          At this point, did you believe that Sergeant

3    Ballinger wanted to retire?

4        A.   I don't know what he wanted.  I -- I don't.

5    That's speculation.  I don't know.

6        Q.   Well, you testified earlier that at some

7    point you believed that Sergeant Ballinger wanted to

8    retire.

9        A.   That would have been prior to this date.  I

10   don't know if he -- I don't know, and it was related

11   to -- it would be hearsay.  It was through his

12   attorney to my attorney.

13       Q.   So you're not contending that on June 1st,

14   2017 Sergeant Ballinger wanted to retire.

15       A.   I don't -- I don't know what his status was

16   or what he -- what his thought was at that point.

17                    (Exhibit-25, Independent medical

18   examination report, marked for identification.)

19       Q.   I'm handing you what's been marked as

20   Exhibit 25 in your deposition.  This is a report from

21   doctor -- well, a report to John Clifford at Clifford

22   & Kenny, claimant being Tim Ballinger.  It's from

23   Doctor Fine Edelstein.  Do you recognize this?

24       A.   (Deponent viewing document.) Yes.

133

1    Q.   When did you first see this?

2    A.   July.

3    Q.   And that's at least a week or 10 days or so

4  after the date of this.  How do you recall receiving

5  it in July?

6    A.   I got an e-mail from John Clifford, I

7  believe it was on July 5th, saying he had received a

8  report.

9    Q.   Now, can I ask you to turn to what's

10  marked -- it's page 4 of the document -- what's marked

11  as six one four on the bottom?  Under causality on the

12  bottom, do you the -- where it says, "The above

13  symptoms appear to be related to the work injury"?

14    A.   (Deponent viewing document.) Yes.

15    Q.   Now, when you received this, did you

16  immediately place Sergeant Ballinger on 111F?

17    A.   No.

18    Q.   Why not?

19    A.   Well, he hadn't reapplied for the -- he

20  applied earlier in May, June -- I'm not sure of the

21  date -- with a form that wasn't complete.

22         And then he reapplied later in either July

23  or August, and, again, it wasn't complete.  It -- he

24  submitted it to Lieutenant Wells.

1      I know Lieutenant Wells sent him a detailed

2  letter as to all the deficiencies in his application,

3  so I didn't take any action on a form I hadn't

4  received.

5      Q.   What discussions did you have with

6  Lieutenant Wells about Sergeant Ballinger's 111F

7  application?

8      A.   I just told Sergeant Wells to review the

9  policy and go over the application form with Sergeant

10  Ballinger and point out all the deficiencies that he

11  hadn't completed yet or hadn't addressed yet.

12     Q.   What deficiencies were there?

13     A.   Off the top of my head, I don't recall all

14  of them, but I know he didn't, like, write a report.

15  He had no causation from his -- you know, the current

16  time frame to going back.

17         He didn't -- there was doctors he was

18  supposed to see, according to the policy, that he

19  hadn't abided by.

20         I don't remember all the different things

21  off the top of my head.  I just know they were

22  significant.

23     Q.   How many conversations with Lieutenant Wells

24  did you have about Sergeant Ballinger's 111F

135

1  application?

2      A.   I don't remember any more than one, maybe

3  two.  I mean, it wasn't something we talked about on a

4  daily basis.

5      Q.   What did Lieutenant Wells say to you about

6  it?

7      A.   That he was trying to get in touch with

8  Sergeant Ballinger to go over things.  I know he tried

9  on numerous occasions to -- to work with Sergeant

10 Ballinger.

11     Q.   Did he say anything else about it?

12     A.   No.  He didn't say anything, no.  I know he

13 had some type of documentation where he wrote all the

14 different things he did.

15          I don't -- like I said, I don't recall, off

16 the top I my head, all the different conversations he

17 may have had with Ballinger about the deficiencies.

18     Q.   You said he had documentation about he --

19 about all different things he did.  Who were you

20 talking about there?

21     A.   Sergeant -- Lieutenant Wells.

22     Q.   Had documentation from --

23     A.   He documented all the different contacts he

24 had with Ballinger trying to arrange a meeting to go

136

1   over the deficiencies.  I believe he also had text

2   messages where he was trying to come up with

3   arrangements.

4          And Ballinger was saying that he was on

5   vacation, was playing in the band, he's part of the

6   Boston Police Gaelic brigade, and that he was

7   unavailable.

8      Q.   So what kind of report did you want from

9   Sergeant Ballinger?

10     A.   Well, if you look at the IOD policy, it's

11  specific that you're supposed to write a report

12  documenting the injury.

13         And if it's an exacerbation of an old

14  injury, you have to document as to how that happened.

15  You have to notify your supervisor.  The supervisor

16  writes a report.

17         You then -- it's supposed to be evaluated by

18  a physician at the hospital.  You got to provide

19  medical documentation.  He -- he didn't do any of

20  that.

21     Q.   Well, in this situation, do you agree with

22  me that you were the one saying he wasn't fit for

23  duty?  He wasn't the one saying that.

24     A.   I never said he was not fit for duty.  I was

1  relying on doctors that would say that he wasn't fit

2  for duty.  I'm not a medical professional.  I'm not

3  making that determination.

4      Q.   But you were the one that initially

5  questioned it, fair to say; correct?

6      A.   Yes.

7      Q.   He never -- he didn't question it initially;

8  did he?

9      A.   Who's he?

10      Q.   Sergeant Ballinger; right?

11      A.   No.

12      Q.   Now, going back to Doctor Edelstein's

13  report, going to causality, there's a section called

14  disability.  Do you see that?

15                  MR. LOUISON:  What page is that on?

16                  MR. SULMAN:  Same page I was at

17  before.

18                  MR. LOUISON:  I don't know what

19  page that is.

20                  MR. SULMAN:  It's page 4.

21      Q.   She writes, "Neurologically he appears to

22  have some worse problems with his balance with a

23  slightly wide-based gait, mild tremor and significant

24  anxiety.  I would suggest that a psychiatrist evaluate

138

1   whether his symptoms of PTSD are clearly current

2   interfering with his ability to work as a police

3   officer."  Did you ever have Sergeant Ballinger

4   evaluated by a psychiatrist after his evaluation by

5   Doctor Fine Edelstein?

6       A.   No.

7       Q.   Then she writes, "He appears to have

8   multiple problems that stem from the initial injury in

9   2006 that would appear to interfere with his job as a

10  SWAT team and police officer."

11          Now, on the next page, you pose a question,

12  Number 1, "Can Sergeant Ballinger process and recall

13  information so that he's able to produce accurate

14  reports reflecting witness statements and accurate

15  description of events?"  Do you see that?

16      A.   (Deponent viewing document.) Uh-huh.

17      Q.   Now, you testified earlier that Sergeant

18  Ballinger, as a court prosecutor, doesn't regularly

19  produce police reports; right?

20      A.   But that isn't why I was asking that

21  question.  I was asking that question to find out

22  whether or not he could perform the essential

23  functions of a police sergeant.

24      Q.   Is there a reason you didn't have him

139

1 evaluated by a psychiatrist or psychologist after

2 this?

