UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| TIM BALLINGER,<br><br>Plaintiff,<br><br>v.<br><br>TOWN OF KINGSTON, MAURICE J. SPLAINE, and ROBERT H. FENNESSY, JR.,<br><br>Defendants. | CIVIL ACTION NO. 18-cv-11187 |

**OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

I. Introduction

Four weeks after Kingston Police Department sergeant and court prosecutor Timothy Ballinger testified in a highly public, contentious hearing televised over the internet -- in which he offered critical information about the operations of the Department and disclosed his post-traumatic stress disorder -- Police Chief Maurice Splaine placed him on administrative leave. Ballinger would never work another day in the Department. Defendants have now moved for summary judgment on Ballinger's claims of disability discrimination based on disparate treatment and failure to accommodate under Chapter 151B and the ADA, invasion of privacy, tortious interference, and violation of his First Amendment rights. For the reasons that follow, Defendants' motion must be denied.

II. Relevant Facts[1]

Timothy Ballinger was hired in 1998 by the Town of Kingston as a patrol officer in the Kingston Police Department. Plaintiff's Statement of Facts ("SOF"), ¶1. He was promoted to the

---

[1] The complete factual record is contained with the parties' respective statements of material facts.

rank of sergeant in 2004. In 2006, he suffered an on-the-job injury, an electrocution at a worksite, that caused him to take a medical leave. *Id.*, ¶2. He was eventually cleared to return to full duty, although he had some lingering effects from the injury for which he received ongoing treatment. *Id.* He received evaluations every year (which were sent to the Department) and remained cleared for full duty. *Id.* Defendant Maurice Splaine was a lieutenant in the Department at the time of Ballinger's injury in 2006. *Id.*, ¶3. Splaine received notification about the injury and Ballinger's return to work. *Id.*

When Ballinger first returned to duty from his injury, he was assigned to the detectives unit. *Id.*, ¶4. At some point, he began working as a court prosecutor within the detectives unit part-time and also as a detective. *Id.*, ¶5. Around 2015, the fulltime court prosecutor retired and Ballinger assumed the position of full-time court prosecutor. *Id.* He maintained that position until he was placed on paid administrative leave by Splaine in March 2017. *Id.*

In the position of court prosecutor, Ballinger served as a liaison between every officer in the Department and the district attorney's office. *Id.*, ¶6. He prosecuted all misdemeanors, clerk hearings, and motor vehicle hearings. *Id.* He also worked on domestic violence hearings. *Id.* As court prosecutor, Ballinger performed only those duties of court prosecutor. *Id.*, ¶7. He did not receive any criticisms within the Department or from without about his work as court prosecutor. *Id.* After placing him on leave, Splaine could not say when Ballinger last made an arrest, responded to a crime in progress, stopped a motor vehicle, restrained a resisting individual, or searched a building. *Id.*, ¶8.

On June 28, 2016, Ballinger testified in a disciplinary hearing in support of Sergeant Susan Munford, who was contesting a thirty-day suspension. *Id.*, ¶9. Besides her position of sergeant, Munford also served as a member of the Board of Selectmen. *Id.*

On February 17, 2017, Ballinger testified at a termination hearing in support of Sergeant Munford. *Id.*, ¶10. Splaine attended the hearing in person. *Id.* Munford publicized the hearing on her termination widely in Kingston – she invited residents to the hearing at the most recent Board of Selectmen meeting and set up a live video feed at the hearing to Facebook. *Id.* Representatives from the District Attorneys' office were present in the hearing room along with a state trooper. *Id.* In Splaine's own words, "there was quite an audience there." *Id.*

The hearing involved issues about the handling of evidence. *Id.*, ¶11. Ballinger testified about widespread problems in the Department about processing evidence. *Id.* Splaine was concerned that Ballinger made "really blanket allegations, disparaging remarks against the whole station" in his testimony -- that "nobody follows policies and procedures"; nobody "properly catalogued evidence"; and that "he saw evidence laying around the station, things of that nature, things that just weren't true." *Id.* Splaine said it was "really disheartening" to hear what Ballinger testified about the Department's handling of evidence. *Id.*

Splaine acknowledged that maintaining evidence is an important function of the police department. *Id.*, ¶12. He also acknowledged that the public had a right to know how the police department is functioning. *Id.* He admitted that he did not want the public to believe that the police department was mishandling evidence. *Id.* He said that the hearing was potentially embarrassing for him and the entire department. *Id.* He referenced the well-known state drug lab controversy involving Annie Dookhan[2] and how allegations of improper handling of evidence could remind the public of that controversy. *Id.*

Ballinger also testified about his PSTD during the February 17 hearing. *Id.*, ¶13. He said he had PSTD and he had memory issues. *Id.* This was his complete testimony concerning his

---

[2] For one of many court decisions describing the malfeasance of Annie Dookhan, *see Commonwealth v. Francis,* 474 Mass. 816 (2016).

