# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                   )
**TIM BALLINGER,**                    )
                                   )
          **Plaintiff,**         )        **Civil Action No.**
                                   )        **18-11187-FDS**
         **v.**                   )
                                   )
**TOWN OF KINGSTON, MAURICE**    )
**SPLAINE, AND ROBERT FENNESSY,**   )
                                 )
         **Defendants.**        )
_____)

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This is a lawsuit for disability discrimination and retaliation. Plaintiff Tim Ballinger was a sergeant with the Kingston Police Department, eventually becoming a "court prosecutor," assisting in various court matters on behalf of the department. For several years, he did not engage in any of the physical duties typically required of police officers, including making arrests, restraining suspects, investigating crimes, or responding to emergency calls.

In February 2017, Sgt. Ballinger testified in support of another officer, Sgt. Susan Munford, at her termination hearing. During the hearing, he disclosed that he suffered from post-traumatic stress disorder, or PTSD. He had not previously advised the police department of that fact. Several weeks after the hearing, he was interviewed by his superior officer about his PTSD. He was later placed on administrative leave on the ground that he was unable to perform the essential functions of a police officer, and eventually was required to retire involuntarily.

Sgt. Ballinger then filed this suit, asserting claims under the Americans with Disabilities

Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Massachusetts Antidiscrimination Statute, Mass.

Gen. Laws ch. 151B, various common-law claims, and 42 U.S.C. § 1983. Defendants have

moved for summary judgment. For the following reasons, the motion will be granted in part and

denied in part.

## I.     Background

### A.     Factual Background

The following facts are as set forth in the record and are undisputed except as noted.

Tim Ballinger was hired as a patrolman in the Kingston Police Department in 1998.

(Defs. Ex. A ("Splaine Dep.") at 41:15-17).[1] He was promoted to sergeant in 2004. (Defs. Ex.

D at 2).

Maurice Splaine is the current chief of the Kingston Police Department. (Splaine Dep. at

18:5-7). Robert Fennessy is the Town Administrator in Kingston. (Pl. Ex. 5).

At all relevant times, Kingston hired its police officers pursuant to the Civil Service Law

codified in Mass. Gen. Laws chapter 31. (Defs. SMF ¶ 1). All police officers are expected to

perform the duties and responsibilities of an officer as set forth in the Personnel Administration

Rules administered by the Massachusetts Human Resources Division ("HRD"). (Splaine Dep. at

35:9-13; *see also* Def. Ex. B (list of duties)).

On August 21, 2006, Sgt. Ballinger received a severe electric shock at a construction

worksite while working a detail. The shock caused a variety of injuries and required him to take

medical leave. (Defs. Ex. T ("Ballinger Dep." at 14:8-16:22); Defs. Ex. F at 1).

On March 3, 2007, his neurologist, Dr. Douglas Katz, noted that he suffered from "mild

---

[1] An arbitration report states that Ballinger was first employed by the Kingston Police Department in 1994. (Defs. Ex. I at 3). However, whether he was first hired in 1994 or 1998 appears to be irrelevant to the issues presented here.

PTSD symptoms" but that his recovery was otherwise proceeding well and that a "medical endpoint" would be reached in five to six months.  (Defs. Ex. E).

Sgt. Ballinger initially returned to service on April 15, 2007.  (*Id.*).  It appears that he required another leave of absence shortly thereafter and was unable to return to work permanently until early 2008.  (Ballinger Dep. at 18:19-22).

In April 2008, Sgt. Ballinger was assigned to work as a detective sergeant.  (Splaine Dep. at 50:23-51:11; Ballinger Dep. at 27:23-28:10).  Three months later, he went on a "uniform patrol assignment."  (*Id.* at 51:2-3).  He worked a "four and two" rotation, where he would work four days and then take two days off.  (*Id.* at 40:17-19).  He worked two days in uniform and two days in plainclothes per rotation.  (Ballinger Dep. at 28:2-7).  He testified that he could not perform details every day because he "had a lot of pain in [his] feet" and "couldn't stand up." (*Id.* at 118:14-18).

After returning to work in 2008, Sgt. Ballinger made three requests for accommodation, all of which were granted.  He asked for lights for his cruiser, a heater for his office, and a lamp with a magnifying glass to assist him in reading.  (*Id.* at 34:20-35:16).  He made no further accommodation requests.  (*Id.* at 35:10-22).

The Kingston Police Department employs a court prosecutor.  The court prosecutor is a police-department employee who prosecutes misdemeanors, serves as a liaison between the clerk's office and the District Attorney's Office, and represents the Town in court in clerk's hearings, civil motor-vehicle hearings, and domestic-violence cases.  (Ballinger Dep. at 57:18-58:1).  The position typically does not involve making arrests, subduing or restraining individuals, or other tasks involving significant physical activity.  (*See* Splaine Dep. at 97:5-23).

The Kingston police court prosecutor works a "five and two" rotation, meaning he or she

works five days and then takes two days off. (*Id.* at 58:2-4). Court prosecutor is a specialty assignment within the department for which officers could apply. (*Id.* at 38:6-12). According to Chief Splaine, before an officer could take on a specialty assignment, he had to "be able to do the essential functions of [his existing position]." (*Id.* at 98:3-6).

Sometime in 2009 or 2010, while serving as a detective, Sgt. Ballinger became the backup court prosecutor. (Ballinger Dep. at 31:2-16). Since returning to work, and during his time as a court prosecutor, he continued to perform some limited detail work, including evening and weekend details and patrolling a mall. (*See* Ballinger Dep. at 118:19-119:5).

On February 29, 2012, Sgt. Ballinger was again seen by Dr. Katz, who noted that he suffered from reduced hearing function. (Defs. Ex. F). Dr. Katz further wrote that his "[PTSD] symptoms are relatively minor at this time, though still some present." (*Id.* at 2). Otherwise, however, Dr. Katz concluded that "no psychotherapy" and "no specific work restrictions" were needed at that time. (*Id.*at 3).

In 2015, the incumbent court prosecutor retired, and Sgt. Ballinger succeeded him. (Ballinger Dep. at 38:11-13; Splaine Dep. at 57:6-21). There were no complaints about his ability to perform his duties as a court prosecutor, either while he served as a backup or after he took over the position full-time. (Pl. Ex. 2 at 6).

In June 2016, a disciplinary matter arose involving another officer, Sgt. Susan Munford. (Defs. Ex. I at 4). Sgt. Munford was also a member of the town's Board of Selectmen. (Pl. Ex. 3 ("Munford Dep." at 5:21-6:5)). At the time, Sgt. Ballinger was the president of the Kingston Police Officers' union. (Defs. Ex. I at 3).

Sgt. Ballinger testified in support of Sgt. Munford at a disciplinary hearing on June 28, 2016. (*Id.* at 5). That same evening, he was scheduled to work a midnight-to-8:00 a.m. overtime

shift. (Defs. Ex. I at 4). According to Sgt. Ballinger, he mistakenly thought that he was scheduled to work another day and went to sleep at 10:00 p.m. (*Id.*). A patrolman, Thomas Mori, called and woke him. He arrived at the police station at 12:39 a.m. (*Id.* at 4-5).

Upon arriving, Sgt. Ballinger allegedly shouted at the commanding officer of the previous shift, Sgt. Zachary Potrykus, for having Officer Mori make the phone call. (*Id.*). Sgt. Potrykus had testified adversely to Sgt. Munford five days earlier in the disciplinary hearing. (*Id.* at 5). After Sgt. Potrykus turned away to leave, Sgt. Ballinger yelled, "[y]ou going to fucking lie about this too?" (*Id.* at 4). That was an apparent reference to Sgt. Potrykus's earlier testimony. (*Id.* at 4-5). Sgt. Potrykus reported the incident to his superior officer, Lt. Thomas Kelley. (*Id.*).