3     A.   No.  We were waiting for her to answer the

4 questions medically if he was able to do the essential

5 functions, and there's two follow-up reports to this

6 as well.

7     Q.   I'm getting to that.

8     A.   Okay.

9     Q.   Who posed the questions to Doctor Edelstein?

10     A.   Labor counsel, John Clifford.

11                 (Exhibit-26, Grievance, marked for

12 identification.)

13     Q.   I'm handing you what's been marked as

14 Exhibit 26 in your deposition.  This is an e-mail from

15 Sergeant Ballinger to yourself with an attached

16 grievance.

17        The e-mail is also copied to Attorney

18 Panettiere and Zach Potrykus.  Was Sergeant Potrykus

19 the union president at the time?

20     A.   (Deponent viewing document.) Yes.

21     Q.   And Sergeant Ballinger writes, "Chief, I was

22 told by Bobby on June 30th that you denied my second

23 request to be placed on 111F, although I don't know

24 why.  Attached you will find a grievance related to

140

1  this.  I will deliver a signed hard copy to the

2  station."  Who -- Bobby is Lieutenant Wells.

3      A.    (Deponent viewing document.) Yes.

4      Q.    So as of June 30th, is it fair to say

5  Sergeant Ballinger had made a second request to be

6  placed on 111F?

7      A.    He -- again, he tried to apply, but he

8  hadn't completed the application, and I hadn't denied

9  something that he hadn't formally applied for, and

10  there's a response e-mail to this where I told him

11  that.

12                      (Exhibit-27, August 8, 2017

13  addendum, marked for identification.)

14      Q.    Now, this is a subsequent report or,

15  technically, an addendum by Doctor Fine Edelstein;

16  correct?

17      A.    (Deponent viewing document.) Yes.

18      Q.    Dated August 8th, 2017, we're looking at any

19  Exhibit 27.

20      A.    (Deponent viewing document.) Yes.

21      Q.    And it's sent to John Clifford; right?

22      A.    Yes.

23      Q.    John Clifford is your labor counsel.

24      A.    Yes.

141

1      Q.    And is he the one that poses these

2  questions?

3      A.    Yes.

4      Q.    The first question is, "Are the issues

5  relating to Sergeant Ballinger's memory and cognitive

6  function likely to be permanent"; correct?

7      A.    (Deponent viewing document.) Yes.

8      Q.    And she answered that Sergeant Ballinger's

9  cognitive and psychological issues were unlikely to

10  improve over time and that they were permanent, and

11  I'm paraphrasing.

12      A.    (Deponent viewing document.) Yes.

13      Q.    And then in response to the question, quote,

14  is Sergeant Ballinger likely to be permanently

15  incapacitated from performing the essential function

16  of his position based on observations and evaluations

17  of his medical history; she answered, essentially, yes

18  for the role of SWAT officer; right?

19      A.    (Deponent viewing document.) That's correct.

20      Q.    Which was fair to say not what John Clifford

21  wanted?

22      A.    That's correct.  And I didn't know that he

23  had this second addendum.  I just know that he said he

24  was working with the doctors to get clarification.

1          And I didn't get either the second one or

2     the third clarification till sometime in September

3     when he sent them to me together as part of an e-mail.

4          Q.   At this point, did you know that the town

5     was looking to involuntarily retire Sergeant

6     Ballinger?

7          A.   No.  We were looking for permanency.  The

8     application for the accidental disability retirement

9     wasn't, you know, started or completed until after we

10    received the third report from the doctor.

11         Q.   Well, do you -- if the town wasn't looking

12    to permanently retire Sergeant Ballinger, why was the

13    labor counsel asking about the permanency of Sergeant

14    Ballinger's conditions?

15         A.   Because she was like right at the cliff but

16    didn't want to push him off.  She was saying that he

17    couldn't do a lot of the essential functions; that he

18    was, you know, basically guarded; prognosis was

19    guarded; that he couldn't do a SWAT commander.

20              And she hadn't answered the question yet can

21    he do the essential functions of a police sergeant,

22    and that's what we were waiting for, and it was in the

23    third correspondence that she said that, no, he can't,

24    and it's permanent.

143

1    Q.    That's my question.  Why did John Clifford

2   push on the permanency of it?

3    A.    So that you could file for a disability

4   retirement.  Right now you've got it so he can't work,

5   but what are you going to do with him?  You got to,

6   you know, retire him or he's going to stay on sick

7   time forever and he's going to run out.  I mean, we're

8   trying to do what's best for everybody, I mean.

9                     (Exhibit-28, September 11, 2017

10  addendum, marked for identification.)

11   Q.    This is Exhibit 28 I'm handing you.  This is

12  a September 11th, 2017 letter to Attorney Clifford

13  titled "Addendum from Doctor Fine Edelstein."  Do you

14  recognize this?

15   A.    (Deponent viewing document.) Yes.

16   Q.    And it's your testimony that you received

17  this addendum along with the addendum dated August

18  8th, 2017 together.

19   A.    Yes.

20   Q.    And you received them both sometime in

21  September 2017.

22   A.    Yes.

23   Q.    And this addendum states -- and I'll

24  paraphrase, but correct me if I'm not saying it

144

1   correctly -- that the doctor initially performed a

2   disability retirement examination on Sergeant

3   Ballinger, and she opined that he had a diagnosis of

4   electrocution injury, memory disfunction, PTSD, and

5   small fiber neuropathy with imbalance and tinnitus,

6   which were causally related to his work injury;

7   correct?

8       A.   (Deponent viewing document.) That's what she

9   writes, yes.

10      Q.   And she felt he was disabled and commented

11  on his job as a SWAT police officer and was now asked

12  to comment on whether he was generally fit to perform

13  as a police officer, police sergeant; correct?

14      A.   (Deponent viewing document.) That's correct.

15      Q.   And she states after reviewing the report

16  and evaluation it's her opinion that she is not --

17  that he is not able to work as a police sergeant;

18  right?

19      A.   That's correct.  I don't know why she

20  changed why she was doing the exam.  In her initial

21  report, in the first paragraph, it talks about that

22  she was doing an independent medical exam, and that's

23  what we asked for.

24           And then in her addendum, she's now changed

1   it to disability retirement exam.  That isn't why he

2   was sent there.

3          It was to establish whether or not he could

4   work as a police officer.  He wasn't sent there, you

5   know, at that point for a disability retirement.

6       Q.   Well, that's what she says there.

7       A.   Well, I can't comment on what she said.  I

8   can, you know...

9       Q.   Did you tell your attorney to send him for a

10  disability retirement?

11      A.   No.  We were -- John Clifford was, you know,

12  on board from the get-go with us to determine whether

13  or not he could do the essential functions of the

14  police -- as a police officer and whether or not he

15  had PTSD, the original five questions I asked, that's

16  what we were looking for, you know, and it just

17  morphed into all this other stuff.

18      Q.   Did you have discussions with your attorney

19  about this evaluation?

20      A.   Yes.

21      Q.   And what were those discussions?

22      A.   That it was, you know, permanent, and now we

23  were going to proceed with a disability retirement.

24  Prior to us proceeding with it, he was in contact with

146

1   Ballinger's attorney, and they were trying to work out

2   some type of settlement agreement.