PSTD symptoms during the February 17, 2017 hearing. *Id.*

Local newspapers and media covered the February 17 hearing and earlier hearing dates. *Id.*, ¶14. *See* Testimony ends in Kingston Sgt. Susan Munford testimony case, Kathryn Gallerani, Wicked Local, Feb. 17, 2017, *at* https://kingston.wickedlocal.com/news/20170217/testimony-ends-in-kingston-sgt-susan-munford-termination-case; Kingston police sergeant admits to violating policy, Kathryn Gallerani, The Enterprise, Feb. 14, 2017, at https://www.enterprisenews.com/news/20170214/kingston-police-sergeant-admits-to-violating-policy.

On March 8, 2017, Lt. Thomas Kelley, based on orders from Splaine, instructed Ballinger to attend an interview the next day regarding his testimony on February 17. *Id.*, ¶17. The interview focused on Ballinger's PTSD. *Id.* When asked, Ballinger denied being impaired to the point that he could not perform his job. *Id.* He was not asked any questions about performing his duties as court prosecutor. *Id.*

On March 14, 2017, Ballinger was placed on administrative leave via a memorandum from Splaine. *Id.*, ¶18. According to Splaine, Ballinger testified on February 17 that he was suffering from a serious medical and/or psychological issue which could impair his ability to perform the essential functions of his position. *Id.* Splaine determined that Ballinger should not work anymore until it could be determined whether Ballinger in fact suffered from a serious medical condition and whether the condition limits his ability to perform the essential functions of his job. *Id.* He asked Ballinger to provide a note from his doctor within ten days answering whether Ballinger has PTSD and whether he can perform the essential functions of his job, and Splain gave the job description of a police officer to Ballinger to give to his doctor. *Id.* On March 17, 2017, Ballinger was evaluated by Russell T. Fry, Psy.D. who determined that Ballinger had

PTSD and his symptoms did not allow him to perform the essential functions of a police officer. *Id.* On March 24, Splaine placed Ballinger on paid administrative leave. *Id.*

On March 27, Ballinger was evaluated by his regular neurologist, Douglas Katz, M.D., who determined that despite Ballinger's symptoms, Ballinger could perform the essential functions of police officer. *Id.*, ¶19. As a result of this, Splaine required Ballinger to take an independent medical examination with Judy Fine Edelstein, M.D., which he did on June 22. *Id.* Dr. Edelstein was also asked whether Ballinger could perform the essential functions of a police officer, not a court prosecutor. *Id.* After several reports where she initially deferred to a psychiatrist who treats the condition of PTSD (like Dr. Katz), she opined that Ballinger would very likely not be safe as a police officer in the state of Massachusetts. *Id.* In October 2017, the Town of Kingston, through Splaine, filed an application for involuntary accidental disability retirement for Ballinger. Def. SOF, ¶27.

Splaine made a shift bid announcement twice per year according to the collective bargaining agreement. Pl. SOF, ¶21. On May 25, 2017, Splaine informed the members of the Department about shift bids for the second half of 2017 – July 2, 2017 through December 30, 2017. *Id.*. Unlike previous shift bids, however, Splaine removed court prosecutor from the available shift bids for sergeants for July 2 to December 30, 2017. *Id.* The court prosecutor position is a collective bargaining position under the superior officer's contract. *Id.* Because Splaine removed the court prosecutor position from shift bids for sergeants, when Ballinger went to bid for sergeant positions, he could not bid for the court prosecutor position for the first time since 2015.[3] *Id.*

Robert Fennessy was the Town Manager in Kingston at the time. *Id.*, ¶24. He reported to

---

[3] Even though Ballinger was on administrative leave, he still submitted a preference for shift bids.

the Board of Selectmen, which was the appointing authority. *Id.* The Chief of Police reported to him on a day to day basis. Fennessy had no authority to hire or fire employees. *Id.*

According to Fennessy, the Town Administrator has no role when a Town employee retires due to a disability except to alert the Board of Selectmen. *Id.*, ¶25. He needs to give the Board of Selectmen enough information to fill the position that would become vacant. *Id.* He testified that he did not need to notify the Board about the retiring employee's disability. *Id.*

When Ballinger's involuntary disability retirement application was filed on October 2, 2017, Fennessy sent the entire application packet to the Board of Selectmen. *Id.*, ¶26. Fennessy labeled the information "Confidential Material." *Id.* The packet included Ballinger's PTSD diagnosis. *Id.* He admitted that the individual members of the Board of Selectmen did not need to know about Ballinger's PTSD. *Id.* Susan Munford, a member of the Board of Selectmen, received Ballinger's retirement application packet from Fennessy and confirmed it contained his PTSD diagnosis. *Id.*, ¶27. She testified that based on her experience as a board member, there was no reason to receive the application. *Id.* She was aware of other members of police department who had been involuntarily retired due to disability and yet she did not receive copies of their applications for retirement. *Id.*

### III. <u>Standard of Review</u>

Under Fed. R. Civ. P. 56(c), summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). A genuine issue of material fact exists "when a rational fact-finder could resolve the issue in favor of either party." *Murgo v. Home Depot USA, Inc*., 190 F. Supp. 2d 248, 249-250 (D. Mass. 2002). In

considering a motion for summary judgment, the Court must review the record "in the light most flattering to the nonmovant and indulge all reasonable inferences in that party's favor." *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997); *McLain v. City of Somerville*, 424 F. Supp. 2d 329, 332 (D. Mass. 2006).