On June 29, 2016, Chief Splaine notified Sgt. Ballinger that he was the subject of an internal-affairs investigation concerning the previous evening's argument. (*Id.*). The investigating officer, Lt. Robert Wells, interviewed the involved parties and an eyewitness, dispatcher Gail Fallon. (*Id.* at 6).

On July 7, 2016, Lt. Wells sent Chief Splaine a summary of his investigation, which concluded that Sgt. Ballinger had failed to report for duty on time and that he had engaged in disrespectful treatment of another officer. (*Id.* at 7).

On July 28, 2016, Chief Splaine issued a Notice of Disciplinary Action suspending Sgt. Ballinger for three days. (*Id.* at 8). Pursuant to the governing collective bargaining agreement, Sgt. Ballinger appealed the decision to an arbitrator, who vacated it. (*Id.* at 22-23).

On February 17, 2017, Sgt. Ballinger testified on behalf of Sgt. Munford at her termination hearing. (Pl. Ex. 4 at 3). The proceeding was public, and Sgt. Munford had it broadcast on Facebook Live. (Splaine Dep. at 78:22-24; Pl. Ex. 8 at 1). Because the hearing

was overseen by a hearing officer, not by the Board of Selectmen, citizens were not permitted to speak.  (Pl. Ex. 8).

In his deposition, Chief Splaine characterized Sgt. Ballinger's testimony at the hearing as "blanket allegations" and "disparaging remarks against the whole [police department]."  (Splaine Dep. at 80:1-3).  Specifically, Chief Splaine testified that Sgt. Ballinger "was alleging that nobody follow[ed] policies and procedures; that nobody . . . properly catalog[u]ed evidence; [and] that he saw evidence laying around the station."  (*Id.* at 80:10-13).  Chief Splaine testified that he believed Sgt. Ballinger was offering "scorch-and-burn testimony [to try] to protect Sergeant Munford."  (*Id.* at 81:8-9).

During the hearing, Sgt. Ballinger disclosed that he had PTSD and some memory issues.  (Splaine Dep. at 87:13-23).  He also recounted an earlier conversation with Lt. Kelley concerning a decision to suspend Sgt. Munford's license to carry a firearm.  (Defs. Ex. J at 165:2-6).  He had mentioned to Lt. Kelley that he, like Sgt. Munford, had PTSD but that his license to carry had not been suspended.  (*Id.*).  Lt. Kelley purportedly replied, "be careful what you wish for."  (*Id.* at 166:5-6).[2]

On March 8, 2017, Lt. Kelley sent a letter to Sgt. Ballinger requiring him to attend an interview the following day.  (Pl. Ex. 9).  The interview's stated purpose was "to discover facts and offer [him] an opportunity to explain and clarify statements" he had made at the hearing on February 17.  (*Id.*).

The interview on March 9 focused on Sgt. Ballinger's claim that he had been diagnosed

---

[2] Sgt. Munford was eventually terminated from the police department by the Board of Selectmen on April 25, 2017.  (Pl. Ex. 7).  She admitted to failing to follow department policy in logging reports and storing evidence.  (Pl. Ex. 6).  On appeal, an arbitrator agreed that her performance was negligent, but nevertheless reinstated her employment with the police department on the ground that there had been lax enforcement of evidence storage rules across the entire department.  (Pl. Ex. 7).

with PTSD. (Pl. Ex. 10 ("Kelley Dep.") at 111:2-5). According to Sgt. Ballinger, he had assumed the department was aware of his PTSD because of various medical forms he had submitted referring to PTSD symptoms. (Defs. Ex. L at 3).

After the interview, Chief Splaine concluded that Sgt. Ballinger's ability to perform the essential functions of the job of a police sergeant was in question. (Defs. Ex. D at 3-4). Accordingly, on March 14, 2017, he sent a memorandum to Sgt. Ballinger placing him on administrative leave through March 24, 2017. (Pl. Ex. 11). The memorandum further required him to provide a physician's note addressing the following five questions:

1. Does Sergeant Ballinger have Post Traumatic Stress Disorder (PTSD) or a related condition?

2. If so, does this condition prevent Sergeant Ballinger from performing the essential functions of his job? (A copy of the essential duties of a police officer is included with this notice, for reference.)

3. Is this condition related to Sergeant Ballinger's position as a police officer?

4. Are issues with short or long-term memory a symptom of this condition?

5. Is Sergeant Ballinger subject to unprovoked attacks of anger or similar behavior as a result of this condition?

(*Id.*). As indicated, Chief Splaine attached a copy of the essential duties of a police officer. (Splaine Dep. at 96:15-17). He did not, however, attach any description of the court prosecutor position, because no such written description exists. (*Id.* at 98:3-6).

On March 21, 2017, Dr. Russell Fry, a psychiatrist, responded to Chief Splaine's questions. As relevant here, Dr. Fry concluded that Sgt. Ballinger suffered from PTSD and that he was unable to "function with the full capacity as a police officer." (Defs. Ex. O). On March 24, 2017, Chief Splaine placed Sgt. Ballinger on sick leave effective March 27, 2017. (Pl. Ex. 12).

On March 27, 2017, Sgt. Ballinger was seen again by Dr. Katz. (Defs. Ex. P). Dr. Katz

wrote that he had "several ongoing neurologic problems," including "ongoing hearing loss and tinnitus," "memory retrieval," and "anxiety as well as nightmares that are consistent with symptoms of [PTSD]." (*Id.*). Dr. Katz concluded that he was able to "continue to carry out the duties of a police officer and detective," but cautioned that a stressful situation could trigger a severe anxiety episode. (*Id.*).

Chief Splaine then directed Sgt. Ballinger to undergo an independent medical examination with Dr. Judy Edelstein, a neurologist. (Pl. SMF ¶ 20). On June 22, 2017, Dr. Edelstein issued an initial report assessing that Sgt. Ballinger did suffer from anxiety, depression, and PTSD, but that he was largely able to handle those issues. (Defs. Ex. Q at 4). Dr. Edelstein continued, however, that he had balancing issues, difficulty sleeping, anxiety, and some psychological difficulties. (*Id.*). She concluded that he had "mild cognitive dysfunction" and PTSD, "which would make it difficult and prevent him from possibly producing accurate police reports." (*Id.* at 5). After Chief Splaine asked Dr. Edelstein several follow-up questions, she added that Sgt. Ballinger's memory and cognitive issues were likely permanently impaired and that he should not serve as a SWAT team commander, which was one of his assignments. (Defs. Ex. Q at 7-8).

Around the same time, the police department underwent a semiannual bidding process for shift assignments for the second half of 2017. (Pl. SMF ¶ 21). For the first time in several years, the role of court prosecutor was not available for bidding by sergeants. (Splaine Dep. at 159:3-6). Chief Splaine testified that he removed that position from the bidding process because of budget concerns and because he intended Sgt. Ballinger to work the shift that had been handled by Sgt. Munford. (*Id.* at 159:7-12). As police chief, Chief Splaine had discretion under the collective bargaining agreement to decide whether to fill the position of court prosecutor in the

first instance, and whether the position should be filled by a patrolman or sergeant. (*Id.* at 160:3-5). Currently, three people are jointly assigned to the position of court prosecutor on a part-time basis. (Splaine Dep. at 111:12-14).