3           And they kept moving -- in John's words --

4   the finish line, and, finally, we just said we're just

5   filing it, you know, and that's what we did.

6       Q.   What were those settlement discussions?

7            What were those?

8       A.   There was -- there was, like, 10 items they

9   were looking at; putting him on 111F; making him

10  whole; giving him back all his sick days.  I forget

11  the whole litany of things.  Like I said, there was a

12  laundry list of things.

13          And, eventually, Leigh Panettiere was

14  removed as the person representing Ballinger from the

15  union, and she was replaced with a more senior person.

16          It was at one point that Panettiere was, you

17  know, all ready to settle, you know, with the town and

18  John Clifford.

19          And then Mr. Ballinger, basically, changed

20  the terms of what he was looking for, and we just said

21  we just -- John Clifford just says, we're going to do

22  it without a settlement; we're just going to put him

23  on 111F; we're going to reinstate his sick days; we'll

24  make sure that he gets a -- you know, a W-2 that

147

1    reflects, you know, the changes in his tax status, and

2    that we were proceeding with the disability

3    retirement.

4         Q.   So you're saying when Leigh Panettiere was

5    on board as union counsel, she was ready to make a

6    settlement.

7         A.   Yes.

8         Q.   And then when she was removed, the union

9    pulled out.

10        A.   No.  The other attorney was trying to make a

11   settlement too.  Ballinger's the one that kept

12   changing his mind as to what he was looking for.

13        Q.   Who was the other attorney?

14        A.   If you brought up the website.

15        Q.   Was it the same counsel?

16        A.   Yes, it was the same.

17        Q.   Still Sandulli Grace?

18        A.   Still Sandulli Grace, but it was a more

19   senior.

20        Q.   John Becker?

21        A.   No.  It was a female.  I don't recall.

22        Q.   Let me go back to -- since you were talking

23   about your communication with counsel, let me go back

24   to your -- the February 17th, 2017, the testimony,

148

1    remember the testimony?

2        A.    Yeah.

3        Q.    Did you talk with your counsel about that,

4    about the testimony?

5        A.    Yes.

6        Q.    What were your communications with counsel

7    about that testimony?

8        A.    We really didn't want to do anything until

9    we had -- were able to review what he actually said.

10   We waited until, you know, we could review, you know,

11   the testimony and kind of, you know, produce our own

12   transcript of what he said until we could get an

13   official one, so that was basically it.

14           And then we talked about whether or not he

15   was physically and mentally fit to be a police officer

16   based on his public testimony.

17       Q.    And who'd you have those discussions with?

18       A.    With both John Clifford and Jamie Kenny.

19       Q.    And where were you when you had those

20   discussions?

21       A.    I was in my office.  A lot of it was done on

22   the phone.

23       Q.    Did you talk about anything else?

24       A.    No.

149

1      Q.    Nothing --

2      A.    I mean, I'm sure we did, but nothing that's

3   relevant to this.

4      Q.    Nothing else about his testimony?

5      A.    No.

6      Q.    And did your counsel advise you to have

7   Lieutenant Kelley interview him?

8      A.    Well, after -- after the --

9      Q.    Yeah, after you placed him on leave.

10      A.    Yes.  Yes.

11      Q.    And why did he say it was best to have

12   Lieutenant Kelley do it?

13      A.    Lieutenant Kelley is our internal affairs

14   investigator, and, you know, we just have him do it.

15   I mean, I wasn't going to do it.  I'm the one that's

16   got to make the decision.  Somebody else has got to

17   gather the facts and, you know, conduct the interview.

18                      (Exhibit-29, Notice of

19   injured-on-duty status, marked for identification.)

20      Q.    I'm handing you what's been marked as

21   Exhibit 29.  This is a letter from you to Sergeant

22   Ballinger dated November 7th, 2017 notifying Sergeant

23   Ballinger that he has been placed on injured-on-duty

24   status per Chapter 41, Section 111F; correct?

150

1    A.    (Deponent viewing document.) Yes.

2    Q.    Now, you state here in the third paragraph

3    that you are placing Sergeant Ballinger on Section

4    111F, quote, notwithstanding your failure to apply for

5    Section 111F benefits in accordance with Kingston

6    Police Department rules and regulations; correct?

7    A.    (Deponent viewing document.) Yes.

8    Q.    Why did you do that?

9    A.    Because twice he filed grievances saying

10   that I denied him 111F benefits when both times he

11   didn't, you know, apply or, you know, fill out the

12   forms correctly, so -- and he filed grievances twice

13   on something that he hadn't even applied for.

14   Q.    By November 7th, had he applied?

15   A.    No.

16   Q.    So why did you grant him the benefits?

17   A.    Because now we had a report from a

18   neurologist that said he was unable to do the

19   essential functions of a police officer.

20         And the reason there's a delay from sometime

21   in September till now is that the attorneys were going

22   back and forth trying to come up with a settlement

23   agreement.

24         And when they couldn't, you know, arrive at

1    one, we just said we're just putting him out; we're

2    not going to postpone this, you know, any longer.

3        Q.   So this was not a result of a settlement

4    agreement.

5        A.   No.  We just did this on our own, you know.

6        Q.   Now, at the bottom of the letter -- I

7    shouldn't say the bottom, but in the last full pull

8    paragraph, you write, "As a condition of your

9    conditioning injured-on-duty status under

10   Massachusetts General Laws, Chapter 41, Section 111F,

11   you are ordered to cooperate completely with the

12   disability retirement process, including attending any

13   medical panel or other proceeding convened regarding

14   his disability retirement application."  Did I read to

15   correctly?

16       A.   (Deponent viewing document.) Yes.

17       Q.   You understand that it was an involuntary

18   retirement application; right?

19       A.   That's correct.

20       Q.   Now, and then you also write to him -- and

21   I'll paraphrase here -- that if he fails to attend,

22   cancel, or postpone an appointment, the town retains

23   the right to convene a hearing to determine whether he

24   should be moved from injured on duty.

152

1    A.    (Deponent viewing document.) That's correct.

2    Yeah.

3    Q.    So if he asked to postpone a hearing for any

4    reason, his kid's sick, he's sick, or whatever, you

5    were retaining the right to cancel his 111F.

6    A.    Right.  We wanted to make sure he would go

7    and not prolong the period -- the process.  As it is,

8    it takes somewhere between eight to 12 months to get

9    somebody, you know, approved for a disability

10   retirement.

11        And counsel said there's been occasion where

12   people have, you know, again, come up with what you

13   said, I'm sick, my kids are sick, and they just come

14   up with excuse after excuse for not, you know, going

15   through the process, so we just said you got to go.

16   We wanted to have a consequence in there if he didn't.

17                  (Exhibit-30, Injured on duty

18   policy, marked for identification.)

19   Q.    Chief, this is Exhibit 30.  This is the

20   injured on duty policy with the Kingston Police

21   Department.

22   A.    (Deponent viewing document.) Yes.

23   Q.    This is the one in effect when Sergeant

24   Ballinger --

153

1      A.    (Deponent viewing document.) Yes.

2      Q.    Let me finish my sentence.

3      A.    Oh, okay.

4      Q.    When Sergeant Ballinger testified in

5 February of 2017 and, eventually, was approved for IOD

6 status?