<div align="center">IV. <u>Argument</u></div>

**1**.     **Material Disputes of Fact Preclude Summary Judgment on Ballinger's Discrimination Claims Under Counts I-IV.**

   A.     <u>The Complaint Alleges Two Distinct Violations Under Chapter 151B and ADA – Disparate Treatment and Failure to Accommodate.</u>

Under Counts I–IV of the First Amended Complaint, Ballinger alleges that the Town and Splaine violated his rights under state and federal anti-discrimination laws in two distinct ways. *First,* he alleges that the Town and Splaine discriminated against him on the basis of disability through disparate treatment by placing on him on leave and causing his involuntary termination in violation of Chapter 151B and the ADA (Counts I and II). *Second*, he alleges that the Town and Splaine refused to accommodate his disability with a reasonable accommodation in violation of Chapter 151B and the ADA (Counts III and IV). The ADA counts are only alleged against the Town because the federal law does not authorize individual liability.

Under a disparate treatment disability case, where the employer acknowledges that the adverse action was taken because of the employee's disability (as Defendants do here), a plaintiff must show that he or she suffered an adverse employment action, that he or she has a handicap, that he or she is a qualified handicapped person, and that the adverse action was taken because of his or her handicap. *See Gannon v. City of Boston*, 476 Mass. 786, 795 (2017). Under a failure to accommodate case, a plaintiff must show that he has a disability, that he is capable of performing the job with or without a reasonable accommodation, that he requested a reasonable

accommodation, that his employer refused the accommodation, and that he suffered harm from the employer's refusal. *See Murray v. Warren Pumps, LLC*, 2013 U.S. Dist. LEXIS 130574, at *10 (D. Mass. Sep. 11, 2013).

    B.    <u>Defendants Unlawfully Removed Plaintiff from His Court Prosecutor Position Because Splaine Learned of His Disability.</u>

According to Splaine, he did not learn about Ballinger's PTSD until the February 17, 2017 hearing where Ballinger disclosed it. This admission is critical because it means that Ballinger was performing the duties of the court prosecutor position up until that point *not* because of an accommodation, but because Splaine had simply decided to give him this special position. Thus, when Splaine removed Ballinger from the court prosecutor position, he was not removing a special accommodation put in place because of Ballinger's disability, but taking away Ballinger's job *because of his disability.*

In *Phelps v. Optima Health, Inc.,* 251 F.3d 21 (1st Cir. 2001), the First Circuit ruled that a court should normally evaluate the essential functions of a particular job without considering any "special arrangements" between an employer and a disabled employee put in place due to the employee's particular disabilities. *Id.* at 25.[4] In *Phelps*, the plaintiff was a staff nurse who had made a special arrangement with her supervisor to work as medication nurse, which required less lifting, due to a back injury. *Id.* at 24. At some point she was required to once again perform staff nurse duties and needed to share those duties with another nurse due to the lifting restrictions caused by her injury. *Id.* Later, a new supervisor decided that the plaintiff needed to be able to perform all of the essential duties of a staff nurse, which the plaintiff could not perform, and terminated her employment. This adverse action did not violate the ADA because the previous

---

[4] Defendant did not cite *Phelps* directly, but relied on *Maldonado v. Municipality of Ponce*, 206 F. Supp. 2d 198 (2002), which cites *Phelps*.

"special arrangement" did not excuse the plaintiff from needing to perform the essential functions of a staff nurse position. *Id.*

*Phelps* applies where the employer *is aware* of the employee's disability and makes special arrangements to account for an inability to perform the essential duties with or without an accommodation. The policy reason for the decision is straightforward: the anti-discrimination laws should not be a disincentive to employers to retain disabled employees by providing more accommodations than the law requires. *Phelps*, 251 F.3d at 26 ("[T[]o find otherwise would discourage employers from granting employees any accommodations beyond those required by the ADA.").