On October 2, 2017, the Town of Kingston made an application to the Plymouth County Retirement Board that Sgt. Ballinger be subjected to involuntary disability retirement. (Defs. Ex. C at 4). Attached to the application was an affidavit from Chief Splaine stating that in reliance on Dr. Edelstein's evaluation, he was of the opinion that Sgt. Ballinger was "not able to perform the essential job functions of a Kingston police officer." (*Id.* at 3). The application itself stated that Sgt. Ballinger's current position required certain physical capacities, including the abilities to "separate individuals in a fight or disturbance," "erect physical barriers," "bodily serve as a barrier," and "physically restrain or subdue a violent or resisting individual or arrestee to protect [one's] self, the person being restrained[,] and the public." (*Id.* at 7).

As noted, Robert Fennessy is the Town Administrator in Kingston. (Defs. Ex. S ("Fennessy Dep.") at 16:2-16). He was appointed by, and reports to, the Board of Selectmen. (*Id.* at 16:13-16). All town department heads, including the Chief of Police, report to Fennessy. (*Id.* at 17:9-22). As Town Manager, Fennessy had no role in the process for involuntary-disability retirement except to notify the Board of Selectmen and to apprise the board of facts relevant to the involuntary retirement procedure. (*Id.* at 27:16-20, 28:20-30:5).

The town's counsel, John Clifford, advised Fennessy to e-mail Sgt. Ballinger's involuntary-disability retirement packet to the Board of Selectmen. (*Id.* at 30:6-20). The packet was marked "confidential" and mentioned that Sgt. Ballinger had PTSD. (*Id.* at 33:20-24; Pl. SMF ¶ 26). Sgt. Munford, who was still a member of the Board, received the e-mail. (Pl. Ex. 3 ("Munford Dep.") at 62:21-24). She testified that she had never received a similar involuntary-

retirement application while serving on the Board. (*Id.* at 65:10-14).

Three independent physicians ultimately agreed that Sgt. Ballinger was incapable of performing the essential duties of a police sergeant and that his incapacity was likely to be permanent. (Defs. Ex. R). Accordingly, the Plymouth County Retirement Association voted unanimously to require Sgt. Ballinger to retire involuntarily. (Defs. SMF ¶ 28).

### B. Procedural Background

The complaint in this action was filed in the Superior Court on December 5, 2017. An amended complaint was served on defendants on May 29, 2018, and the case was removed to this court on the basis of federal-question jurisdiction on June 6, 2018.

On November 29, 2018, this court granted Ballinger's motion for leave to file a second amended complaint. The second amended complaint asserts seven counts. Counts One and Three allege disability discrimination and failure to accommodate, respectively, by Kingston and Chief Splaine in violation of Mass. Gen. Laws ch. 151B. Counts Two and Four allege disability discrimination and failure to accommodate, respectively, by the Town of Kingston in violation of the ADA. Count Five alleges invasion of privacy by Fennessy in violation of Mass. Gen. Laws ch. 214, § 1B. Count Six asserts a common-law tortious interference claim against Chief Splaine. Count Seven alleges a Section 1983 claim for violation of Ballinger's First Amendment rights against Chief Splaine.

Defendants have moved for summary judgment as to all counts.

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## III. Analysis

### A. Counts One, Two, Three, and Four: Claims for Disability Discrimination and Failure to Accommodate

Counts One and Three allege disability discrimination and failure to accommodate, respectively, by the Town of Kingston and Chief Splaine in violation of Mass. Gen. Laws ch. 151B. Counts Two and Four allege disability discrimination and failure to accommodate, respectively, by the Town of Kingston in violation of the ADA.

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

"Chapter 151B is considered the 'Massachusetts analogue' to the [ADA]." *Sensing v. Outback Steakhouse of Fla., LLC*, 575 F.3d 145, 153 (1st Cir. 2009). Accordingly, the analysis

of plaintiff's claims under federal and state law is largely identical. *Id.*; *Flagg v. AliMed, Inc.*, 466 Mass. 23, 33 (2013) (Massachusetts courts apply federal case law to interpret Mass. Gen. Laws ch. 151B).

### 1.      Disability Discrimination

A *prima facie* case of disability discrimination requires the plaintiff "to show that (1) [he] was disabled within the meaning of the ADA, (2) [he] was a 'qualified individual,' and (3) the defendant took an adverse employment action against [him] on the basis of [his] disability." *Pena v. Honeywell Int'l*, 923 F.3d 18, 27 (1st Cir. 2019) (quoting 42 U.S.C. § 12112(a) and *Tobin v. Liberty Mut. Ins. Co.*, 433 F.3d 100, 104 (1st Cir. 2005)).

The principal issue in this case is whether plaintiff is a "qualified individual" under the statute.[3] A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). To be a qualified individual, an employee must show "(1) 'that she possesses the requisite skill, experience, education and other job-related requirements for the position'; and (2) 'that she is able to perform the essential functions of the position with or without reasonable accommodation.'" *Echevarria v. AstraZeneca Pharm. LP*, 856 F.3d 119, 126 (1st Cir. 2017) (quoting *Mulloy v. Acushnet Co.*, 460 F.3d 141, 147 (1st Cir. 2006)). Here, there is no dispute that plaintiff satisfies the first of these requirements. Defendants contend, however, that he is unable to perform the essential functions of his position because of his PTSD.

The analysis is complicated by the fact that plaintiff has held different positions. Before

---

[3] Defendants do not contest that plaintiff has shown that he has a "disability" within the meaning of the ADA and Mass. Gen. Laws ch. 151B. (Defs. Mem. at 6). They do contend, however, that he has failed to present sufficient evidence on the third element of his disability discrimination claim: whether defendants took an adverse employment action against him on the basis of his disability. (*Id.* at 6).

2015, he worked as a detective sergeant and as a backup court prosecutor.[4]  From 2015 to 2017, his primary job was as a court prosecutor, and he did little patrol or detail work.  Finally, after he disclosed his PTSD in 2017, he was removed from the court-prosecutor position and returned to patrol duty.  The two positions have different essential functions; for example, a court prosecutor rarely, if ever, makes arrests, which is an essential task for a detective sergeant, according to the Massachusetts HRD.  (*See* Splaine Dep. at 58:10-24, 97:5-6; Defs. Ex. B at 2-3).

The analysis is further complicated by the fact that plaintiff had disabilities other than PTSD, such as extreme foot pain and an intermittent inability to stand, that were also caused by the 2006 electrical shock.  Those disabilities were known to at least some members of the police department at the time he became a court prosecutor because he had requested accommodations for them.  (*See* Ballinger Dep. at 14:8-16:22; 34:20-35:9.)

In any event, the issue is whether plaintiff can perform the essential functions of the relevant position.  But is the relevant position a detective sergeant, or a court prosecutor?

Defendants contend that no matter which position plaintiff held, he must be able to perform the essential functions of an ordinary police officer's job, because doing so is a prerequisite for the court prosecutor position.  Indeed, Chief Splaine testified to that effect.  (Splaine Dep. at 98:3-6).  However, an employer's view about what functions are essential to a job is relevant, but "not dispositive."  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 25 (1st Cir. 2002).  Rather, "the complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis."  *Id.*  The

---

[4] The parties have used several different terms to describe the position held before he became a full-time court prosecutor.  (*See, e.g.*, Def. Ex. D. at 3-4 ("police sergeant"); Ballinger Dep. at 27:23-28:10 ("detective sergeant"); Pl. Ex. 11 ("police officer").)  For the sake of consistency, the Court will refer to this position as detective sergeant.

court must look to the actual circumstances of plaintiff's job—whichever job that was—in order to determine which functions were essential to it.

Plaintiff was a court prosecutor at the time of his removal, and he contends that he was removed from that position as a result of unlawful disability discrimination. Thus, the court-prosecutor position would seem to be the appropriate frame of reference as to which functions were essential to his job. *See Hamm v. Exxon Mobil Corp.*, 223 Fed. App'x 506, 508 (7th Cir. 2007) ("Whether an individual is a qualified individual with a disability is determined at the time of the employment decision.").