7      A.    Yes.

8      Q.    That's fine.  Thank you.

9            Do you recall before this case was filed in,

10 first, state court and federal court, it was filed at

11 the Massachusetts Commission Against Discrimination?

12     A.    Yes.

13                  (Exhibit-31, Position statement,

14 marked for identification.)

15     Q.    Sir, I've handed you what's been marked as

16 Exhibit 31.  This document is on your law firm's

17 letterhead, and I believe it's the position statement

18 of the Town of Kingston, yourself; is that correct?

19     A.    (Deponent viewing document.) Yes.

20     Q.    And is that your signature on the last page?

21     A.    (Deponent viewing document.) Yes.

22     Q.    And by signing that, did you affirm that the

23 facts in the position statement were based on

24 information obtained in the records of the Town of

154

1   Kingston and various employees?

2       A.    (Deponent viewing document.) Yes.

3       Q.    And to the extent you had personal

4   knowledge, you verified and affirmed that it was true

5   under the pains and penalties of perjury.

6       A.    Yes.

7                    (Exhibit-32, January 3, 2016 - July

8   2, 2016 shift bid, marked for identification.)

9       Q.    I'm handing you what's been marked as

10  Exhibit 32.  This is a document on Town of Kingston

11  Police Department letterhead.  Do you recognize this

12  as a shift bid from January 3rd, 2016?

13      A.    (Deponent viewing document.) Yes.

14      Q.    It's probably issued several months

15  beforehand; right?

16      A.    (Deponent viewing document.) Well, this is

17  the bid that I would have put out in mid-May -- no, in

18  mid-November --

19      Q.    Right.

20      A.    -- for the January shift bid.

21      Q.    And this is a shift bid for the

22  sergeants; right?

23      A.    That's correct.

24      Q.    And it says at the top under the title of

1    shift bid for January 3rd, 2016 through July 2nd, 2016

2    reads, "The following shifts are available.  All shift

3    bids are to be completed and sent to Chief Splaine via

4    the Microsoft Online Office 365 e-mail system by

5    eight a.m. on Monday, November 3rd, 2015.  Each

6    sergeant may submit up to five preferences for shift

7    assignments.  The shift assignments shall be posted by

8    four p.m. on Tuesday, December 1st, 2015."  And below

9    that it lists six shifts; correct?

10        A.   (Deponent viewing document.) Yes.

11        Q.   And then the last shift is -- has the letter

12   P and police, slash, court prosecutor next to it;

13   right?

14        A.   (Deponent viewing document.) That's correct.

15   Yeah.

16        Q.   And then it says after that, "Note, the

17   police court prosecutor, P, position is not available

18   for bid at this time.  This position is only open

19   during the July shift bid sequence.  Sergeant

20   Ballinger shall remain in his position through July

21   2nd, 2016."  Did I read that correctly?

22        A.   (Deponent viewing document.) Yes.

23        Q.   Why was Sergeant Ballinger going to remain

24   in that position?

1     A.    Because the collective bargaining agreement

2   says you only bid a specialty position in a July shift

3   bid, so since this shift took place in January, he

4   still had six months to go in his position.

5                    (Exhibit-33, July 3, 2016 -

6   December 31, 2016 shift bid, marked for

7   identification.)

8     Q.    I'm handing you what's been marked as

9   Exhibit 33.  This is a document on Town of Kingston

10  Police Department letterhead that appears to be the

11  Mass C.O.P. shift bid for July 3rd, 2016 through

12  December 31st, 2016.  Is that fair to say?

13    A.    (Deponent viewing document.) Yes.

14    Q.    So this would be the next shift bid that

15  came up.

16    A.    (Deponent viewing document.) Yes.

17    Q.    And it -- did it issue on or around May

18  20th, 2016 --

19    A.    (Deponent viewing document.) Yes.

20    Q.    -- according to the bottom left?

21    A.    (Deponent viewing document.) Yes.

22    Q.    Now, at the end, I didn't -- I didn't say

23  this in the last document, but both this and the last

24  document shows six sergeants at the time.  Is that

1    fair to say?

2        A.    (Deponent viewing document.) Yes.

3        Q.    Now, at the bottom of this document Exhibit

4    33, it states, "Specialty assignments, slash,

5    position."  Below that, quote, there will also be a

6    court prosecutor position.  Individuals selected to

7    work as the court prosecutor will work a five and two

8    workweek.  Did I read that correctly?

9        A.    (Deponent viewing document.) Uh-huh.

10       Q.    This is per Article 7.0 of the agreement by

11   and between the Town of Kingston and the Superior

12   Police Officers Union, Mass. C.O.P.S., Local 386.

13   Moreover, this position does qualify for a stipend,

14   end quote.  Now, who bid for that position, as far as

15   you can recall?

16       A.    I don't know if anybody bid for it.

17       Q.    Who was assigned that position?

18       A.    Nobody at that point.  I -- wait.  Wait.

19   Yeah.  Ballinger would have been assigned.  I'm trying

20   to remember what year things happened, yeah.

21   Ballinger applied.

22       Q.    And was Ballinger assigned to that position?

23       A.    Yes.

24       Q.    So Ballinger during the July 3rd, 2016 to

158

1    December 31st, 2016 --

2         A.   Yes.

3         Q.   -- period was assigned the court prosecutor

4    position.

5         A.   Yes.

6                   (Exhibit-34, E-mail, marked for

7    identification.)

8         Q.   I'm handing you what's been marked as

9    Exhibit 34 in your deposition.  This is an e-mail from

10   yourself to -- it appears to be the sergeants at the

11   time.  Is that fair to say?

12        A.   (Deponent viewing document.) Yes.

13        Q.   On May 25th, 2017, and this is an e-mail for

14   the shift bids from July 2nd, 2017 through December

15   30th, 2017.

16        A.   (Deponent viewing document.) Yes.

17        Q.   And this is after Mr. -- sorry -- after

18   Sergeant Ballinger was placed on paid admin leave and

19   then sick leave; correct?

20        A.   That's correct.

21        Q.   And so you're posting four shifts, one, two,

22   three, four at the top.  Do you see that?

23        A.   (Deponent viewing document.) Yes.

24        Q.   And then you don't list any specialty

159

1   positions at the bottom; right?

2        A.   (Deponent viewing document.) That's correct.

3        Q.   So was -- the court prosecutor position was

4   not open to sergeants at the time.  Is that fair to

5   say?

6        A.   That's correct.

7        Q.   And why was that?

8        A.   Like I explained earlier, I had budgetary

9   concerns, and I needed to cover the shift that Munford

10  used to work, so I was going to have Ballinger work

11  the -- you know, the open shift that Munford would

12  have had.

13       Q.   So what was your intention as to who would

14  serve in the role as court prosecutor during this time

15  period?

16       A.   It was going to be split between Lieutenant

17  Wells and Detective Calter.  It would still be within

18  the -- what they call it -- the CIB, which is the

19  criminal investigation bureau, which houses the

20  detectives and the prosecutor position.