Subsequent courts have found *Phelps* inapplicable where employers were unaware of an employee's disability at the time of the special arrangement. *See Rooney v. Sprague Energy Corp.*, 581 F. Supp. 2d 94 (D. Me. 2008). In *Rooney,* the plaintiff served for twenty years as a terminal operator for the defendant's energy company during which time he was not expected to perform the full written job description's essential duties. *Id.* at 105. Specifically, the plaintiff was never expected to perform tank gauging until the employer became aware of his disability; as the court explained, "Sprague did not excuse Mr. Rooney from tank gauging because he had macular degeneration; it was unaware he had the eye condition until a few weeks before it suddenly terminated him." *Rooney,* 581 F. Supp. 2d at 104; *Incutto v. Newton Pub. Sch,* 2019 U.S. Dist. LEXIS 58320, at *9 (D. Mass. Apr. 4, 2019) (denying summary judgment on kindergarten teacher's ADA claim where court, after rejecting application of *Phelps*, found that plaintiff could perform her particular position on part-time basis even though school said essential functions of teacher required full-time hours) ("Because the Court does not find that full-time classroom presence by the same teacher was necessarily an essential function of Ms.

Incutto's job, this case differs materially from *Phelps* and is not controlled by the disposition there."); *Molina v. DSI Renal, Inc*., 840 F. Supp. 2d 984, 999 (W.D. Tex. 2011) (duties regularly performed by employee in her position did not require any accommodation).

In Ballinger's case, he served in the position of court prosecutor for years and performed all of the essential functions of that job until Splaine reportedly learned of his PTSD. Splaine did not knowingly excuse Ballinger from any required duties of police sergeant on account of his PTSD when he assigned Ballinger to prosecutor. Rather, Splaine simply assigned Ballinger to, and expected him to fulfill, a different set of responsibilities on a regular basis. As in *Rooney*, the additional responsibilities that Splaine expected Ballinger to perform *after* he became aware of Ballinger's disability were not part of Ballinger's job before learning about the disability. As in *Incutto*, Ballinger could perform all of the responsibilities of court prosecutor. This is the job that he performed at the time that Splaine discovered his PTSD.

Identifying an employee's essential functions "involves fact-sensitive considerations and must be determined on a case-by-case basis." *Gillen v. Fallon Ambulance Serv*., 283 F.3d 11, 25 (1st Cir. 2002). Determining what constitutes an essential function "often proves difficult to resolve at summary judgment." *Rooney v. Sprague Energy Corp*., 483 F. Supp. 2d 43, 53 (D. Me. 2007) (denying summary judgment). In *Rooney,* the district court determined that tank gauging was not an essential function for summary judgment purposes based on the record that the plaintiff never performed this duty despite it being included on the written job description. *Id.* At trial the *Rooney* jury reached the same finding based on the evidence. *Rooney*, 581 F. Supp. 2d at 104.

While Defendants contend that Ballinger's actual job at the time of his administrative leave was police sergeant, and court prosecutor was merely an assignment, this assertion cannot

alone establish that there are no material facts as to Ballinger's essential functions. *Incutto*, 2019 U.S. Dist. LEXIS 58320, at *10. An employer's perspective on job duties in an ADA case is one factor only and carries weight "in the absence of evidence of discriminatory animus." *Ward v. Mass. Health Research Inst., Inc.*, 209 F.3d 29, 34 (1st Cir. 2000). Where the record here shows that Splaine decided that Ballinger was required to perform a far broader range of essential functions than required for his court prosecutor job only *after* learning about his PTSD, this provides compelling "evidence of discriminatory animus." *Id.*

The record establishes that Ballinger worked as a court prosecutor in a discrete set of responsibilities compared the larger range of duties expected of a sergeant. The Town admitted in answers to interrogatories that Ballinger was only required to perform those duties that were formally a part of his job as court prosecutor. The Town also admitted that it received no complaints about his ability to perform the duties of court prosecutor.

Defendants admit that Ballinger was performing the job of court prosecutor adequately at the time. Splaine imposed a negative change in Ballinger's terms of employment only after, and in direct response to, he learned about Ballinger's disability.[5] Allowing Splaine to force Ballinger to meet the complete functional requirements of police sergeant will sanction outright disability discrimination.

---

[5] Approving Defendants' actions here risks creating perverse policy incentives just as the *Phelps* court sought to avoid. Employers may be encouraged to impose broader functional requirements on employees once an employer becomes aware of an employee's disability so as to render the employee not qualified to perform the essential functions of the position.

C.  Defendants Failed To Accommodate Ballinger By Eliminating The Only
    Accommodation That They Knew Was Available.

Under the ADA, a reasonable accommodation can include a transfer into an alternative

position.[6] *See Audette v. Town of Plymouth,* 858 F.3d 13, 20-21 (1st Cir. 2017). The disabled

employee must be able to show that she can perform the duties of the position that she or he

desires.  *Id.*

Defendants only argument in favor of summary judgment on the failure to accommodate

claims is that Ballinger never requested an accommodation. Def. Mem. at 11. This elevates

forms over substances beyond reason and in disregard to established law. "When a disabled

individual's need for an accommodation is obvious, the individual's failure to expressly request"

one is not fatal to the ADA claim. *See Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d

1185, 1197 (10th Cir. 2007); *In re McDonough,* 457 Mass. 512, 523 n.22 (2010); *Enica v.*

*Principi*, 544 F.3d 328, 339 (1st Cir. 2008), *citing* EEOC Enforcement Guidance: Reasonable

Accommodation and Undue Hardship Under the Americans with Disabilities Act, EEOC Notice

915.002 (October 17, 2002), *available at https://www.eeoc.gov/policy/docs/accommodation.html*

("In many instances, both the disability and the type of accommodation required will be obvious,

and thus there may be little or no need to engage in any discussion.").