However, the detective-sergeant position may be the appropriate one if plaintiff was made a court prosecutor in order to accommodate his disabilities. In *Phelps v. Optima Health, Inc.*, 251 F.3d 21 (1st Cir. 2001), the First Circuit concluded that "when an employer and employee have made arrangements to account for the employee's disability[,] a court must evaluate the essential functions of the job without considering the effect of the special arrangements." *Id.* at 25-26. "To find otherwise," the court reasoned, "would unacceptably punish employers from doing more than the ADA requires, and might discourage such an undertaking on the part of employers." *Id.*[5]

The *Phelps* principle may not apply, however, where an employer excuses an employee from some essential functions of a job for reasons unrelated to the employee's disability. In *Rooney v. Sprague Energy Corp.*, 581 F. Supp. 2d 94 (D. Me. 2008), the plaintiff prevailed at trial on claims that his employer had discriminated against him because he had macular

---

[5] For example, the plaintiff in *Phelps* was a nurse who was unable to lift fifty pounds on a consistent basis. *Id.* While the plaintiff's specialized role as a "medication nurse" permitted her to avoid that function, that position "had been created specifically for her physical limitations." *Id.* Thus, the First Circuit held that the ability to lift fifty pounds consistently "remained an essential function of her position." *Id.*; *see also Basith v. Cook County*, 241 F.3d 919, 930 (7th Cir. 2001).

degeneration.  *Id.* at 97.  The defendant moved for judgment as a matter of law, arguing that the plaintiff could not perform tank gauging, which was an essential function of the job.  *Id.* at 103-106.  While the plaintiff "had never done tank gauging during his two decades of employment," nonetheless the defendant argued, citing *Phelps*, that this remained an essential function of his job.  *Id.* at 104.  The court disagreed, concluding that a jury could reasonably find *Phelps* did not apply.  The defendant had excused the plaintiff from tank gauging for twenty years but had been "unaware" that the he had macular degeneration until several weeks before firing him.  *Id.*  Using the plaintiff's actual job duties to determine which functions were essential would therefore permit an employer to demand that the plaintiff perform non-essential tasks in order to justify firing him.

Here, there is a genuine dispute of fact as to whether plaintiff was made a court prosecutor in order to accommodate his disabilities.  Some evidence suggests that he was not.  Chief Splaine testified that he made plaintiff the court prosecutor in 2015 because he was "the best person for the job" and because no one else had applied.  (Splaine Dep. at 57:22-58:1).  And there is evidence that defendants had changed plaintiff's duties long before they discovered the disability for which he was allegedly fired; Chief Splaine had made him the full-time court prosecutor in 2015, but did not learn of his PTSD until February 17, 2017.  (Pl. Ex. 4 at 3).

However, there is also evidence suggesting that defendants may have made him a court prosecutor in order to accommodate his other disabilities (that is, those other than PTSD).  It is a reasonable inference (indeed, likely) that plaintiff was "the best person for the job" of court prosecutor by 2015 because he had served as a backup for it since sometime in 2009 or 2010.  And it is a reasonable inference that he received the backup court prosecutor assignment because of disabilities (other than PTSD) caused by his 2006 electric shock.  Those disabilities, which

included extreme foot pain and an intermittent inability to stand, were making it difficult for him to perform ordinary police work at the time he became backup court prosecutor. (Ballinger Dep. at 27:5-17). And they were known to at least some members of the police department by that time; he had taken medical leave and had requested several accommodations for them in 2008. (Ballinger Dep. at 14:8-16:22; 34:20-35:9). A jury could reasonably infer that senior members of the police department were aware of those disabilities, and his resulting limitations, and that he was made a backup court prosecutor in order to accommodate them.

Based on that evidence, there is a genuine dispute of material fact as to whether plaintiff was made a court prosecutor (1) because of his disabilities (at least in part) or (2) because of his qualifications and interest. There is therefore a genuine dispute of fact as to whether the relevant position, for determining whether he can perform the essential functions of the position, is detective sergeant or court prosecutor.

That does not, however, end the inquiry. If plaintiff could not perform the essential functions of *either* position, his claim cannot survive summary judgment. Defendants contend that his PTSD precludes him from performing the essential functions of either a court prosecutor or a detective sergeant.

"An essential function is one that is 'fundamental' to a position." *Sepúlveda-Vargas v. Caribbean Restaurants, LLC*, 888 F.3d 549, 553 (1st Cir. 2018). "[T]he complex question of what constitutes an essential job function involves fact-sensitive considerations and must be determined on a case-by-case basis." *Id.* (quoting *Gillen*, 283 F.3d at 25). In *Sepúlveda-Vargas v. Caribbean Restaurants, LLC*, the First Circuit laid out several considerations that bear on that analysis:

> In making this case-by-case determination, the ADA instructs [courts] to give consideration "to the employer's judgment as to what functions of a job are

> essential, and if an employer has prepared a written description before advertising
> or interviewing applicants for the job, this description shall be considered
> evidence of the essential functions of the job."

*Id.* (quoting 42 U.S.C. § 12111(8)).  Other factors include "'[t]he consequences of not requiring

the incumbent to perform the function[,]' '[t]he work experience of past incumbents in the job[,]'

and '[t]he current work experience of incumbents in similar jobs.'"  *Id.* (quoting 29 C.F.R.

§1630.2(n)(3)) (alterations in original).  Again, an "employer's good-faith view of what a job

entails, though important, is not dispositive."  *Gillen*, 283 F.3d at 25 (citing *Ward v.*

*Massachusetts Health Research Inst.*, 209 F.3d 29, 34 (1st Cir. 2000)).

"[W]hile the employer bears the burden of showing that a fought-over job function is

essential, the employee bears the burden of showing that she could perform that function, even if

only with some reasonable accommodation for her disability."  *Lang v. Wal-Mart Stores E., L.P.*,

813 F.3d 447, 454 (1st Cir. 2016) (internal citations omitted).

Here, a jury could reasonably conclude that plaintiff was able to perform the essential

functions of a court prosecutor.  As an initial matter, there is no written description of a court

prosecutor's job responsibilities.  (Splaine Dep. at 98:3).  In practice, plaintiff prosecuted

misdemeanors, served as a liaison between police officers and the District Attorney's office, and

represented the Town in court.  (Ballinger Dep. at 57:18-58:1).  There is no evidence of any

complaints or concerns about his performance of these duties.  (Pl. Ex. 2 at 6).  Chief Splaine

testified that while plaintiff was a court prosecutor, he did not perform any strenuous physical

activity or encounter any hazardous situations.  (Splaine Dep. at 97:5-23).  And to the extent he

did perform detail or patrol work, it appears to have been limited in scope and duration.

(Ballinger Dep. at 118:22-119:5) (stating that he would often "just stand[] in one spot" or patrol

a mall).

On the other hand, some evidence points the other way.  Several medical professionals

have opined that plaintiff is unable to perform the essential functions of his job. To be sure, some of them primarily addressed whether he could perform the functions essential to the job of detective sergeant, not a court prosecutor. (*See* Splaine Dep. at 96:15-17; Defs. Exs. O, P). But at least one physician concluded that his disabilities could interfere with his duties as a court prosecutor, specifically his ability to remember information and testify accurately. (Defs. Ex. Q at 5-6). Furthermore, defendants contend that even as a court prosecutor, he could be called to respond to "strenuous physical and emotional situations" on occasion. (Defs. Mem. at 10; Defs. Ex. D at 4). *See Phelps*, 251 F.3d at 26 (the fact that the plaintiff does not face such situations "does not necessarily mean that those tasks . . . are not essential"); *cf. Rooney v. Sprague Energy Corp.*, 483 F. Supp. 2d 43, 53-54 (D. Me. 2007) (denying summary judgment where two functions defendant characterized as "essential" were never or rarely performed by plaintiff).