21       Q.   Isn't the prosecutor position a collective

22  bargaining position under the contract?

23       A.   Yes, it is.

24       Q.   So is it -- has that been a subject matter

160

1  of a grievance, taking it out of the collective

2  bargaining?

3     A.   I didn't take it out.  It says that I can

4  fill it or choose not to fill it, and I can fill it

5  either from a patrolman or with a sergeant.

6     Q.   Right.

7     A.   I don't have the personnel.

8     Q.   But you're filling it with a lieutenant now.

9     A.   Well, you know, he's in charge.  I mean, he,

10 basically, had Calter going to court every day, but he

11 could go if he needed to.

12    Q.   And now you have a lieutenant going; right?

13    A.   Possibly.

14    Q.   And the Superior Officers Union is not

15 grieving this.

16    A.   No.

17    Q.   And taking this out of specialty bidding has

18 nothing to do with making this unavailable to Sergeant

19 Ballinger.

20    A.   No.  He never came back either.  I mean, he

21 was -- it's kind of a moot point.

22    Q.   Well, he didn't come back because he -- you

23 didn't make the prosecutor position available to him;

24 isn't that fair to say?

161

1    A.   No.   He didn't come back because he couldn't

2  do the essential functions of a police sergeant, and

3  that's what I needed him to do here.  I've only got so

4  many funds.  It's a very small department.

5                    (Exhibit-35, Retirement

6  application, marked for identification.)

7    Q.   I'm handing you what's been marked as

8  Exhibit 35.

9                    MR. SULMAN:  I only have one copy

10  because it's a hundred pages, but I can e-mail you a

11  copy, if you want later.

12                    MR. LOUISON:  I'm sure I have it.

13                    MR. SULMAN:  Yeah.

14    Q.   Is this -- it's a hundred pages, Chief, but

15  do you recognize this as the retirement application

16  for Sergeant Ballinger?

17    A.   (Deponent viewing document.) Yes.

18    Q.   If you want, you can review it, but I'm not

19  misrepresenting anything.

20                    MR. LOUISON:  Can I just take a

21  look at it?

22                    MR. SULMAN:  Sure.

23                    MR. LOUISON:  Just I was looking

24  for this, and I'm sure you produced this in

162

1  document --

2                    MR. SULMAN:  I think you produced

3  this actually.

4                    MR. LOUISON:  Okay.  I'm just --

5                    MR. SULMAN:  We may have produced

6  it, but I think you did.

7                    MR. LOUISON:  Okay.  I just wanted

8  to make sure I have this.  There's a Bates stamp.

9                    MR. SULMAN:  If it says

10  confidential, then you produced it.

11                    MR. LOUISON:  Okay.  All right.

12          And this is the application.  I do believe I

13  have it.  Okay.  Thank you.

14                    MR. SULMAN:  Sure.

15      Q.   Who -- Strike that.

16          Do you recall that the town or agents of the

17  town submitted an application for involuntary

18  accidental disability for Sergeant Ballinger on

19  October 2nd, 2017?

20      A.   (Deponent viewing document.) Yes.

21      Q.   And as a part of that, did you submit an

22  affidavit?

23      A.   (Deponent viewing document.) I know I had to

24  sign a couple different things, yes.

1     Q.    Are you -- do you see your affidavit there?

2     A.    (Deponent viewing document.) Yes.

3     Q.    And you opined there in the affidavit that

4  as a result of the documentation received from Doctor

5  Edelstein, you are of the opinion that Mr. Ballinger

6  is not able to perform the essential job functions of

7  a Kingston police officer, and Mr. Ballinger is

8  eligible for involuntary disability retirement.

9     A.    (Deponent viewing document.) That's correct.

10    Q.    Now, do you understand on what basis the

11 town originally applied for involuntary disability

12 retirement for Mr. Ballinger?

13    A.    Originally, I know it included PTSD, and I

14 know that Mr. Ballinger objected, and that counsel

15 told me we had to fill out a new, like, cover page

16 that removed PTSD and listed a, you know, litany of

17 other, you know, injuries as well.

18    Q.    Do you know why the supplemental page --

19 well, strike that.

20        Was there any other reason the supplemental

21 information was submitted besides Sergeant Ballinger's

22 objection?

23    A.    No.

24                  (Exhibit-36, Supplemental

164

1   information, marked for identification.)

2       Q.    I'm handing you what's been marked as

3   Exhibit 36.  Do you recognize this document?

4       A.    (Deponent viewing document.) Yes.

5       Q.    Have you seen this before?

6       A.    Yes.

7       Q.    This has your initials on it.

8       A.    (Deponent viewing document.) Yes.

9       Q.    This is the supplemental information for

10  Sergeant Ballinger's disability application.

11      A.    That's correct.

12      Q.    And what part of this was amended?

13      A.    (Deponent viewing document.) The part where

14  it says, "basis of disability."

15      Q.    And that the town put down electrocution

16  injury, memory disfunction, small fiber neuropathy,

17  imbalance tinnitus.

18      A.    (Deponent viewing document.) Correct.

19      Q.    Did you understand why Sergeant Ballinger

20  did not voluntarily file for accidental disability?

21      A.    No.

22      Q.    Did he ever tell you?

23      A.    No.

24      Q.    Did he ever state at a disability panel that

1   you attended why he did not?

2       A.    I never attended a panel.

3       Q.    Were you ever informed why he did not

4   voluntarily file?

5       A.    No.

6       Q.    Can you turn back to your -- to the actual

7   application?

8       A.    The big packet?

9       Q.    Yeah.

10      A.    Yeah.

11      Q.    Okay.  Can you look at on the bottom

12  confidential 628 to 629?

13      A.    (Deponent viewing document.) Okay.

14      Q.    Are you there?  Okay.  This is where you're

15  asked to describe the essential duties.  Do you see

16  that?

17      A.    (Deponent viewing document.) Yes.

18      Q.    Did you fill out this form?

19      A.    No.

20      Q.    Who filled it out?

21      A.    Chris Kenny, he's the one that signed it.

22  He's the attorney at Clifford & Kenny.

23      Q.    Do you see under Number 1, it says, "Please

24  describe the essential duties that the applicant is

1    required to perform in his or her current position?"

2        A.    (Deponent viewing document.) Uh-huh.

3        Q.    And then it simply refers to the attached

4    Massachusetts PD police officer task survey.

5        A.    (Deponent viewing document.) Okay.

6        Q.    Right?

7        A.    (Deponent viewing document.) Yes.

8        Q.    Now, you understand that -- Strike that.

9              You agree with me that Sergeant Ballinger's

10   civil service position was a sergeant; right?

11       A.    Yes.

12       Q.    But his actual position in the Kingston

13   Police Department was court prosecutor; right?

14       A.    No.   It was an assignment.   His position was

15   police sergeant.

16       Q.    His day-to-day position where he worked

17   every day was at the Plymouth District Court as court

18   prosecutor; right?

19       A.    He was there for a period of time, yes.

20       Q.    As you testified earlier, he every day went

21   to the station, picked up paperwork, and went to the

22   court; right?