Here, the "obvious" accommodation for Ballinger was transfer or assignment to court

prosecutor. Splaine knew from experience that Ballinger could perform all of the functions of

that job. Despite this knowledge, Splaine *eliminated* the only accommodation available to

---

[6] Chapter 151B, on the other hand, does not allow a transfer to an alternative position as a reasonable accommodation. *Russell v. Cooley Dickinson Hosp., Inc*., 437 Mass. 443, 454 (2002) (Chapter 151B less permissive than ADA in terms of reasonable accommodation).

Ballinger when he removed court prosecutor from the superior officer shift bids. *See Hodgetts v. City of Venice*, 794 F. Supp. 2d 1265, 1275 (M.D. Fla. 2011) (denying summary judgment to employer on failure to accommodate claim where it knew about employee's difficulty walking and eliminated accommodation that allowed him to perform essential functions of job). Ballinger contends that Splaine removed the court prosecutor position from the sergeant shift bid process purposefully so it was not available to Ballinger as an available accommodation

This case is on all fours with *Hodgetts*. There, the employee provided evidence that he had obvious difficulty walking, requiring him to wear a knee brace and use a cane for even short distances. *Id.* at 25. He also showed sufficient evidence that a supervisor knew about his disability when she eliminated his accommodation. *Id*. The district court concluded that sufficient evidence showed he was "obviously disabled, and thus not required to specifically request accommodations, and . . . Defendant had removed previous accommodations." *Id.* at 26.

The same conclusion must be reached here. Splaine cannot dispute that he knew about Ballinger's PTSD and related cognitive issues when he placed Ballinger on leave, or that Ballinger had been working as a five day per week court prosecutor for the past two plus years, which did not involve the same regular duties as a full-time police sergeant. Whether or not the court prosecutor position was intended as an accommodation when Ballinger was placed in the position originally, Splaine knew in March 2017 when he placed Ballinger on leave that Ballinger performed the duties of the position without issue. Yet he never once sought to determine whether Ballinger's PTSD impaired Ballinger's ability to perform the functions of *this* position. Instead, he made it so Ballinger could never work in this position again.

The record demonstrates that Ballinger could perform the duties of court prosecutor whether it is regarded as a position or as an as assignment because Ballinger could perform the

position of sergeant *assigned full-time to court prosecutor*. None of the specialists retained by the Town to evaluate Ballinger were asked to evaluate him for this assignment.

Defendants focus solely on marginal tasks that Ballinger might perform as a sergeant outside of his nine to five court prosecutor duties. For instance, on the involuntary retirement application, Splaine wrote down tasks that Ballinger never performed as a court prosecutor or even as a detective or SWAT team leader. (SOF, ¶21.) To the extent such marginal duties are properly considered, Defendants fail to explain why they did not allow Ballinger to continue working as a court prosecutor and restrict him from the assignments that implicated these marginal duties.

Under the ADA and its regulations, evidence of whether a particular function is essential includes, but is not limited to: (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function;  (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or  (vii) The current work experience of incumbents in similar jobs. Here, the amount of time spent on the job performing the function, the current work experience of Ballinger, and the work experience of past incumbents in similar jobs all allow a jury to find that Ballinger's essential functions were limited to his court prosecutor position, not the marginal functions highlighted in their submission to the retirement board.

**2.**     **The Evidence Allows A Finding for Ballinger on Count VII for Violation of His Right of Freedom of Speech Under The First Amendment.**

　　A.     <u>Applicable Law</u>

The analysis used to determine whether a government employer has violated an

employee's First Amendment rights was crystalized in the First Circuit's *DeCotiis* decision. *Decotiis v. Whittemore,* 635 F.3d 22 (1st Cir. 2011). First, a court must determine whether the employee spoke as a citizen on a matter of public concern (a two-part inquiry). *Id.* at 30. Second, the court must perform the *Pickering* balancing test and weigh the combined interest of the employee as a citizen in commenting upon matters of public concern and the public's interest in the information against the interest of the government as an employer in promoting the efficiency of the public services it performs through its employees. *Id.* at 29. Third, the employee must show that the protected expression was a substantial or motivating factor in the adverse employment decision. *Id.* If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may only escape liability if it can show that "it would have reached the same decision even absent the protected conduct." *Id.* at 30 (internal citations omitted).