Under the circumstances, there is a genuine issue of material fact as to whether plaintiff was able to perform the essential functions of a court prosecutor. Thus, whether he was a "qualified individual"—that is, someone who, with or without reasonable accommodation, can perform the essential functions of the employment position—is a question for the jury to resolve at trial.

Accordingly, defendants' motion for summary judgment on Counts One and Two will be denied.

### 2.    Failure to Accommodate

"In general, for purposes of bringing a failure to accommodate claim under the ADA, a plaintiff must show that: (1) he is a handicapped person within the meaning of the Act; (2) he is nonetheless qualified to perform the essential functions of the job (with or without reasonable accommodation); and (3) the employer knew of the disability but declined to reasonably accommodate it upon request." *Sepúlveda-Vargas*, 888 F.3d at 553. "However, the burden for

the employee at the second step of the inquiry changes slightly when an employee becomes disabled, can no longer perform the essential functions of her job, and requests as an accommodation a transfer or complete reassignment of duties. Instead of addressing the essential functions of her current position, an employee must demonstrate that she can perform the essential functions of the position she desires." *Audette v. Town of Plymouth*, 858 F.3d 13, 20–21 (1st Cir. 2017).

Here, the accommodation that plaintiff desired was reinstatement as court prosecutor. (Pl. Opp. at 12). In other words, he contends that defendants should have returned him to that position, whether or not he had previously received it on account of his disabilities.

On this point, there is an important distinction between the ADA and Mass. Gen. Laws ch. 151B. Under the ADA, a reasonable accommodation can include a transfer into an alternative position, if that position exists and is vacant. *Id.*; *see also* 42 U.S.C. § 12111(9). However, under Mass. Gen. Laws ch. 151B, transfer to an alternative position—that is, a different one than that for which an employee was initially hired—is not a reasonable accommodation. *Russell v. Cooley Dickinson Hosp., Inc.*, 437 Mass. 443, 454 (2002). Plaintiff has not identified any other reasonable accommodation besides a transfer to the court prosecutor position. (*See* Pl. Opp. at 12 (position as court prosecutor was the "only accommodation available to" plaintiff)). Thus, as a matter of law, defendants were not required under ch. 151B to reinstate plaintiff as a court prosecutor, and they are entitled to summary judgment as to Count Three.

However, whether the court-prosecutor position was a reasonable accommodation under the ADA remains a disputed factual issue. It is undisputed that the position existed and was available to plaintiff at the time that defendants learned of his PTSD. Indeed, he already held it.

His removal from that position was entirely at defendants' choice. Chief Splaine has testified that he could choose an officer to fill the position. (Splaine Dep. at 38:6-17, 160:3-5). Thus, it was "an actual vacant position to which [he could] transfer." *Audette*, 858 F.3d at 21. And as discussed above, a jury could reasonably conclude that plaintiff was able to perform the essential functions of the court-prosecutor position.

Defendants contend that even if the court-prosecutor position was a reasonable accommodation and plaintiff could perform its essential functions, his claim fails because he did not request that accommodation. However, the First Circuit has indicated that such requests are unnecessary in "situations where the nature of the disability and accommodation required are so obvious that 'there may be little or no need for discussion' with the employee." *See Enica v. Principi*, 544 F.3d 328, 339 (1st Cir. 2008) (quoting EEOC, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT, EEOC Notice 915.002 (Oct. 17, 2002), available at http://www.eeoc. gov/policy/docs/accommodation.html); *see also Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1197 (10th Cir. 2007) ("When a disabled individual's need for an accommodation is obvious, the individual's failure to expressly 'request' one is not fatal to the ADA claim.").

Here, there is a genuine dispute of material fact as to whether plaintiff's injury and the type of accommodation he required were "so obvious" that no discussion was necessary. Chief Splaine knew about plaintiff's PTSD when he placed him on leave and removed him from the court-prosecutor position. Whether or not defendants had previously put him in that position to accommodate his disabilities, he had performed it for more than a year without any complaints about his ability. (Pl. Ex. 2 at 6). On those facts, a jury could reasonably conclude that it was unnecessary for plaintiff to request to remain in the court-prosecutor position because his need to

do so was obvious.  *See Hodgetts v. City of Venice*, 794 F. Supp. 2d 1265, 1275 (M.D. Fla. 2011)

(plaintiff was "not required to specifically request accommodations" where his employer knew

he "had obvious difficulty walking" yet removed previous accommodations of his disability).

Accordingly, defendants' motion for summary judgment will be granted as to Count

Three (the failure-to-accommodate claim under ch. 151B) but will be denied as to Count Four

(the failure-to-accommodate claim under the ADA).

## B.    Count Five:  Invasion of Privacy

Count Five alleges that Fennessy violated Mass. Gen. Laws ch. 214, § 1B by disclosing

plaintiff's medical records to the Board of Selectmen for the Town.

Mass. Gen. Laws ch. 214, § 1B provides as follows:

> A person shall have a right against unreasonable, substantial or serious
> interference with his privacy. The superior court shall have jurisdiction in equity
> to enforce such right and in connection therewith to award damages.

 "To sustain a claim for invasion of privacy, the invasion must be both unreasonable and

substantial or serious."  *Nelson v. Salem State Coll.*, 446 Mass. 525, 536 (2006).  In the context

of employment, "there may be inquiries of a personal nature that are unreasonably intrusive and

no business of the employer."  *O'Connor v. Police Comm'r of Boston*, 408 Mass. 324, 330

(1990).  "To determine whether the inquiry amounts to a violation of [ch.] 214, § 1B, however,

'the employer's legitimate interest in determining the employees' effectiveness in their jobs

should be balanced against the seriousness of the intrusion on the employees' privacy.'"  *Id.*

(quoting *Bratt v. IBM Corp.*, 392 Mass. 508, 520 (1984)).

Defendants contend that plaintiff has failed to present any evidence that the disclosure of

his medical records to the Board of Selectmen was unreasonable and either substantial or serious.

Specifically, defendants contend that the disclosure did not violate ch. 214, § 1B because (1) the

Board had a valid interest in plaintiff's health as it related to his job performance and (2) the

Board already had possession of his medical records.

A genuine factual dispute exists as to those issues. "Without doubt, a persons's [sic] medical condition and treatment are private facts protected by [ch. 214, § 1B]." *Lemire v. Silva*, 104 F. Supp. 2d 80, 93 (D. Mass. 2000). It is true that the Board acted as the chief executive of plaintiff's employer. (Fennessy Dep. at 27:21-24). It therefore had a "substantial and valid interest in aspects of an employee's health that could affect the employee's ability to effectively perform job duties." *See Bratt*, 392 Mass. at 524. It also had an interest in plaintiff's "fitness to be a police officer." *See Mulgrew v. City of Taunton*, 410 Mass. 631, 637 (1991).

However, it is unclear whether the disclosure of plaintiff's PTSD to the Board served either of those interests. It was the Plymouth County Retirement Association, not the Board, that ultimately decided to force plaintiff into retirement. (Defs. SMF ¶ 28). That raises the question of why Fennessy informed the Board about plaintiff's PTSD. Fennessy testified that one reason he shared disability retirements with the Board was so it could fill newly vacant positions. (Fennessy Dep. at 28:7-24). But he did not explain why plaintiff's PTSD was relevant to that purpose. Furthermore, while Fennessy indicated that he also shared disability retirements with the Board to "keep them apprised," he also admitted that some Board members likely only needed to know that plaintiff was involuntarily retired—not that he had PTSD. (*Id.* at 28:3-6, 34:5-20). (*See also* Munford Dep. at 65:10-14 (Board member had never seen a similar disability retirement application).)