23       A.    Yes.

24       Q.    And remained at court all day; right?

1      A.    Until he came back to find more paperwork.

2      Q.    Now, under Number 2, it says, "How

3  frequently is the applicant required to perform these

4  essential duties?"  Do you see that?

5      A.    (Deponent viewing document.) Yes.

6      Q.    It says, "The applicant is required to

7  perform any and all essential duties on a

8  shift-to-shift basis and during work details."  Do you

9  see that?

10      A.    (Deponent viewing document.) Uh-huh.

11      Q.    Actually, on a shift-to-shift basis, he

12  doesn't perform those duties of a sergeant.  He

13  performs the prosecution duties; isn't that correct?

14      A.    He would if he's working overtime, and he

15  would have if he came back in July of '17.  Could you

16  imagine if I said, you could only go to court, and

17  then he's not able to work details or overtime, then I

18  would be having a disfair treatment lawsuit instead.

19  I mean, it was a no-win situation.

20      Q.    I'm just -- I'm just asking about what he

21  actually did.  That's all I'm asking you.

22            Now, if you turn back to Exhibit 20,

23  Interrogatory Number 6 states, "The town is not aware

24  of any duties the plaintiff was required to perform

168

1  that were not formally a part of his job at the

2  Kingston Police Department court prosecutor."  That's

3  what's written there; correct?

4      A.    (Deponent viewing document.) I've never seen

5  this before, but, okay.

6      Q.    Now, Number 3 on page 629 of the

7  application, it says, "Please describe the physical

8  requirements of the applicant's current position."

9          And, apparently, your attorney wrote

10  "Separate individuals in a fight or disturbance, erect

11  physical barriers, bodily serve as a barrier,

12  physically restrain or subdue a violent or resisting

13  individual or arrestee to protect self, the person

14  being restrained, and the public."  Do you see that?

15      A.    (Deponent viewing document.) Yes.

16      Q.    Do you understand how often a court

17  prosecutor did that?

18      A.    You never know what's going to happen in

19  court.  I mean, you just don't know.  I mean, it could

20  happen.

21          He also has to drive from the station to the

22  courthouse.  He would have a duty to act if he

23  observed something.

24      Q.    Then it says Number 5, "Could the applicant

1  perform the essential duties of his or her current

2  position if he or she was reasonably accommodated?"

3  And the answer is, no.  Did you consider the court

4  prosecutor position to be a reasonable accommodation?

5       A.   No.  Because that's an assignment within

6  either the patrol division or the sergeant.  You've

7  got to do the essential functions of one or the other

8  before they can have an assignment.

9       Q.   Can you turn to the next page, 630?  Number

10  2 here, you see this, where it says, "Did the

11  applicant request any modification of his -- of job

12  duties in order to accommodate his or her medical

13  condition?  If yes, please explain."  Did I read that

14  correctly?

15      A.   (Deponent viewing document.) Yes.

16      Q.   And the answer is.  "Yes.  However,

17  applicant cannot perform the essential duties of his

18  position."  What modifications of job duties did

19  Sergeant Ballinger request?

20      A.   I don't know if his attorney requested them

21  through the law firm, but he didn't provide me with

22  any request.

23      Q.   So you're not aware of --

24      A.   I'm not aware of it.

170

1    Q.    -- what they're referring to.  Okay.

2          At some point -- this is going to another

3    topic -- was Susan Munford's license to carry

4    suspended?

5    A.    Yes.

6    Q.    And did you testify in that proceeding?

7    A.    In the court proceeding?

8    Q.    Yes.

9    A.    Yes.

10   Q.    And was that after Sergeant Ballinger was

11   placed on sick leave or paid administrative leave?

12   A.    No.

13   Q.    It was beforehand.

14   A.    Yes.  Wait.  No.  It would have been after.

15   That would have been in June of 2017.

16   Q.    Okay.  Did the subject matter of Susan

17   Munford or Susan Munford's post-traumatic stress

18   disorder come up in that proceeding?

19   A.    Yes.

20   Q.    Because that was the reason why --

21   A.    Yes.

22   Q.    -- you took her -- not took her, but you

23   suspended her license to carry?

24   A.    That was one of the reasons, yes.

1    Q.   Were you asked any questions about whether

2  other members of the police department had PTSD?

3    A.   Yes.

4    Q.   And did you -- what did you answer?

5    A.   Not that I'm aware of.

6    Q.   Did you forget about Sergeant Ballinger at

7  the time?

8    A.   No.  The medical reports that kept coming

9  never had a definitive diagnosis.  They talked about

10  he would have mild PTSD like symptoms were improving.

11  They would talk about he displayed aspects of it, but

12  there was a definitive diagnosis that he had PTSD.

13         In fact, a lot of the reports were saying

14  that they diagnosed him with some other medical

15  condition, so I didn't have a diagnosis at that time

16  that he had PTSD.

17    Q.   So you remembered him -- you remembered his

18  testimony.  You just didn't actually think of him --

19    A.   Remember what?

20    Q.   -- of having PTSD at the time.

21    A.   What do you mean remember his testimony?

22    Q.   I mean, it's not that you forgot his

23  testimony.

24    A.   He can allege that he has anything, but

1    without any type of medical documentation to back it

2    up, I don't know, and that's what I'm looking at.

3        Q.   And you remembered his -- the report from

4    Doctor Fry at the time that we looked at.

5        A.   Yeah.

6        Q.   And from Doctor Katz at the time, but you

7    just didn't think those were definitive.

8        A.   Yeah.  Doctor Fry wrote that he had

9    symptoms, and that he -- he diagnosed him with some

10   other medical condition or mental condition, you know.

11           They all dance around whether or not there's

12   a diagnosis, and I know we're getting argumentative,

13   but that's the way I looked at it, is that there was

14   no definitive diagnosis.  The only one that had a

15   diagnosis that was presented was Munford.

16           Ballinger, like I said, they talked about

17   symptoms, displays symptoms, has aspects.  Nobody

18   wanted to come right out and say he was diagnosed with

19   PTSD.  That -- that doesn't exist.

20       Q.   You're used to people being cross-examined

21   on the stand, right, with, like, sort of nuance

22   answers; right?

23       A.   Okay.

24       Q.   Do you feel like your answer's a little

173

1    nuanced here, about how you're not aware of Sergeant

2    Ballinger being -- having PTSD at this time?

3         A.   When that --

4                   MR. LOUISON:  Objection to the form

5    question.

6         A.   When that did happen, our attorney objected

7    right away, and there was no follow-up, so I couldn't

8    make any type of clarification 'cause the judge ruled

9    that it wasn't relevant as to the discussion.

10                  MR. SULMAN:  Off the record.

11                  (Brief break from 3:18 p.m. to

12   3:29 p.m.)

13        Q.   (BY MR. SULMAN) Did Sergeant Ballinger have

14   any nicknames around the station?

15        A.   I don't know.

16        Q.   You don't know.

17        A.   I don't -- I mean, I'm not in the click.  I

18   mean, I don't know what they called one another.

19        Q.   Did you ever call him any nicknames?

20        A.   No, I mean, not that I recall.

21        Q.   Did you ever refer to him as sparky?

22        A.   Me?

23        Q.   Yeah.

24        A.   No.  I can see why, but I never did, no.

1    Q.   Did you ever hear anyone else calling him

2  sparky?