B.     <u>Ballinger Was Speaking as A Citizen.</u>

A public employee is protected by the First Amendment when speaking as a citizen on a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). Public employees do not speak as citizens when their speech arises "pursuant to their official duties." *Decotiis*, 635 F.3d at 30; *McGunigle v. City of Quincy*, 132 F. Supp. 3d 155, 170 (D. Mass. 2015) (Saylor, J.). In *Garcetti*, the Supreme Court described non-citizen speech as speech that "owes its existence to a public employee's professional responsibilities," speech that the employer "has commissioned or created," speech that the employee "was paid to" make, speech that the employee's "duties required him to make," speech that amounts to the employee's "work product," and speech that is an "official communication." *Mercado-Berrios v. Cancel-Alegria*, 611 F.3d 18, 27 n.9 (1st Cir. 2010), *citing Garcetti*, 547 U.S. at 422-23. These categories of speech by public employees are not afforded First Amendment protection.

The inquiry here is practical, not formal. *See Stuart v. Town of Framingham*, 301 F. Supp. 3d 234, 240 (D. Mass. 2018). "The court asks what the employee's official responsibilities are . . . focusing on the duties an employee actually is expected perform, and not merely those formally listed in the employee's job description." *Id.* The Court then moves on to assess a set of factors established by *Decotiis* to determine whether the employee's speech was made pursuant to his official duties. *Id.* at 240-241.

In *Decotiis*, the First Circuit explained that in determining whether an employee spoke as a citizen or pursuant to his official duties requires "a hard look at the context of the speech." *Id.* at 30. *DeCotiis* lists several non-exclusive factors to consider: 1) whether the employee was commissioned or paid to make the speech in question; 2) the subject matter of the speech; 3) whether the speech was made up the chain of command; 4) whether the employee spoke at her place of employment; 5) whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"); 6) whether the employee's speech derived from special knowledge obtained during the course of her employment; and 7) and whether there is a so-called citizen analogue to the speech. *Id.* (internal citations omitted).

An application of these factors to this case points strongly in favor of finding that Ballinger spoke as a citizen. He was not commissioned or paid to testify at the termination hearing, although he may have been at work; he spoke to an independent hearing officer, not up the chain of command; the subject matter was improper functioning of the Department, not his regular duties; and perhaps most significantly, the speech would not have given observers that he represented the Town of Kingston or the Department when he spoke, see *Stuart*, 301 F. Supp. 3d at 241 (explaining that since officer's speech contradicted chief's statements, it would not give

"an observer the impression that Plaintiff was representing his employer when he spoke").

While Ballinger was certainly testifying about matters related to his employment,[7] he was not required to testify and no reasonable observer would believe he was testifying pursuant to his official duties – on the contrary, he testified critically about the Department's operations and against the Town's interest in support of an employee being disciplined. As the Supreme Court clarified in a decision following *Garcetti*, "The critical question under *Garcetti* is whether the speech at issue is itself *ordinarily within the scope of an employee's duties*, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014) (emphasis added). Testifying in a widely publicized termination hearing is not usually within the scope of Ballinger's duties.[8]

The nature of the February 17, 2017 hearing was not a typical termination hearing. Susan Munford was also a member of the Board of Selectmen. She publicized the hearing widely, aired it live over Facebook, and made sure it was attended by a large audience. Thus, Ballinger did not testify about a purely private disciplinary issue, but about a highly public dispute. As a public termination proceeding televised over the internet and publicized by the selectmen, the hearing is more akin to a public trial or is at least a hybrid of an internal grievance and a public trial. Although some case law casts doubt on whether First Amendment protection covers run-of-the-mill grievance testimony, *e.g., Falge v. Brooks*, 2011 U.S. Dist. LEXIS 36738, at *9 (D. Nev. Mar. 29, 2011), these cases concern the average grievance that has no wider import in the

---

[7] Defendants' argument that "[t]je subjects of his speech are all matters that are directly related to Ballinger's employment" misses the mark. Def. Mem. at 20. If this were the law, virtually all speech that touched upon a government employee's duties would fall outside of First Amendment protection – letters to the editor, public testimony that referenced job duties, reports to outside agencies. "The mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240.

[8] On the other hand, had Ballinger been disciplined for testimony he gave in court in his capacity as court prosecutor, this would not enjoy First Amendment protection because he would have been speaking pursuant to his duties in his capacity as an employee of the Town of Kingston.

community. The context of Ballinger's testimony, on the other hand, was a contentious public termination proceeding involving a police sergeant who also serves as a member of the legislative body for the municipality. His testimony certainly has a "citizen analogue." *Decotiis*, 635 F.3d at 32. Indeed, at least one member of the public wanted to speak at the termination hearing. Pl. SOF, ¶15.