However, the disclosure of plaintiff's PTSD was not necessarily unreasonable. Fennessy forwarded plaintiff's medical records to the Board at the advice of counsel and in an email that was marked confidential. (Fennessy Dep. at 30:1-5, 32:11-33:12). He testified he routinely relayed such information. (*Id.* at 33:22-24). Plaintiff also testified that his medical records,

which included his PTSD diagnosis, were "sent automatically" to the police department because he received disability benefits. (Ballinger Dep. at 19:5-10, 20:11-14). For Fennessy to relay medical information that plaintiff had already provided to one department of the Town to its executive body without his permission may not have been necessary or prudent, but it also may not have been unreasonable.

In any event, the material facts are in dispute, and a jury could reasonably conclude that Fennessy violated ch. 214, § 1B. Accordingly, defendants' motion for summary judgment will be denied as to Count Five.

### C.      Count Six:  Tortious Interference

Count Six alleges that Chief Splaine tortiously interfered with plaintiff's contract with the Town by placing him on paid administrative leave because of his testimony.

"To prevail on a claim of tortious interference with a contract, a plaintiff must establish that '(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.'" *Weiler v. PortfolioScope, Inc.*, 469 Mass. 75, 84 (2014) (quoting *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 715-16 (2011)). "Actual malice must be shown to prove improper means." *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 70 (1st Cir. 2008). In addition, a plaintiff must show that she suffered a pecuniary loss as a result of the defendant's actions. *See Birbiglia v. St. Vincent Hosp., Inc.*, 427 Mass. 80, 83 (1998).

However, a state-law tortious interference claim may be preempted by federal law where the plaintiff is subject to a collective bargaining agreement ("CBA"). Section 301 of the Labor Management Relations Act creates federal jurisdiction over "[s]uits for violations of contracts between an employer and a labor organization representing employees in an industry affecting

commerce . . . ." 29 U.S.C. § 185(a).  The Supreme Court has held that § 301 "completely pre-empts" some state law claims; its "pre-emptive force . . . is so 'extraordinary' that it converts an ordinary state common-law complaint into one stating a federal claim."  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 393 (1987); *see also O'Donnell v. Boggs*, 611 F.3d 50, 53-54 (1st Cir. 2010).  "[S]tate law claims are preempted under section 301 if they 'require construing the collective-bargaining agreement' because of the congressional interest in uniform interpretation of collective bargaining agreements."  *O'Donnell*, 611 F.3d at 54 (quoting *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 407 (1988)).  The First Circuit has held that Massachusetts state-law tortious interference claims are preempted by § 301 "where deciding them would require the court to interpret a CBA."  *Id.*; *see also Magerer v. John Sexton & Co.*, 912 F.2d 525, 530-31 (1st Cir. 1990); *see, e.g.*, *Hamilton v. Partners Healthcare Sys., Inc*., 209 F. Supp. 3d 397, 406-411 (D. Mass. 2016).

Here, determining the merits of plaintiff's claim would require the interpretation of the applicable CBA.  Defendants contend that Chief Splaine did not knowingly induce a breaking of plaintiff's contractual relationship with the Town because he acted in accordance with the applicable contract—that is, the CBA.  *See O'Donnell*, 611 F.3d at 56 (tortious interference claim preempted where defendants could "be expected to defend" their acts as "justified by supervisory . . . responsibilities authorized by the contract").[6]  Specifically, defendants contend that when Splaine placed plaintiff on paid administrative leave and then sick leave, he "acted within his authority" under article 28 of the CBA between the Town and its police officers.

---

[6] Defendants have not explicitly raised the defense that plaintiff's tortious-interference claim is preempted by § 301.  A § 301 preemption defense is waivable.  *Sweeney v. Westvaco Co.*, 926 F.2d 29, 39-40 (1st Cir. 1991).  The Court will not construe it as waived here, however, because defendants specifically invoked the terms of the CBA, the construction of which is controlled by federal law, as a defense.  Construed liberally, that was sufficient to raise a § 301 preemption defense.

(Defs. SMF ¶ 19). Under article 28, officers injured in the performance of their duty must notify the Chief of Police, who "shall designate as to the circumstances of [their] injury and the extent of [their] incapacity" and "determine [their] date of return and schedule." (Defs. Ex. N ("CBA"), Article 28). If Chief Splaine was authorized by those CBA provisions to place plaintiff on paid administrative leave, then plaintiff cannot establish that Splaine knowingly induced the breaking of the CBA. Thus, the tortious interference claim cannot be resolved without deciding whether Chief Splaine acted under his article 28 authority. *See O'Donnell*, 611 F.3d at 55-56 (tortious interference claim could not be resolved without deciding scope of CBA's management rights clause). That is true even if Splaine had "personal motives," such as plaintiff's testimony in defense of Sgt. Munford, as long as it was permitted by the CBA. *See id.* Thus, because there is a "real interpretive dispute" that implicates the CBA, the tortious interference claim is preempted by § 301. *See id.*; *Martin v. Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42 (1st Cir. 1997).

When § 301 preempts a state-law claim, "that claim must either be treated as a § 301 claim . . . or dismissed as pre-empted by federal labor-contract law." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) (internal citations omitted). "[F]ederal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress." *Republic Steel Corp. v. Maddox*, 379 U.S. 650, 652 (1965). Thus, "courts ordinarily dismiss claims" preempted by § 301 if the applicable CBA provides an arbitration process and "relief can be provided within the CBA process." *Cavallaro v. UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 6 (1st Cir. 2012); *see also Allis-Chalmers*, 471 U.S. at 220-221 ("This complaint should have been dismissed for failure to make use of the grievance procedure established in the [CBA]").

The applicable CBA here provides such an arbitration process. (CBA, Article 6). There

is no indication that plaintiff pursued that process.[7]  Therefore, the tortious-interference claim is barred.[8]

Accordingly, defendants' motion for summary judgment will be granted as to Count Six.

**D.      Count Seven:  42 U.S.C. § 1983**

Count Seven alleges that Chief Splaine unlawfully retaliated against plaintiff, in violation of his First Amendment rights, by disciplining him and involuntarily retiring him after he testified on behalf of Sgt. Munford at her termination hearing.[9]

**1.      Whether Plaintiff Has Made Out a First Amendment Violation**

As a government employee, plaintiff's right of free speech is not the same as that of an ordinary citizen.  That is because "a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public."  *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004).  To prove a claim of First Amendment retaliation as a public employee, plaintiff must establish (1) that he "spoke as a citizen on a matter of public concern"; (2) that his interest, "as a citizen, in commenting upon matters of concern" outweighs the government's interest "as an employer, in promoting the efficiency of the public services it performs through its employees"; and (3) that the protected speech was a "substantial or motivating factor in the adverse action against the plaintiff."

---

[7] While plaintiff appealed his three-day suspension in 2016 to an arbitrator, there is no indication that he took similar action over his paid administrative leave and involuntary retirement.

[8] Defendants also contend that the claim fails because (1) he has not shown he suffered a pecuniary loss and (2) he has failed to establish that Chief Splaine acted with an improper motive.  Because the Court finds that plaintiff's claim is preempted, it does not reach these issues.

[9] Plaintiff has sued under 42 U.S.C. § 1983 for the alleged violation of his First Amendment rights.  In order to "state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution or laws of the United States and (2) that the perpetrator of the violation was acting under color of law."  *Cruz–Erazo v. Rivera–Montanez*, 212 F.3d 617, 621 (1st Cir. 2000).  Here, the parties do not dispute that the alleged perpetrator, Chief Splaine, acted under color of state law.