3    A.   No.  I mean, the officers or sergeants

4  aren't going to, you know, joke around if I'm in the

5  room.

6    Q.   But it's your testimony that you never

7  referred to him as sparky.

8    A.   I've never called him sparky.  My

9  predecessor could have, but it was never me.  I know

10  he has a tattoo with a lightning bolt on his arm.

11    Q.   Well, that's not my question.

12    A.   Oh, okay.  I mean, but...

13    Q.   Are you aware if anyone's ever teased him

14  about being electrocuted at work?

15    A.   No.  I mean, I know that he would joke about

16  it, but I don't know if any, like, bullying or teasing

17  about it, no.

18    Q.   How would he joke about it?

19    A.   You know, that he got -- you know, I don't

20  know, you know, a lot of volts that went through his

21  body.

22         I mean, that -- I mean, you know, I don't

23  recall a specific instance where he would be joking,

24  but Timmy basically had a pretty, you know, jovial

1   personality.  He was always joking about something.

2       Q.   Other than the incident with Sergeant

3   Potrykus on June 28th, 2016, were there other

4   incidents where Sergeant Ballinger got into what you

5   described as a heated interaction with another officer

6   or superior officer?

7       A.   The only thing that I'm aware of is during

8   his defense in the Potrykus matter is he said that

9   Potrykus yelled at him in the back of the station just

10  before the Munford testimony, you know, hearing, but

11  other than that, I don't know of anything.

12      Q.   Is that the same incident or a different

13  incident?

14      A.   It would have -- it would have been the same

15  -- same -- no.  It wouldn't a different -- different

16  day.

17          He was trying to say that Potrykus, you

18  know, yelled at him in the back parking lot, something

19  about you tried to jam me up or something with the

20  Munford matter, but I really don't know too much more

21  about it.

22      Q.   Other than that, were there any other times

23  that you're aware of Sergeant Ballinger being accused

24  of yelling or engaging in any kind of outbursts at

176

1    work?

2        A.    No.   I'm not aware of anything else.

3        Q.    Are you aware of any times when he's been

4    observed as having problems with balance at work?

5        A.    With?

6        Q.    Balance.

7        A.    I read in one of the documents -- and I

8    don't know if it was MCAD or something -- where it

9    said that when he was at the courthouse, he fell

10   upstairs one time.

11            And I thought that was kind of odd, and it

12   kind of stuck out, but, again, there's so much

13   documentation, I don't remember exactly where I read

14   that quote.

15       Q.    So my question is more based on your -- when

16   he worked for you, prior to this case being filed,

17   when he worked for you, did you observe or did anyone

18   report to you that Sergeant Ballinger had problems

19   with balance at work?

20       A.    No.

21       Q.    While Sergeant Ballinger worked for you or

22   under you, did anyone report to you or did you observe

23   problems that Sergeant Ballinger had with anxiety at

24   work?

1    A.    When he worked for me, it would have been

2    before the accident.

3    Q.    I mean, under you -- under you while you

4    were chief or lieutenant?

5    A.    Could you rephrase the question?

6    Q.    While Sergeant Ballinger worked for you or

7    under you, did you receive any reports or did you

8    observe any problems with Sergeant Ballinger's

9    anxiety?

10    A.    I know he got frustrated when he didn't pass

11    the lieutenant's exam, but as far as frustration that

12    was out -- overt, no.

13          That sparky thing I think I read that in one

14    of the doctors' reports that he referred to himself as

15    sparky, but I've never heard that around the station.

16    Q.    Before his testimony on February 17th, 2017,

17    did you observe or have any reports of Sergeant

18    Ballinger having problems with his memory?

19    A.    I don't know if Panettiere may have said

20    that at a prior hearing or not.  It could have been

21    stated in the Munford 30-day suspension hearing, but I

22    don't -- I don't want to say that it was.  I don't

23    want to say that it wasn't.  It's possible.

24    Q.    But if it was, it would have been in that

1  hearing.

2       A.   Yeah.

3       Q.   But no one at work reported it to you from

4  an observation at work.

5       A.   No.

6       Q.   When I say "no one at work," I mean either

7  employees or people that work with Sergeant Ballinger.

8       A.   The only thing that I recall is it was a bus

9  accident where he was a primary investigator, and

10  Lieutenant Wells told me that the attorney that was

11  filing a civil claim in the matter said that Ballinger

12  testified to one thing, you know, at a deposition

13  where he said that he observed something on a

14  videotape that wasn't possible.

15            Because of the way the camera was angled, it

16  would have been taking a picture of the kids, and

17  Ballinger, I guess, testified that the video camera

18  showed the road, and it would have been 180 degrees

19  off.

20            That's the only thing that I recall that was

21  ever told to me that he had, you know, an issue with

22  any type of memory thing.

23       Q.   And what was it that he misremembered, the

24  distance of something in a video?

1    A.    My recollection is the video camera that was

2 on the school bus would have been aimed at the kids

3 sitting in the seats.

4         And he, I guess, said in a deposition that

5 he could tell from his recollection of watching the

6 video that it was showing, you know, the car that came

7 at the school bus and hit the bus, and I guess the way

8 the camera is situated is that would have been

9 impossible.

10    Q.    And your testimony before about his memory

11 was that he wasn't able to remember decades; right?

12    A.    Right.

13    Q.    This testimony that you just said is that he

14 switched a memory in his mind; right?

15    A.    Either he misremembered what he saw, I don't

16 know, but supposedly what he testified to wasn't

17 physically possible the way the camera was angled.

18    Q.    And when did Lieutenant Wells tell you about

19 this?

20    A.    It would have been prior to the Munford

21 matter.  I don't know.  I don't know when the

22 deposition was in this.

23         This was something that's been in litigation

24 for years.  I'm not sure what, you know, part of it he

180

1   would have testified as to.  The accident happened

2   when my kid was still in high school, and he's now a

3   college grad, so...

4        Q.   Did Lieutenant Wells tell you about this

5   when he was lieutenant or sergeant?

6        A.   Lieutenant.

7        Q.   Did that memory mistake have a material

8   effect on the litigation?

9        A.   That, I don't know.  I don't know if it's

10  been resolved yet.

11       Q.   And that didn't cause you to make any

12  changes when you learned that in Sergeant Ballinger's

13  role or responsibilities at work?

14       A.   No.  It was hearsay, and the attorneys never

15  told me anything about it.  They never put anything in

16  writing documenting anything.  I think it was a casual

17  conversation that an attorney had with Lieutenant

18  Wells at the courthouse.

19       Q.   Have you had any conversations with

20  Lieutenant Kelley about the decision to place --

21  Strike that.

22            What conversations have you had with

23  Lieutenant Kelley about the decision to place Sergeant

24  Ballinger on sick leave and remove him from the court

 1  prosecutor position?

 2      A.   I don't know if I had any specific, you

 3  know, conversations in regards to that.  I'm the one

 4  that makes the decision on who's going to work what

 5  shift and what specialty position.