C.    Ballinger's Speech Related To A Matter of Public Concern

There can be little debate that Ballinger's speech related to a matter of public concern. He testified about the alleged mishandling of evidence in the police station and alleged misconduct of a sergeant and sitting selectman. *See Bennett v. City of Holyoke,* 230 F. Supp. 2d 207, 224 (D. Mass. 2002) ("[O]fficial misconduct is a topic of inherent concern to the community."); *Stanley v. City of Dalton*, 219 F.3d 1280, 1288 (11th Cir. 2000) (holding that speech asserting that fellow officer stole money from evidence room related to matter of public concern).

Local media covered the hearing and reported on Ballinger's testimony on the storage of evidence. The media reported that the Town's attorney accused Ballinger "of giving testimony that's damaging to the credibility of the department and questioning the integrity of every other officer." Munford invited residents of Kingston to her termination hearing at the Board of Selectmen meeting prior to the hearing. Even Splaine acknowledges that the subject of evidence handling carries great importance to the public. He did not want the public to believe that the police department was mishandling evidence because it would be potentially embarrassing for him and the entire department.

Defendants contend that "these are not matters of public concern; rather, they are specific to Munford's employment." Def. Mem. at 19. On the contrary, issues regarding the mishandling of evidence in a police department concern every resident of a municipality, as Splaine himself

admitted. In Munford's case, the Defendants accused her of not following through on four sexual assault cases. (Def SOF, Ex. A, Splaine Dep. at 71.) Chief Splaine cannot seriously contend that this is not a matter of public concern. Moreover, Munford's role as a member of the Board of Selectmen made her termination hearing highly public in nature.

      D.     The *Pickering* Balancing Test Weighs Heavily in Favor of Ballinger.

Defendants did not bother to argue that there was insufficient evidence for the *Pickering* balancing test to weigh in favor of Ballinger; therefore, the Court must find that Defendants have waived this argument. *See De Giovanni v. Jani-King Int'l,* 968 F. Supp. 2d 447, 454 (D. Mass. 2013) (finding independent contractor argument not developed by defendants was therefore waived on summary judgment).

Defendants contend that "[t]he decision to place Ballinger on leave after such concerning testimony, was a decision that any reasonable employer would have done" because "Splaine was genuinely concerned as to whether or not Ballinger was able to perform the essential functions of his job in a safe and effective manner." Def. Mem. at 20. This argument clearly takes the evidence in the light most favorable to Defendants, which is improper for a party moving for summary judgment. Further, the argument does not address *Pickering* balancing, but causation.

In any event, the record is clear that the *Pickering* balancing test allows a finding in favor of Ballinger. Defendants cannot show any disruption to the Department caused by Ballinger's testimony. His speech occurred because the Town decided to terminate Susan Munford and she made the termination hearing public. This is a far cry from a public employee leaking government documents or making an unanticipated disclosure and causing controversy within an agency. *Compare Bruno v. Town of Framingham,* 2009 U.S. Dist. LEXIS 108729, at *28 (D. Mass. Nov. 20, 2009) (finding disruption outweighed public concern where employee

circumvented policy of speaking with supervisors first before going to press).  The discord over Susan Munford's pending discipline already existed.[9]

### E. Sufficient Evidence Allows A Jury To Find Causation.

Defendants also did not offer any argument to challenge the sufficiency of the evidence on causation on Ballinger's First Amendment claim other than the aforementioned "any reasonable chief" argument. Causation in employment termination cases involves issues of motives and is thus inappropriate for summary judgment purposes. *See Patrick v. Jansson Corp*., 392 F. Supp. 2d 49, 54 (D. Mass. 2005). The record is replete with evidence to support a finding of causation on the claim. Ballinger testified and Splaine admitted that the testimony caused him to have Ballinger interviewed and then placed on paid administrative leave. While Defendants deny the testimony about the evidence room caused Ballinger to be placed on leave, a jury does not need to credit Defendants' version of the facts.

### F. Splaine Is Not Entitled To Qualified Immunity.

Splaine's argument on qualified immunity passes by Ballinger's First Amendment claim like ships sailing in the night. Putting Ballinger on leave in response to learning about his PTSD – while discriminatory, as explained *supra* – is not a violation of the First Amendment. But it does violate the First Amendment to place Ballinger on leave because of his critical testimony about the police department's operational problems, like mishandling of evidence. A reasonable

---

[9] This case is easily distinguishable from *McGunigle*, where this Court found under a *Pickering* balancing analysis that a police officer's interest in his speech about enforcement of city's dog ordinances, although on a matter of public concern, was outweighed by the department's interest in maintaining order and discipline within its force. *McGunigle*, 132 F. Supp. 3d at 172-173. The officer was writing tickets to neighbors against the direct orders of his chief, which "undermined not just his superiors' confidence in his loyalty and willingness to implement orders, but also his own authority as an officer with the community." *Id.* at 172. Here, the issues concerning the evidence room were already exposed by Munford. Moreover, Defendants do not even contend that Ballinger's disclosure about the evidence room caused any disruption or potential disruption; Splaine simply testified that he was concerned about embarrassment.