*Davignon v. Hodgson*, 524 F.3d 91, 100 (1st Cir. 2008) (quoting *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968)) (internal quotation marks omitted).

Only the first and the third elements are in dispute here.  Defendants contend that plaintiff was not speaking as a citizen on a matter of public concern when he testified at Sgt. Munford's hearing.  They also appear to contend that plaintiff was put on leave and involuntarily retired because of his PTSD, rather than his testimony.  However, they do not contest whether plaintiff's interest in testifying outweighed any countervailing interest of the Town.[10]

### a.    Whether Plaintiff Spoke as a Citizen on a Matter of Public Concern

The first element itself has two subparts:  the plaintiff must establish (1) that "the speech touched upon a matter of public concern" and (2) that he spoke as a "citizen" rather than as an employee.  *Decotiis v. Whittemore*, 635 F.3d 22, 30 (1st Cir. 2011); *see also Curran v. Cousins*, 509 F.3d 36, 45 (1st Cir. 2007) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  Both subparts are questions of law for the court to decide.  *Lewis v. City of Boston*, 321 F.3d 207, 219 (1st Cir. 2003); *see also Davignon* at 100; *Bergeron v. Cabral*, 535 F. Supp. 2d 204, 211 (D. Mass. 2008).

### (1)    Whether Plaintiff's Speech Involved a Matter of Public Concern

"Whether an employee's speech involves a 'matter of public concern' is a case-specific, fact-dependent inquiry."  *Curran*, 509 F.3d at 46.  The court looks to the "content, form, and context of a given statement as revealed by the whole record."  *Davignon*, 524 F.3d at 101 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).  "Where speech relates to a matter of

---

[10] Defendants briefly refer to the second element, but they do not address it directly.  (*See* Defs. Mem. at 22).  Defendants do not contend that the adverse employment actions here were taken in response to protected speech but were ultimately justified by efficiency interests.  Rather, they contend that the reason for those actions was plaintiff's PTSD, not his protected speech—a contention that addresses the third element, causation.

inherent public concern, such as official malfeasance or the neglect of duties, this inquiry is confined to the subject matter of the speech." *Decotiis*, 635 F.3d at 30.

Here, plaintiff's testimony at Munford's termination hearing related to a matter of an inherent public concern. It is true that, on its face, the termination hearing was only about allegations of misconduct—specifically, the mishandling of evidence and the failure to investigate sexual assaults properly—by one officer, Munford. (Splaine Dep. at 71:13-16). *Cf. Hunt v. City of Portland*, 726 F. Supp. 2d 1244, 1270 (D. Or. 2010) (one officer's misconduct, including mishandling evidence, was likely not a matter of public concern). However, Chief Splaine testified that at the hearing, plaintiff "was alleging that nobody follows policies and procedures; that nobody, you know, properly cataloged [sic] evidence; that he saw evidence laying around the station, things of that nature . . . ." (Splaine Dep. at 80:10-13). Construing all facts and reasonable inferences in plaintiff's favor, his claims of widespread police misconduct involve matters of public concern. Indeed, as Splaine himself acknowledged, allegations of such widespread police misconduct, including the mishandling of evidence, are a topic of inherent concern to the community. (*Id.* at 81:16-82:5). *See Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 224 (D. Mass 2002) (corruption and racism within police department); *see also United States v. Wecht*, 484 F.3d 194, 210 (3d Cir. 2007), *as amended* (July 2, 2007) ("[T]he process by which the government investigates and prosecutes its citizens is an important matter of public concern."); *Teague v. City of Flower Mound*, 179 F.3d 377, 383 (5th Cir. 1999) ("Speech concerning police misconduct is public in content.").[11]

---

[11] Notably, Munford's termination hearing was covered by local media. *See, e.g.*, Kathryn Gallerani, *Testimony Ends in Kingston Sgt. Susan Munford Termination Case*, WICKEDLOCAL, https://kingston.wickedlocal.com/news/20170217/testimony-ends-in-kingston-sgt-susan-munford-termination-case (saved at https://perma.cc/7YEE-BJZP).

### (2)     Whether Plaintiff Spoke as a Citizen

The next question is whether plaintiff spoke as a citizen.  A public employee who is speaking as an employee, rather than as a citizen, has no First Amendment right of action based on his "employer's reaction to the speech."  *Garcetti*, 547 U.S. at 418.  In other words, the focus in this context is not on the content of the speech, but "the role the speaker occupied when he said it."  *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 692 (5th Cir. 2007).

To determine whether a public employee spoke as an employee or a citizen, the court must first identify plaintiff's official responsibilities.  *Decotiis*, 635 F.3d at 31.  In identifying his official responsibilities, "the proper inquiry is 'practical' rather than formal, focusing on 'the duties an employee actually is expected to perform,' and not merely those formally listed in the employee's job description."  *Id.* (internal quotation marks omitted) (quoting *Mercado–Berrios v. Cancel–Alegria*, 611 F.3d 18, 26 (1st Cir. 2010)).  Here, plaintiff's official responsibilities at the time of the testimony were those of a court prosecutor:  to prosecute misdemeanors, to serve as a liaison between police officers and the District Attorney's office, and to represent the Town in court.  (Ballinger Dep. at 57:18-58:1; Pl. Ex. 2 at 5).

The next step is to ask whether "the speech at issue [was] made pursuant to [the employee's] responsibilities."  *Id.* at 32 (quoting *Mercado–Berrios*, 611 F.3d at 26).  "To determine whether such speech was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech."  *Id.*  The First Circuit has identified several non-exclusive factors that are instructive:  (1) "whether the employee was commissioned or paid to make the speech in question"; (2) "the subject matter of the speech"; (3) "whether the speech was made up the chain of command"; (4) "whether the employee spoke at [his] place of employment"; (5) "whether the speech gave objective observers the impression that the employee represented the employer when [he] spoke (lending it 'official significance')"; (6)

"whether the employee's speech derived from special knowledge obtained during the course of [his] employment"; and (7) "whether there is a so-called citizen analogue to the speech." *Id.*

Several of those factors weigh in plaintiff's favor. He was not commissioned or paid to testify at the hearing. He spoke to a hearing officer, rather than up the chain of command. (Pl. Ex. 8 at 1). No reasonable observer would have believed that his complaints about widespread evidence mishandling represented the Town's view. *See Stuart v. Town of Framingham*, 301 F. Supp. 3d 234, 240 (D. Mass. 2018) (concluding that an officer's statements "directly contrary" to a police chief's statements would not give an observer the impression that he represented his employer). And while it is unclear exactly where the hearing took place, plaintiff was clearly not at work; the hearing was open to members of the public and broadcast on Facebook Live. (*See* Splaine Dep. at 82:6-14).

To be sure, some factors indicate plaintiff spoke as an employee. There was no "citizen analogue" to his testimony, because citizens could not speak at the hearing. (Pl. Ex. 8). His testimony related to his employment in the police department and it drew on special knowledge obtained during that employment—specifically, how Kingston police officers handled evidence. "But the mere fact that an individual's speech 'relates to public employment' or 'concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech.'" *Stuart*, 301 F. Supp. 3d at 241 (quoting *Lane v. Franks*, 573 U.S. 228, 239 (2014)). "Indeed, '[g]overnment employees are often in the best position to know what ails the agencies for which they work,' and there is 'considerable value . . . in encouraging, rather than inhibiting, speech by public employees.'" *Id.* (quoting *Lane*, 573 U.S. at 236) (internal quotations omitted). "[S]peech by public employees on subject matter related to their employment holds special value precisely because those employees gain

knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 240.