 6          And, again, I usually do it strictly based

 7  on crunching numbers, you know.  I don't, you know,

 8  really talk to, you know, people about what I'm going

 9  to do in order to, I think, do what's best for the

10  department.

11      Q.   So maybe a better question is:  Did you have

12  any discussions, like consultations, with Lieutenant

13  Kelley or did you just make the decision on your own?

14      A.   I just made the decision.

15      Q.   Similar with Lieutenant Wells, did you

16  discuss with him any of your decisions or you just

17  make the decisions on your own?

18      A.   I usually just make them and tell them this

19  is what's going to happen.

20      Q.   And did Lieutenant Kelley make any -- have

21  any questions with you or have any pushback with you

22  or did he just follow your orders?

23      A.   He just followed the orders.

24      Q.   Did Lieutenant Wells have any pushback with

1  you or discuss with you or did he just follow the

2  orders?

3      A.   He just followed the orders.

4      Q.   Do you consider yourself to have sort of a

5  command staff or is it more just a chain of command

6  where you make the decisions and your lieutenants

7  follow them?

8           Do you understand my question?

9      A.   Yes.  You know, it depends on the situation.

10  I mean, I'm not going to say that everything I do I

11  don't consult with people, but, ultimately, every

12  decision is mine, and I have to own it.

13           I do consult with Lieutenant Kelley a lot

14  more than I do with Lieutenant Wells 'cause Lieutenant

15  Kelly's office is right next to mine, and with all

16  these, you know, internal affairs investigations going

17  on, I'm more involved with him on a daily basis than I

18  am with Lieutenant Wells.

19      Q.   Regarding these issues with putting Sergeant

20  Ballinger on admin leave and sick leave, did you

21  confer with Lieutenant Kelley first and then make the

22  decision or did you make the decisions and simply tell

23  Lieutenant Kelley what you decided?

24      A.   A lot of times the decisions were made on a

183

1   conference call with labor counsel, and Tommy Kelley

2   was a lot of times in the office when these

3   conferences were made, so he heard an awful lot of

4   stuff.

5           He would pipe in, you know, what he thought,

6   you know, and we would go back and forth with labor

7   counsel saying if we do this, what's the implications,

8   that type of thing, so he was, you know, present for a

9   lot of these.

10      Q.    Did Lieutenant Kelley ever remark words to

11  the effect that Sergeant Ballinger -- Strike that.

12          Did you have any discussion with Lieutenant

13  Kelley after Sergeant Ballinger's testimony at the

14  Munford hearing in February without the presence of

15  counsel?

16      A.    I think just after he did the interview

17  there with Panettiere, I think that was about it.

18      Q.    You testified earlier about your

19  conversation with counsel after the Munford testimony.

20  Was that in the presence of Lieutenant Kelley?

21      A.    Probably.

22      Q.    Do you remember anything Lieutenant Kelley

23  said?

24      A.    No.

184

1    Q.    Did Lieutenant Kelley object to interviewing

2  Sergeant Ballinger or, you know, changing the status

3  quo in any way?

4    A.    No.

5    Q.    Did Lieutenant Kelley offer an opinion about

6  the decision to place Sergeant Ballinger on paid

7  administrative leave on March 14th?

8    A.    No.

9    Q.    Did he have anything to say about Sergeant

10 Ballinger's testimony regarding the issue of the

11 evidence handling and the handling of the evidence and

12 what you testified to earlier today?

13    A.    Can you rephrase the question?

14    Q.    Sure.

15          You testified earlier today about Sergeant

16 Ballinger's testimony in February 2017 regarding the

17 handling of evidence and his corroboration of what

18 Susan Munford was saying.  Did Lieutenant Kelley have

19 anything to say to you regarding his opinion of that

20 portion of Sergeant Ballinger's testimony?

21    A.    He didn't think Ballinger was credible.

22    Q.    He didn't think Ballinger was credible.

23    A.    Not at all.

24    Q.    What did he say about that, anything more

1  than that?

2      A.    That it just wasn't true.  I mean, Ballinger

3  was trying to just make allegations without any

4  specific dates or times, and it -- it just wasn't

5  credible statements he was saying.

6      Q.    And did he say this is on the phone call

7  that you had with the union counsel?

8      A.    He probably said it right after the hearing

9  too when we had a brief meeting with counsel.  It

10  would have been Attorney Kenny.

11      Q.    But he also said it on your phone call with

12  union counsel.

13      A.    I would say yes.  Yeah.

14      Q.    Did you say anything about that on that

15  phone call?

16      A.    I would say more than likely, yes.

17      Q.    Do you recall what you said about that?

18      A.    No, I don't.  I mean, again, Jamie Kenny was

19  the attorney that handled the Munford, you know,

20  stuff.

21          And then later the next week is when we were

22  talking to John Clifford about what Ballinger said,

23  and I'm sure that those two attorneys had

24  conversations when she got back as to what transpired.

1     Q.    So am I correct that after the testimony on

2  February 17th, you had a conversation with Jamie

3  Kenny, and then the next week you had a conversation

4  with John Clifford?

5     A.    Probably both, yeah.

6     Q.    You mean both of them, Jamie Kenny and John

7  Clifford?

8     A.    Yeah.  They're both, you know, the same

9  firm.  I mean, what we said, you know, exact dates and

10  times, I don't know.  A lot of times they would both

11  be on a conference call.

12    Q.    And they're labor counsel for the town;

13  right?

14    A.    That's correct.

15    Q.    So they don't represent you personally;

16  right?

17    A.    That's correct.

18    Q.    They're paid for by the town.

19    A.    That's correct.  Yes.

20    Q.    And Louison Costello is the town's attorney.

21    A.    No.

22    Q.    Your attorney?

23    A.    No.  Well, sort of.

24    Q.    The insurance counsel?

187

1    A.    The insurance company.

2    Q.    The insurance counsel.  Okay.

3          And is it MIIA Insurance?

4    A.    MIIA, yes.

5                   MR. SULMAN:  I have nothing

6    further.

7                   MR. LOUISON:  Very good.

8                   (Deposition of MAURICE J. SPLAINE

9    concluded at 3:50 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

188

1                    C E R T I F I C A T E

2          I, MAURICE J. SPLAINE, hereby certify under

3    the pains and penalties of perjury that I have read

4    the foregoing transcript of my testimony and further

5    certify that said transcript is a true and accurate

6    record of my testimony (with the exceptions of the

7    corrections noted below.)

8    PAGE    LINE              CORRECTIONS

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20         Signed under the pains and penalties of

21   perjury this _____ day of _____ 2019.

22

23         _____

24                    MAURICE J. SPLAINE

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX COUNTY


I, JENNIFER M. VAILLANCOURT, Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that the deponent whose deposition is hereinbefore set forth was duly sworn and that such deposition is a true record of the testimony given by the deponent.

I further certify that I am neither related to nor employed by any of the parties in or counsel to this action, nor am I financially interested in the outcome of this action.

In witness whereof, I have set my hand and seal this 16th day of January, 2019.


_____

Jennifer M. Vaillancourt, Notary Public in and for the Commonwealth of Massachusetts. My Commission Expires June 29, 2023.