police chief would know that a police officer has a right to speak out at a public hearing about the operations of the department, even where those issues also implicate the individual rights of a member. Since at least 2003, police chiefs in Massachusetts have been on notice that it is a violation of the First Amendment to retaliate against a police officer for publicly criticizing the internal operations of the police department. *See Wagner v. City of Holyoke*, 241 F. Supp. 2d 78, 93 (D. Mass. 2003) (rejecting summary judgment on merits of First Amendment claim based on public statements about discrimination and corruption in department, but dismissing claim based on qualified immunity); *Putnam v. Town of Saugus*, 365 F. Supp. 2d 151, 169 (D. Mass. 2005) ("The law is quite clear that speech like Putnam's report and testimony relating to the possible corruption of public officials addresses a matter of public concern.").

Defendants may argue that qualified immunity protects officials against claims unless the rights are clearly established, but it is also clear that this defense may be overcome by "showing that the relevant legal principles were both specific enough and sufficiently well-established that the unlawfulness of the defendant's conduct ought to have been apparent." *Bergeron v. Cabral*, 560 F.3d 1, 11 (1st Cir. 2009). Thus, it makes no difference whether a fact-pattern exactly like Ballinger's case has been reported in a federal decision. The case law clearly instructs that a police officer has the constitutional right to speak publicly about internal problems in the operations in the department, subject to the *Pickering* balancing test. Such problems are inherently a public concern, as Splaine acknowledged himself.

3.    **Sufficient Evidence Allows A Jury To Find Tortious Interference.**

A claim of tortious interference requires establishing (1) that a business relationship existed; (2) that defendant knew of such a relationship; (3) that defendant intentionally and improperly interfered with that relationship; and (4) that plaintiff suffered a loss as a result of

that interference. *See Lynch v. City of Bos.*, 989 F. Supp. 275, 298 (D. Mass. 1997). Defendants'

contention that Splaine did not interfere with Ballinger's employment with the Town is

incredulous. Splaine knowingly took action that caused Ballinger to be placed on paid

administrative leave, then involuntarily retired. He therefore caused Ballinger's relationship with

the Town of Kingston – a third party – to be severed. That he may have done so by the letter of

the collective bargaining agreement makes no difference if he did so for an improper purpose.

"Unlawful discrimination or retaliation may be used to demonstrate the malice necessary to

ground a tortious interference claim." *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 70

(1st Cir. 2008); *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70, 77 (1st Cir. 2001)

(applying Massachusetts law) ("Since there is no practical difference between actual malice and

improper motives and means for the purposes of tortious interference, proven retaliation may

serve as a proxy for actual malice.").

**4.      Sufficient Evidence Allows A Jury To Find A Violation of M.G.L. c. 214, § 1B.**

As Defendants correctly point out, a claim of invasion of privacy under M.G.L. c. 214, §

1B requires showing that the disclosure of private information was unreasonable and either

substantial or serious. The disclosure of Ballinger's medical information meets this standard

easily. "Without doubt, a person's medical condition and treatment are private facts protected by

M.G.L. c. 214 1B. They are 'highly personal or intimate in nature.'" *Lemire v. Silva*, 104 F.

Supp. 2d 80, 93 (D. Mass. 2000), *citing Bratt v. International Business Machines Corp.*, 392

Mass. 508 (Mass. 1984). The invasion of Ballinger's privacy was therefore substantial as it

disclosed his PTSD.[10]

---

[10] Defendants argue that the Board of Selectmen "have a valid interest in Plaintiff's health as it relates to the performance of his job." This is mere sophistry – such an interest does not give selectmen an unfettered right to pour over the medical records of any police officer at their leisure, regardless of a release.

Moreover, Fennessy had no legitimate grounds to send Ballinger's medical information to the entire Board of Selectmen. He acknowledged this much in testimony, saying that the board members needed only to know that Ballinger was retiring and the reason, not his specific medical conditions. Munford, herself a board member, had never reviewed an application for involuntary retirement other than that of Ballinger's. Sending this email was unreasonable.

## V. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment must be denied.

<div style="margin-left: 40%;">

Respectfully submitted,
PLAINTIFF TIM BALLINGER,
By his attorneys,

____/s/ Elijah Bresley _____
Joseph L. Sulman, BBO #663635
Elijah Bresley, BBO #691092
Law Office of Joseph L. Sulman, Esq.
391 Totten Pond Road, Suite 402
Waltham, MA  02451
(617) 521-8600
jsulman@sulmanlaw.com
ebresley@sulmanlaw.com

</div>

Dated: June 3, 2019

## CERTIFICATE OF SERVICE

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

_____/s/ Elijah Bresley_____
Elijah Bresley