Under the circumstances, and considering the required factors in their totality, the Court concludes that plaintiff spoke as a citizen, not an employee, when he testified on behalf of Sgt. Munford at the hearing.

### b.     Whether Plaintiff's Testimony Was a Substantial or Motivating Factor in His Leave / Retirement

The final disputed element of the First Amendment claim is "whether the plaintiff can show that the protected expression was a substantial or motivating factor in [an] adverse employment decision." *Curran*, 509 F.3d at 45. The resolution of that question is ordinarily a question of fact for the jury to decide. *See Davignon*, 524 F.3d at 100-101; *see also Nethersole v. Bulger*, 287 F.3d 15, 18-19 (1st Cir. 2002).

Causation is analyzed under a two-step inquiry. "First, the plaintiff must show that the employer would not have taken adverse action but for the plaintiff's speech." *Davignon*, 524 F.3d at 106. If the plaintiff meets that burden, by means of either direct or circumstantial evidence, the burden shifts to the employer to establish that it would have taken the adverse action even without the protected speech. *Id.*

### (1)     Whether Plaintiff Has Produced Evidence of Causation

The initial burden on the plaintiff is "more substantial than the burden of producing prima facie evidence in, for example, the first stage of a Title VII discrimination case. The employee must produce sufficient evidence of motivation at the initial stage such that the *burden of persuasion itself passes to the defendant-employer*." *Diaz-Bigio v. Santini*, 652 F.3d 45, 51 n.3 (1st Cir. 2011) (internal citations and quotation marks omitted).

There is some direct evidence that plaintiff's testimony caused his adverse employment action. It was Chief Splaine who took those actions—specifically, by placing plaintiff on

administrative leave and beginning his involuntary retirement process.  Chief Splaine's displeasure with the protected speech is clear; he described the testimony as "blanket allegations, disparaging remarks against the whole station"; "scorch-and-burn testimony trying to protect Sergeant Munford"; "things that just weren't true"; and "really disheartening."  (Splaine Dep. at 80:2-14, 81:8-15).

There is also circumstantial evidence of causation.  "[C]lose temporal proximity between two events may give rise to an inference of causal connection."  *Nethersole*, 287 F.3d at 20 (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 168 (1st Cir. 1998).  Here, plaintiff was placed on administrative leave and then involuntarily retired shortly after he testified; the hearing was on February 17, 2017, and by March 14, he had been interviewed about his testimony and placed on leave.

Under the circumstances, that evidence is sufficient to satisfy the standard.  Specifically, plaintiff has succeeded in putting forth sufficient proof to establish a causal relationship between his testimony and the decision to place him on leave and, ultimately, to involuntarily retire him. The burden therefore shifts to the defendants to show that they would have taken the same action even in the absence of the protected conduct.

### (2)  <u>Whether Defendants Would Have Taken the Same Action Regardless</u>

Defendants contend that "any reasonable employer" would have placed plaintiff on leave and involuntarily retired him once his testimony revealed that he had PTSD.  (Defs. Mem. at 20). Thus, plaintiff's testimony contained both protected speech (the criticism of the department) and the reason why defendants say they would have taken the same adverse employment actions regardless of that speech (the revelation that he had PTSD).

There is a genuine dispute of material fact as to whether defendants would have taken

those adverse actions anyway.  The circumstantial evidence of causation cuts both ways.  The reason that plaintiff was put on leave and involuntarily retired shortly after his testimony may have been that he revealed his PTSD.  Or it may have been that he disparaged the police department.  It may have been both.  But Chief Splaine's comments about the testimony show that plaintiff's criticism of the department was, at least in part, a reason he was put on leave and then involuntarily retired.  On those facts, there is a genuine dispute of material fact as to whether Chief Splaine would have put plaintiff on leave and involuntarily terminated him, even if his PTSD had been disclosed, absent his testimony about the police department.  Defendants have therefore failed to establish by undisputed evidence that they would have taken the same action even in the absence of protected conduct.

### 2.  Whether Chief Splaine Is Entitled to Qualified Immunity

Defendants contend that even if the § 1983 retaliation claim establishes a constitutional violation, Chief Splaine is entitled to summary judgment on the basis of qualified immunity, because a reasonable official would not have understood that the conduct at issue violated plaintiff's constitutional rights.

The doctrine of qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity is determined according to a two-part test.  *See Pearson v. Callahan*, 555 U.S. 223, 232-33 (2009); *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cir. 2015).  The relevant inquiries are (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct.  *Mitchell*, 790 F.3d at 77.

The court has discretion to decide which of these two steps to address first.  *Pearson v.*

*Callahan*, 555 U.S. 223, 236 (2009).  The Supreme Court has "detailed a range of circumstances in which courts should address only the immunity question," and thus skip to the second step. *Camreta v. Greene*, 563 U.S. 692, 707 (2011); *see Pearson*, 555 U.S. at 236-242 (discussing factors).  "But it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials." *Camreta v. Greene*, 563 U.S. 692, 707 (2011).

That is the case here.  The analysis above is somewhat fact-intensive, which supports skipping to the second step. *Pearson*, 555 U.S. at 237.  But the well-developed record here enables analysis of the first step without unduly expending judicial resources. *Compare id.* at 237-238.  More importantly, that analysis, while fact-intensive, may provide guidance to public officials about the scope of police officers' right of free speech, which is frequently litigated. *See Camreta*, 563 U.S. at 707-08; *see, e.g.*, *Stuart v. City of Gloucester*, 2019 WL 3082830 (D. Mass. July 15, 2019); *Bettencourt v. Town of Mendon*, 334 F. Supp. 3d 468 (D. Mass. 2018); *Stuart*, 301 F. Supp. 3d at 239-240 (D. Mass 2018).  Accordingly, the Court has started with the first step, finding a triable issue of fact as to whether plaintiff suffered a violation of his right of free speech, and now examines whether any such right was clearly established.

Qualified immunity is often applicable in cases of alleged First Amendment retaliation by a government employer.  That is because the first two elements of the three-part test—whether the plaintiff spoke as a citizen on a matter of public concern and whether his interest in commenting outweighs the government's interest in promoting efficiency—are fact-intensive and can "rarely be considered 'clearly established' for purposes of the *Harlow* qualified immunity standard." *McGunigle v. City of Quincy*, 132 F. Supp. 3d 155, 176 (D. Mass. 2015) (quoting *O'Connor*, 994 F.2d at 917 n.11).

That principle clearly applies here. The question of whether plaintiff spoke as a citizen on a matter of public concern when he testified at Munford's termination hearing is fact-intensive.[12] Thus, even if there were a constitutional violation, Chief Splaine would be entitled to qualified immunity, because objectively reasonable officials would not have understood under the circumstances that the conduct at issue could have violated plaintiff's constitutional right to free speech.

Accordingly, because Chief Splaine is the only named defendant in Count Seven, defendants' motion for summary judgment will be granted as to Count Seven.

## IV.     Conclusion

For the foregoing reasons, defendants' motion for summary judgment is GRANTED as to Counts Three, Six, and Seven, and is otherwise DENIED.

**So Ordered.**

/s/ F. Dennis Saylor, IV
F. Dennis Saylor, IV
Dated: December 10, 2019                                 United States District Judge

---

[12] By contrast, qualified immunity typically does not apply in such cases where the only disputed element is whether the plaintiff's protected speech was the cause of the adverse employment action. *See, e.g., Davison v. Town of Sandwich*, 2017 WL 1115154, at *16 (D. Mass. Mar. 24, 2017). That is because "[d]ecades of law have clearly established that a public employer may not discipline an employee for protected speech." *Bennett v. City of Holyoke*, 230 F. Supp. 2d 207, 227 (D. Mass. 2002).